**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

| | | |
|---|---|---|
| **GOLD RESERVE INC.,** | ) | |
| | ) | |
| Petitioner, | ) | |
| | ) | |
| v. | ) | |
| | ) | Civil Action No. 1:14-cv-02014-JEB |
| **BOLIVARIAN REPUBLIC OF VENEZUELA,** | ) ) | |
| | ) | |
| | ) | |
| Respondent. | ) | |
| | ) | |

**PETITIONER'S OPPOSITION TO RESPONDENT'S
REQUEST TO SET ASIDE ENTRY OF DEFAULT**

Petitioner Gold Reserve Inc. ("Gold Reserve" or "Petitioner") hereby responds to the March 27, 2015 filing by Respondent Bolivarian Republic of Venezuela ("Venezuela" or "Respondent") (D.E. 14).

This case arises from a final and binding arbitral award issued on September 22, 2014, pursuant to the International Centre for Settlement of Investment Disputes (Additional Facility) Rules (the "ICSID Additional Facility Rules"), and the Arbitration (Additional Facility) Rules attached thereto, ordering Respondent to pay Petitioner over $700 million (the "Award"). *See* Petition to Confirm Arbitral Award ("Petition"), D.E. 1 at pp. 1-2 and ¶¶ 36-42. To date, and despite multiple demands, Respondent has not paid Petitioner any of the amounts it owes. In its present filing, Respondent opposes Gold Reserve's request for entry of default and seeks to set aside the Clerk's entry of default. This is nothing but another attempt by Respondent to avoid its obligations.

As a preliminary matter, Petitioner notes that Respondent's opposition to Petitioner's request for entry of default is untimely given that it was filed after the clerk entered default. *See*

D.E. 12 ("Default"). Accordingly, the only issues before the Court are whether Respondent has (i) complied with Local Rule 7(g), governing motions to vacate an entry of default, and (ii) shown "good cause" to set aside entry of default, as required by Fed. R. Civ. P. 55(c). For the reasons set forth herein, it has not.

## BACKGROUND

As set out in greater detail in the Petition to Confirm, Petitioner is a mining company incorporated under the laws of the Province of Alberta, Canada and Respondent is the Bolivarian Republic of Venezuela, a foreign state within the meaning of the Foreign Sovereign Immunities Act ("FSIA"), 28 U.S.C. §§ 1330, 1332, 1391(f), 1441(d), 1602-1611. *See* Petition (D.E. 1) at ¶¶ 2-3.

### A.   Prior Arbitration Between the Parties and Subsequent Proceedings

Respondent consented to arbitrate its disputes with Petitioner in Article XII of the bilateral investment treaty, "Agreement between the Government of Canada and the Government of Venezuela for the Promotion and Protection of Investments," which entered into force on January 28, 1998 (the "BIT"). *See id.* at ¶ 7.

Between 1988 and 2008, companies, ultimately controlled by the Petitioner and/or Petitioner itself, invested hundreds of millions of dollars in exploration and development in gold mining concessions bringing them to the point of production until said investments were unlawfully and effectively taken from it as a result of and by the decisions and actions taken, directed, and supported by the administration of the then-President of Venezuela, Hugo Chávez. *See id.* ¶¶ 17-20; D.E. 2-2 at 10.

Petitioner commenced arbitration proceedings (the "Arbitration") on October 21, 2009, by submitting to ICSID its Request for Arbitration against Respondent under the Additional

Facility Rules. *See id.* at ¶ 21. The arbitration tribunal (the "Tribunal") had its seat in Paris. *See id.* at ¶ 27.

On September 22, 2014, almost five (5) years later, the Tribunal unanimously issued its Award, holding that Respondent failed to accord fair and equitable treatment ("FET") to Petitioner's sizable investment in Venezuela in violation of the BIT, wrongfully revoking permits and rescinding licenses regarding mining concessions and rights held by Petitioner. *See id.* ¶¶ 35-37; D.E. 2-1 through D.E. 2-4 (Award).

On September 26, 2014, Petitioner sent a demand letter to Respondent. *See id.* at ¶ 42.

On or about November 6, 2014, Respondent sought to have the Award corrected by the Tribunal, alleging that, by a succession of "clerical, arithmetical or similar errors", the Tribunal had incorrectly awarded Petitioner an excess of $361 million in damages. *See id.* at ¶ 41 n.8.

On December 15, 2015, the Tribunal unanimously rejected the Respondent's request for correction confirming the final figures of damages awarded to Petitioner under the Award. *See* Decl. of Matthew H. Kirtland ("Kirtland Decl.") (filed herewith), at ¶ 6. With this decision, the Tribunal is now *functus officio*.

Meanwhile, on or about October 22, 2014, the Respondent filed an application to annul the Award before the Paris Court of Appeal. Petitioner responded by filing a motion seeking to have the Award recognized (*exequatur*) by the Paris Court of Appeal. Respondent opposed said motion and sought, in the alternative, a stay of execution of the Award pending the determination of its application to annul the Award. *See id.* at ¶ 7.

Petitioner's motion for exequatur and Respondent's motion in the alternative for stay were heard by a judge from the Paris Court of Appeal and, on January 29, 2015, the Paris Court

of Appeal granted Petitioner's motion for *exequatur* and dismissed Respondent's motion for stay of execution of the Award.  *See id.* at ¶ 8.

### B.     Gold Reserve's Petition to Confirm Arbitral Award

Gold Reserve filed its Petition to Confirm Arbitral Award in this matter on November 26, 2014, seeking to enforce its right to payment from Respondent.  That same day, counsel for Gold Reserve e-mailed counsel for Respondent (Mr. Ronald Goodman of Foley Hoag, the firm that had represented the Respondent in the Arbitration, and which has now entered an appearance on behalf of Respondent in this matter) to provide notice of the filing and inquire whether it would accept service.  *See* D.E. 10-1 at ¶ 4 (Decl. of Matthew Kirtland).  Foley Hoag did not respond to this communication or a follow-up communication on December 8, 2014.  *See id.*  Gold Reserve therefore proceeded to serve Respondent in accordance with the Foreign Sovereign Immunities Act (FSIA), 28 U.S.C. § 1608(a).

The FSIA prescribes several alternate means of service, in descending order of preference.  First, service may be made "in accordance with any special arrangement for service between the plaintiff and the foreign state . . . ."  28 U.S.C. § 1608(a)(1).  This method of service was not available here, because no "special arrangement for service" exists between Gold Reserve and Venezuela.  Thus, Gold Reserve was required to attempt service "in accordance with an applicable international convention on service of judicial documents[.]"  28 U.S.C. § 1608(a)(2). The United States and Venezuela are both parties to the Hague Convention on the Service Abroad of Judicial and Extrajudicial Documents in Civil or Commercial Matters (the "Hague Convention").  Accordingly, Gold Reserve served Respondent in accordance with the Convention.  On December 31, 2014, Gold Reserve's process server dispatched two copies of the relevant papers, in English and translated into Spanish, together with the necessary request

form, to the Ministerio del Poder Popular Para Relaciones Exteriores for the Bolivarian Republic of Venezuela (the Ministry of the People's Power of Foreign Relations, or "Venezuelan Foreign Ministry"), pursuant to Article 3 of the Hague Convention. *See* D.E. 9 at ¶ 3 (Declaration of Rick Hamilton). According to Federal Express tracking records, these documents were received by the Venezuelan Foreign Ministry on January 8, 2015. *See id.* at ¶ 4 and D.E. 9-1.

To comply with the Hague Convention, the Venezuelan Foreign Ministry, which is the Central Authority for Venezuela, was required to return an executed certificate to evidence its receipt of these materials:

> The Central Authority of the State addressed or any authority which it may have designated for that purpose, ***shall*** complete a certificate in the form of the model annexed to the present Convention. The certificate shall state that the document has been served and shall include the method, the place and the date of service and the person to whom the document was delivered. . . .

Hague Convention, Article 6 (emphasis added).[1] It failed to do so. Gold Reserve waited over a month for the Venezuelan Central Authority to send the return certificate and/or respond to its process server's requests for information regarding service. The Venezuelan Central Authority did nothing. *See* D.E. 6 (letter request for service). Gold Reserve therefore proceeded to attempt the next available method of service under the FSIA – service through diplomatic channels.[2] *See id.*

Under 28 U.S.C. § 1608(a)(4), to effect service through diplomatic channels, two copies of the summons and complaint and a notice of suit, together with a translation of each into the official language of the foreign state (in this case, Spanish) must be sent "by any form of mail

---

[1] *See* Hague Convention, *available at* http://www.hcch.net/index_en.php?act=conventions.text&cid=17.

[2] The next method of service under the FSIA is by "any form of mail requiring a signed receipt, to be addressed and dispatched by the clerk of court to the head of the ministry of foreign affairs of the foreign state concerned[.]" 28 U.S.C. § 1608(a)(3). This could not be attempted here because Venezuela has formally objected to service by mail under the Hague Convention.

requiring a signed receipt, to be addressed and dispatched by the clerk of the court to the Secretary of State in Washington, District of Columbia, to the attention of the Director of Special Consular Services[.]" 28 U.S.C. § 1608(a)(4). The Secretary of State is then required to transmit one copy of the papers through diplomatic channels to the foreign state.

On February 12, 2015, Gold Reserve submitted the request for service pursuant to 28 U.S.C. § 1608(a)(4). *See* D.E. 6. The package was dispatched by the Clerk to the State Department on February 19, 2015. *See* D.E. 7, 8.

After this process was underway, on March 2, 2015, counsel for Gold Reserve received a package of documents from its process server containing copies of two letters and what appeared to be the Spanish language copies of the summons, petition, and related documents that had been served on the Venezuelan Foreign Ministry on January 8, 2015, along with two copies of the Hague notice form. *See* Kirtland Decl. ¶ 9.[3] The Hague notice form was date-stamped and contained other notations on the front page indicating receipt and processing by the Venezuelan Foreign Ministry on the same date. *See id.* at ¶ 10 and Ex. 1.[4]

The first letter, written in Spanish, came from the Venezuelan Foreign Ministry, and was directed to the Charge d'Affaires for the Bolivarian Republic of Venezuela in the United States. *See* Ex. 2 (copy of letter in Spanish and translated into English). In this letter, the Foreign Ministry purported to return a "Letter Rogatory" that had been "issued by the United States District Court of the District of Columbia," in this action pursuant to the Hague Convention, so that it "may be sent back to the competent authority of said country." *Id.* The Venezuelan Foreign Ministry claimed that the documents "attached" to the "Letter Rogatory" needed to be

---

[3] The copies of the documents in English served by Gold Reserve were not included in this package.

[4] All exhibit references are to exhibits to the Declaration of Matthew H. Kirtland, filed herewith.

"remedied" because: (1) they were not remitted in original or certified copy and (2) the attached form did not contain a seal from Process Forwarding International. *Id.*

The second letter, written in English, came from the Embassy of the Bolivarian Republic of Venezuela in the United States, and was directed to the United States Department of Justice, Office of Foreign Litigation, in Washington, D.C. *See* Ex. 3. This letter repeated the assertions of the first letter, but in English. *See id.*

These letters confirmed that Respondent had, in fact, been served with the initiating documents in this matter on January 8, 2015. With respect to the two objections raised by Respondent, as explained below, *see infra* at 8-11, they are entirely without merit. With service properly effected on January 8, 2015, Respondent was required to appear and answer the petition sixty days thereafter, i.e., on or before March 9, 2015. *See* 28 U.S.C. § 1608(d). It failed to do so. Gold Reserve therefore properly requested entry of default on March 26, 2015, (D.E. 10), and the clerk properly entered default on March 27, 2015 (D.E. 12).

## ARGUMENT

### I. RESPONDENT HAS FAILED TO COMPLY WITH LOCAL CIVIL RULE 7(g) IN MOVING TO VACATE THE ENTRY OF DEFAULT.

Respondent styles its pleading as an opposition to Petitioner's request for entry of default and a request to "set aside" the Clerk's entry of default. *See* D.E. 14 at 1. The Clerk, however, has already entered default in this action, *see* D.E. 12, so Respondent can only seek to vacate the entry of default pursuant to Fed. R. Civ. P. 55(c).

Respondent has failed to comply with the requirements of Local Civil Rule 7(g). This Rule requires that "[a] motion to vacate an entry of default . . . ***shall*** be accompanied by a verified answer presenting a defense sufficient to bar the claim in whole or in part." LCvR 7(g).

Respondent has not filed a verified answer to the Petition in this case, and therefore, its motion can and should be denied on this ground alone.

Furthermore, for the reasons stated below, Respondent has not established "good cause" to set aside entry of default under Fed. R. Civ. P. 55(c).

## II. RESPONDENT HAS FAILED TO SHOW "GOOD CAUSE" TO SET ASIDE ENTRY OF DEFAULT.

### A. Respondent is in Default Because It was Properly Served on January 8, 2015, and has Failed to Plead or Otherwise Defend this Action.

Respondent's argument is too little, too late. It has known about this action since November 2014, and was properly served with process on January 8, 2015, but failed to timely appear and defend this action.[5] The Clerk properly entered default against Respondent.

#### 1. Respondent was properly served pursuant to 28 U.S.C. § 1608(a)(2) and the Hague Convention on January 8, 2015.

Respondent was properly served under 28 U.S.C. § 1608(a)(2) and the Hague Convention when its Foreign Ministry received the service package on January 8, 2015. Respondent argues that service was not completed because the package was only received by the Venezuelan Central Authority. *See* D.E. 14 at 2. However, Respondent fails to disclose to the Court that its Foreign Ministry, which also serves in the role of Central Authority under the Hague Convention, is the entity which is to be served in the present case. *See* D.E. 9 at ¶ 5 (Decl. of R. Hamilton). As Respondent does not contest that its Foreign Ministry received the service package, Respondent cannot validly argue that service is incomplete.

Respondent's fallback position is that service was not complete because Gold Reserve did not receive an executed certificate of service from the Venezuelan Central Authority. *See* D.E. 14 at 2. This is specious.

---

[5] In fact, the filing by its counsel of a Notice of Appearance and of an opposition on the very same day that Default was entered show that the Respondent has been monitoring the file.

The only reason that Gold Reserve does not have an executed certificate of service is that Respondent willfully and wrongfully failed to execute the certificate of service, as required under the Hague Convention. Under Article 6 of the Convention, the Central Authority *shall* "complete a certificate" stating that the document has been served, together with the method and date of service and the person to whom the document was delivered.[6]

In contravention of its obligations under the Convention, however, Respondent's Central Authority failed to return a completed certificate of service to Petitioner, and instead raised two meritless objections to service.[7] Respondent's first objection is that the documents attached to Gold Reserve's "Letter Rogatory" were not originals or certified copies. *See* Exs. 2, 3. In fact, neither Gold Reserve nor this Court served a "Letter Rogatory" on Respondent. "Letters Rogatory" are the customary means of obtaining judicial assistance from overseas in the *absence* of a treaty or other agreement."[8] Here, what was served on Respondent was a *summons*, not a request for judicial assistance.

Further, and in any event, there is an applicable treaty – the Hague Convention – and Respondent was served with the summons in accordance with its terms. The Convention sets out a straightforward method of service:

> The authority or judicial officer competent under the law of the State in which the documents originate shall forward to the Central Authority of the State addressed a request conforming to the model annexed to the present Convention, without any requirement of legalisation or other equivalent formality.

---

[6] *See* Hague Convention Art. 6, *available at* http://www.hcch.net/index_en.php?act= conventions.text &cid=17.

[7] Although Article 4 of the Hague Convention provides that the Central Authority may "promptly" inform an applicant if it believes that a request for service does not comply with the Convention, as discussed herein, Respondent's Central Authority raised baseless objections that have no grounding in the terms of the Convention.

[8] *See* "Preparation of Letters Rogatory," *at* http://travel.state.gov/content/travel/english/legal-considerations/judicial/obtaining-evidence/preparation-letters-rogatory.html

- 9 -

> The document to be served or a copy thereof shall be annexed to the request. The request and the document shall both be furnished in duplicate.

Hague Convention, Article 3. Nothing in this provision requires service of "original" or "certified" copies – to the contrary, this Article of the Convention specifically contemplates that a "copy" of the document to be served may be annexed to the service request form. *Id.*

Respondent's second objection – that the form sent by Gold Reserve did not contain a "seal" or "stamp" from Gold Reserve's process server – is equally frivolous. The foregoing excerpt from the Hague Convention confirms that nothing requires a "seal" or "stamp" of the process server. To the contrary, the Convention explicitly provides that "legalisation or other equivalent formality" is ***not*** required. *Id.*

Gold Reserve's service on Respondent thus complied with the Hague Convention. As such, Respondent's attempted reliance on its own improper refusal to provide Gold Reserve with a certificate of service under the Hague Convention is misplaced. For Respondent to turn around and attempt to blame Gold Reserve for not providing a certificate of service to the Court borders on bad faith that should not be countenanced. The fact that the Venezuelan Central Authority failed to provide the certificate of service does not mean that service was not validly effected. *Cf.* Fed. R. Civ. P. 4(l) (Failure to prove service does not affect the validity of service."). Certainly it does not constitute the "good cause" required to set aside the entry of default.

### 2. Gold Reserve's Pursuit of Service Pursuant to 28 U.S.C. § 1608(a)(4) Was Proper.

Respondent mistakenly suggests that Gold Reserve has improperly pursued service under 28 U.S.C. § 1608(a)(4). *See* D.E. 14 at 3. At the time Gold Reserve proceeded with service under section (a)(4) of the FSIA, it had not received ***any*** response from the Venezuelan Foreign Ministry to its service request under section (a)(2). *See* D.E. 6. It therefore was proper for Gold Reserve to attempt another method of service on Venezuela. Contrary to Respondent's

suggestion, *see* D.E. 14 at 3, n. 4, the FSIA does not require Gold Reserve to wait any particular period of time for service to be effected under section (a)(2) before attempting another method of service. That Gold Reserve waited over one month for Respondent to comply with its obligations under the Hague Convention and return the certificate of service was more than reasonable. Once again, Respondent's attempt to rely on the protections of the Hague Convention, while willfully evading its own obligations under the Convention, should not be countenanced.

> **B.     Because Respondent's Default Was Willful, Petitioner Will Be Prejudiced if Entry of Default is Set Aside, and Respondent has not Identified Any Defenses to this Action, Respondent Has Not Established "Good Cause" to Set Aside the Entry of Default.**

The relevant facts supporting the entry of default are straightforward: (1) Respondent was properly served on January 8, 2015; (2) it therefore was required to appear and defend by March 9, 2015; and (3) it failed to do so. The Clerk therefore properly entered default. Respondent's only response now is to raise two points under the Hague Convention that lack merit.

Under Fed. R. Civ. P. 55(c), a court has discretion to "set aside an entry of default for good cause." Default judgments are generally disfavored by courts "perhaps because it seems inherently unfair to use the court's power to enter and enforce judgments as a penalty for delays in filing." *Jackson v. Beech*, 636 F.2d 831, 835, (D.C. Cir. 1980). A court considering whether to set aside an entry of default must balance three factors: "whether (1) the default was willful, (2) a set-aside would prejudice the plaintiff, and (3) the alleged defense was meritorious." *Jackson*, 636 F.2d at 836. When balancing these factors, "all doubts are resolved in favor of the party seeking relief." *Id.*

The Jackson factors compel denying Respondent's motion. "A finding of bad faith is not a necessary predicate to the conclusion that a defendant acted 'willfully.'" *Int'l Painters & Allied Trades Union & Indus. Pension Fund v. H.W. Ellis Painting Co., Inc.*, 288 F. Supp. 2d 22, 26 (D.D.C. 2003) (citation omitted). "The boundary of willfulness lies somewhere between a case involving a negligent filing error, which is normally considered an excusable failure to respond, and a deliberate decision to default, which is generally not excusable." *Id.* (citation omitted). Respondent made the deliberate choice to both disregard valid service and not answer or otherwise defend this action, and its default is willful.

Second, Petitioner would be prejudiced if the entry of default is set aside, as Respondent would continue to avoid its legal obligation to pay Petitioner the amount determined in the underlying arbitral award, and Petitioner would be forced to expend further time and money to enforce the binding award. *See id.* at 31 ("Although 'delay in and of itself does not constitute prejudice,' . . . forcing a party to expend further time and money to collect on a claim as to which there are no meritorious defenses unfairly prejudices plaintiff to some degree.") (internal citation and citation omitted).

Third, Respondent has not set out any defense to the Petition to Confirm Arbitral Award, much less one that is meritorious. In these circumstances, even with all doubts resolved in Respondent's favor as required by *Jackson*, the entry of default should stand. *See generally Biton v. Palestinian Interim Self-Gov't Auth.*, 252 F.R.D. 1, 1 (D.D.C. 2008) ("[D]ecisions deliberately made' are not grounds for relief from default even when 'subsequent events reveal that such decisions were unwise.'") (citation omitted).

Finally, Petitioner also argues that entry of default is improper because, under the second paragraph of Article 15 of the Hague Convention, Gold Reserve must wait six months before

seeking a default, and not without first making an effort to resolve the objections raised by the Venezuela Central Authority. *See* D.E. 14 at 4-5. Again, neither of Respondent's arguments has merit. First, the *first* paragraph, not the *second* paragraph, of Article 15 of the Hague Convention applies here. According to that provision, where the defendant has not appeared, judgment shall not be given until it is established that "the document was actually delivered to the defendant . . . by another method provided for by this Convention, and that . . . the service or the delivery was effected in sufficient time to enable the defendant to defend." As discussed above, the documents served by Petitioner were actually delivered to Respondent on January 8, 2015, providing Respondent with more than sufficient time to defend. Second, nothing in the Hague Convention requires Petitioner to "attempt to resolve or address" the objections made by the Venezuela Central Authority when, as here, delivery was made on the Respondent and the objections raised by the Central Authority are frivolous.

Respondent was properly served in accordance with the FSIA and the Hague Convention, and default was properly entered based on Respondent's failure to appear and defend this action. Respondent has failed to show good cause for setting aside the entry of default.

## CONCLUSION

WHEREFORE, Respondent's request to set aside the entry of default should be denied.

Dated:  March 30, 2015                                         Respectfully submitted,

/s/ Matthew H. Kirtland
Matthew H. Kirtland (D.C. Bar # 456006)
matthew.kirtland@nortonrosefulbright.com
Caroline M. Mew (D.C. Bar #467354)
caroline.mew@nortonrosefulbright.com
NORTON ROSE FULBRIGHT US LLP
801 Pennsylvania Avenue, NW
Washington, D.C. 20004-2623
Telephone:  (202) 662-4659
Facsimile:  (202) 662-4643

*Attorneys for Petitioner Gold Reserve Inc.*