**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT COLUMBIA**

GOLD RESERVE INC.,

          Petitioner,

          v.

BOLIVARIAN REPUBLIC OF VENEZUELA,

          Respondent.

)
)
)
)
)
)
)
)
)
)
)
)

Civil Action No. 1:14-cv-02014-JEB

**RESPONDENT BOLIVARIAN REPUBLIC OF VENEZUELA'S MOTION TO DISMISS
PETITION AND TO DENY RECOGNITION OF ARBITRAL AWARD, OR IN THE
ALTERNATIVE, TO STAY ENFORCEMENT, WITH INCORPORATED
MEMORANDUM OF POINTS AND AUTHORITIES
<u>(ORAL HEARING REQUESTED)</u>**

# **TABLE OF CONTENTS**

TABLE OF CONTENTS ..................................................................................................... i

TABLE OF AUTHORITIES ............................................................................................. ii

INTRODUCTION ............................................................................................................. 1

BACKGROUND ............................................................................................................... 4

      A.     The Mining Concessions ..................................................................... 4

      B.     The Arbitration .................................................................................... 6

ARGUMENT ................................................................................................................... 18

   **1.**     RECOGNITION OF THE AWARD SHOULD BE DENIED UNDER
          ARTICLE V OF THE NEW YORK CONVENTION ......................... 18

      A.     The Award Exceeds The Scope of Venezuela's Consent To
            Arbitration ......................................................................................... 19

      B.     The Tribunal Violated Venezuela's Due Process Rights In Its Conduct
            Of The Hearing .................................................................................. 25

      C.     The Award Is Contrary To Public Policy Of The United States
            Because It Assesses Punitive Damages Against A Foreign State ......... 29

   **2.**     IF THE COURT DOES NOT REFUSE RECOGNITION OF THE AWARD,
          ENFORCEMENT SHOULD BE STAYED TO ARTICLE VI OF THE NEW
          YORK CONVENTION ....................................................................... 33

      A.     The Annulment Action Pending Before the Paris Court of Appeal .......... 33

      B.     Enforcement Should be Stayed ........................................................... 37

CONCLUSION ................................................................................................................ 44

STATEMENT PURSUANT TO LCVR 7(M) .................................................................. 44

CERTIFICATE OF SERVICE ........................................................................................ 45

## **TABLE OF AUTHORITIES**

**Authority**                                                                                     **Pages**

<u>Court Opinions</u>

*Alto Mar Girassol v. Lumbermens Mut. Cas. Co.*, No. 04 C 7731, 2005 U.S.        39, 40, 41,
Dist. LEXIS 7479 (N.D. Ill. Apr. 12, 2005)                                                       43

*Belize Soc. Dev. v. Gov't of Belize*, 668 F.3d 724 (D.C. Cir. 2012)                     40

*Berkenhoff GmbH v. Global Trade Network, Inc.*, No. 1:11-cv-00475, 2012           39
U.S. Distr. LEXIS 11579 (W.D. Ohio, Jan. 31, 2012)

*Chevron Corp. v. Republic of Ecuador*, 949 F. Supp. 2d 57 (D.D.C. 2013)          40, 43

*Continental Transfert Technique Ltd. v. Fed. Gov't of Nigeria*, 697 F. Supp.        40
2d 46 (D.D.C. 2010)

*Dole Food Co. v. Patrickson*, 538 U.S. 468 (2003).                                          24

*D.R.C. Inc. v. Republic of Honduras*, 774 F. Supp. 2d 66 (D.D.C. 2012)          40, 42

\*   *Europcar Italia, S.P.A. v. Maiellano Tours,* 156 F.3d 310 (2d Cir. 1998)        39, 40, 43

*G.E. Transp. S.p.A. v. Republic of Albania*, 693 F. Supp. 2d 132 (D.D.C.          40
2010)

*Generica Ltd. v. Pharameutical Basics*, 125 F.3d 1123 (7th Cir. 1997)             26

*Hertz Corp. v. Friend*, 559 U.S. 77 (2010)                                                   23

*Higgins v. SPX Corp.*, Case No. 1:05-cv-846, 2006 U.S. Dist. LEXIS 20771         41
(W.D. Mich. Apr. 18, 2006)

*In re Microsoft Corp.*, 630 F.3d 1361 (Fed. Cir. 2011)                                    23

*Int'l Trading & Indus. Inv. Co. v. DynCorp Aero Tech.*, 763 F. Supp. 2d 12         19
(D.D.C. 2011)

*Iran Aircraft Industries v. Avco Corp.*, 980 F.2d 141 (2d Cir. 1992)                 26, 27

*Jorf Lasfar Energy Co., S.C.A. v. AMCI Exp. Corp.*, Civil Action No. 05-           41
0423, 2005 U.S. Dist. LEXIS 34969 (W.D. Pa. Dec. 22, 2005)

*Laminoirs-Trefilerie-Caleries de Lens, S.A. v. Southwire*, 484 F. Supp. 1063        33
(N.D. Ga. 1980)

**Authority**                                                                                      **Pages**

*Miller & Lux, Inc. v. East Side Canal & Irrigation Co.*, 211 U.S. 293 (1908)                          23

*PCH Mut. Ins. Co v. Cas & Sur. Inc.*, 750 F. Supp. 2d 125 (D.D.C. 2010)                               21

*Scherk v. Alberto-Culver Co.*, 417 U.S. 506 (1974)                                                    28

*Sec. Indus. & Fin. Mkts. Ass'n v. United States CFTC*, Civil Action No. 13-                           24
1916, 2014 U.S. Dist. LEXIS 130871 (D.D.C. Sep. 16, 2014)

*Shu-Tao Lin v. McDonnell Douglas Corp.*, 742 F.2d 45 (2d Cir. 1984)                                   29

*Slaney v. Int'l Amateur Ath. Fed'n*, 244 F.3d 580 (7th Cir. 2001)                                     26

*Spier v. Calzaturificio Tecnica, S.p.A.*, 663 F. Supp. 871, 875 (S.D.N.Y.                             38
1987)

*Tempo Shain Corp. v. Bertek*, 120 F.3d 16 (2d Cir. 1997)                                              27

*Weinstein v. Islamic Republic of Iran*, 184 F. Supp. 2d 13 (D.D.C. 2002)                              32


Arbitration Awards

*Phoenix Action Ltd. v. Czech Republic*, ICSID Case No. ARB/06/05, Award,                              23
15 April 2009.


Statutes

9 U.S.C. §201 *et seq.*                                                                                19

28 U.S.C. §1606                                                                                      3, 33

\*   Décret n° 2011-48 du 13 janvier 2011 portant réforme de l'arbitage                          28, 34, 35,
                                                                                                     36, 37


International Conventions and Treaties

\*   Agreement Between the Government of Canada and the Government of the                         21, 22, 24,
     Republic of Venezuela for the Promotion and Protection of Investments                       31, 35, 37,
     ("BIT").                                                                                          38

| **Authority** | **Pages** |
| --- | --- |
| *    The United Nations Convention on the Recognition and Enforcement of Foreign Arbitral Awards of 1958 ("The New York Convention") | 19, 20, 26, 30, 33 |


<u>Treatises</u>

| | |
| --- | --- |
| *Draft Articles on Responsibility of States for Internationally Wrongful Acts, with Commentaries*, 2001. | 31 |

**<u>INTRODUCTION</u>**

By its petition, Gold Reserve Inc. ("Gold Reserve") asks this Court to recognize a massive arbitral award (the "Award"), in excess of $700 million, that was made against the Bolivarian Republic of Venezuela ("Venezuela") pursuant to the dispute resolution procedures set out in the bilateral investment treaty between Venezuela and Canada.  The arbitration in question was seated in Paris, France, governed by French arbitration law, and conducted under the judicial supervisory authority of the courts in Paris.  It is currently the subject of litigation pending before the Paris Court of Appeal, which must determine whether the Award should be annulled because of the numerous and serious defects that infected the arbitral process and resulting Award.

Rather than wait for the Court in Paris to determine whether the Award is a nullity, Gold Reserve seeks recognition of the Award now.  Its reason for doing so is transparent.  Gold Reserve hopes that, if it can obtain immediate recognition of the Award from this Court, it can render the French annulment proceeding moot by using that recognition as the basis for attaching Venezuelan state assets before there is an opportunity for the Court in Paris to annul the Award.

Gold Reserve's attempt to achieve this end-run around the annulment proceeding should be rejected.  There are at least four reasons for doing so, all supported by the Convention on the Recognition and Enforcement of Foreign Arbitral Awards of 1958 (the "New York Convention"), which governs whether an arbitral award should be recognized abroad.

First, the arbitral tribunal (the "Tribunal") had no jurisdiction to arbitrate the dispute.  Venezuela's consent to arbitrate was limited to the circumstances set out in its bilateral investment treaty with Canada.  Among the relevant conditions imposed by the treaty are the requirements that the party seeking arbitration must be a "Canadian enterprise" and have made an investment in Venezuela.  Gold Reserve satisfies neither.  It is an American enterprise, based

in Spokane, Washington; the company has never had any operations or personnel in Canada.

Nor did Gold Reserve ever make an investment in Venezuela.  Instead, seven years after the

Venezuelan subsidiary of an American company had acquired another Venezuelan company

which held mining concession rights in Venezuela, Gold Reserve manipulated its internal

corporate structure so that a Canadian subsidiary of the American parent was transformed into

the parent company, giving it an indirect ownership stake in the Venezuelan concession holder.

No money or other form of investment ever flowed from Canada to Venezuela.

Second, the plain language of Venezuela's treaty with Canada prohibits arbitral tribunals

from awarding to an investor compensation for losses incurred by a subsidiary, requiring instead

that any compensation must be awarded to the subsidiary itself.  The treaty is unmistakable about

this.  Article XII(9) provides: "Where an investor brings a claim . . . regarding loss or damage

suffered by an enterprise the investor directly or indirectly owns or controls any award shall be

made to the affected enterprise."  Despite the treaty's clear and unambiguous requirement that

compensation be awarded only to the subsidiary, the Tribunal awarded Gold Reserve over $700

million for damages allegedly suffered by a third-tier subsidiary.

Third, the procedures adopted by the Tribunal were grossly unfair and deprived

Venezuela of fundamental due process rights.  Among other things, Venezuela asked for a

modest delay in the start of the oral hearings so that its newly appointed Attorney General, who

had assumed office due to the unexpected death of the incumbent, could be adequately briefed.

This was important because the Attorney General had personal responsibility for its oversight.

In response, in granting the request, the Tribunal dictated that Venezuela would not have the

same amount of time as Gold Reserve to present its case at the oral hearings.  Further, despite the

fact that the parties had agreed upon the appropriate methodology for determining the precise

quantum of damages, the Tribunal failed to apply the agreed-upon methodology.  Instead, it employed its own means for determining damages, even though the means it chose were, according to the Tribunal itself, capable of producing only a rough estimate.  Compounding this error, the Tribunal did not provide Venezuela with a meaningful opportunity to present arguments on the Tribunal's unilaterally adopted and imprecise approach for determining the amount of damages that Venezuela owed.  This, despite the fact that Gold Reserve also challenged the Tribunal's approach.

Fourth and finally, the Tribunal imposed on Venezuela what amounts to punitive damages based on what it considered to be "equitable" considerations.  It did this even though such damages are prohibited by the applicable law.  They are also unenforceable under the express terms of the Foreign Sovereign Immunities Act, which states that "a foreign state . . . shall not be liable for punitive damages."  28 U.S.C. § 1606.

Notwithstanding the above, should this Court still decide to grant Gold Reserve's petition for recognition, enforcement of the award should be stayed pending completion of the annulment proceeding now pending before the Paris Court of Appeal, as allowed by Article VI of the New York Convention.  That Court is the only judicial institution in the world with the competence to determine whether the award should be annulled.  There are serious grounds for annulling the Award under French arbitration law, which requires the Paris Court to scrutinize it thoroughly.

The annulment action in Paris has reached a relatively advanced stage, and is likely to be completed by late 2015.  If enforcement is not stayed, Gold Reserve will undoubtedly commence enforcement actions in jurisdictions throughout the United States, against which Venezuela will be forced to defend itself.  There is a significant risk that, if authorized by this Court, Gold Reserve will be able to secure attachment of Venezuelan state assets prior to the Paris Court's

completion of the annulment proceeding, which may well result in the vacatur of the Award.

Were this to occur, there is an equally serious risk that Gold Reserve, which is a shell company

with no actual operations, will be able to transfer Venezuela's assets to other entities, making it

difficult—if not impossible—for Venezuela ever to recover them in the event of annulment.

## **BACKGROUND**

### A.      **The Mining Concessions**[1]

On April 18, 1988, Venezuela's Ministry of Mines[2] granted a mining concession to a

Venezuelan company, Compania Aurifera Brisas Cuyuni, C.A. (the "Brisas Company") that

covered the near-surface gold resources located within the 500-hectare Brisas property in

southeastern Venezuela (the "Brisas Concession").  *Gold Reserve v. Bolivarian Republic of*

*Venezuela*, ICSID Case No. ARB(AF)/09/1, Award, 22 September 2014 (the "Award") (Dkt. 2-1

through 2-4) ¶ 11.  The Brisas Concession was for a 20-year term and could be renewed for two

additional 10-year terms.  *Id.*

In 1992, the Brisas Company was acquired by Gold Reserve de Venezuela ("Gold

Reserve Venezuela"), a Venezuelan subsidiary of an American company, Gold Reserve

Corporation ("Gold Reserve US").  *Id.*

In March 1998, the Brisas Company secured a concession from Venezuela's Ministry of

Mines to extract gold, copper and molybdenum from the hard rock lying beneath the Brisas

Concession (the "Unicornio Concession").  *Id. ¶* 12.  The Unicornio Concession was for a period

of 20 years, and could be extended for two additional ten-year terms.  *Id.*

---

[1] The factual background set out above serves to provide the context to Venezuela's arguments against recognition. In describing the facts found by the Tribunal, Venezuela does not concede their accuracy, or waive its rights to challenge any such facts in this or any future hearing or proceeding.

[2] The Ministry of Mines was previously known as the Ministry of Energy and Mines and then subsequently the Ministry of the People's Power for Basic Industries and Mining.

Claimant also claimed the right to use various other mining parcels surrounding the Brisas and Unicornio Concessions for infrastructure and services for the exploitation of the Brisas Project.  *Id*. ¶¶ 275–76.  These include the North Parcel (which became central in the Joint Expert Procedure, discussed *infra*), as well as other parcels: Bárbara, Zuleima, NLEAV1, NLSAV1, Esperanza, Yusmari, El Pauji, Morauana, Venamo, Cuyuni and Mireya.  Claimant referred to these, as well as the Brisas and Unicornio Concessions, as the "Brisas Project."  *Id*.

In October 1998, petitioner Gold Reserve was incorporated in the Yukon Territory of Canada as a wholly-owned subsidiary of Gold Reserve US.  *Id. ¶¶* 11, 235.  At the time of its incorporation, Gold Reserve had no ownership stake—direct or indirect—in either Gold Reserve Venezuela or that company's subsidiary, the Brisas Company (which held the Brisas and Unicornio Concessions.)  *See id.*

On January 28, 1998, Venezuela's bilateral investment treaty with Canada  came into force.  *Id.* ¶ 4.  Shortly thereafter, in February 1999, a corporate reorganization reversed the parent-subsidiary relationship between Gold Reserve US and Gold Reserve.  *Id.* ¶¶ 11, 235.  Under the new corporate structure, Gold Reserve became the parent company of Gold Reserve US, and thus, indirectly (through Gold Reserve US and Gold Reserve Venezuela), the parent of the Brisas Company, which continued to hold the Brisas and Unicornio Concessions.  *Id.*  No money transfer or flow of funds into Venezuela resulted from the restructuring which took place through a share-to-share swap outside of Venezuela.  *Id.* ¶ 256.

Even after the corporate reorganization, Gold Reserve continued to function as an American enterprise.  It never maintained operations in Canada.  Its only contact there was a registered agent at a Canadian law firm.  *Id.* ¶ 233.  Gold Reserve continued to have the same management and board of directors as the earlier parent company, and continued to make

decisions concerning the Brisas Concession from its office in Spokane, Washington.  *Id.*  Its

registered office remained in Washington.  *Id.* ¶ 1.  Gold Reserve did not, and does not, carry on

any business in Canada, and has no offices, employees or physical assets there.  *Id*. ¶ 228.

Under Venezuelan law, holders of mining concessions must comply with applicable

mining and environmental laws.  *See id.* ¶ 8.  In regard to the Brisas Company, this included the

obligation to begin exploiting the Brisas Concession within three years of it being granted, and to

begin exploiting the Unicornio Concession within seven years.  *Id.* ¶¶ 402, 432.

The Brisas Company failed to comply with its mining and environmental obligations.  As

a result, Venezuela terminated the Brisas Concession on May 25, 2009, and terminated the

Unicornio Concession on June 17, 2010.  *Id.* ¶¶ 26, 28.  It also revoked the partial environmental

permit it had granted for use on the Brisas Concession.  *Id.* ¶ 24.

### B.    The Arbitration

#### 1.    The Request For Arbitration

On October 21, 2009, Gold Reserve initiated an arbitration against Venezuela under the

arbitration rules of the International Centre for Settlement of Investment Disputes (Additional

Facility) ("ICSID Additional Facility").  Request for Arbitration (Dkt. 2-6) at 1.  Despite the fact

that Gold Reserve was an American enterprise and had never made an investment in Venezuela,

it claimed Venezuela had breached various obligations owed to *Canadian* investors under the

"Agreement between the Government Canada and the Government of the Republic of Venezuela

for the Promotion and Protection of Investments" (the "BIT") (Dkt. 2-5), a bilateral investment

treaty between Venezuela and Canada, and invoked the dispute resolution procedures available

under that treaty.

In particular, Gold Reserve alleged that Venezuela had:

- failed to provide its investment with fair and equal treatment, in breach of Article II(2);

- failed to provide its investment with full protection and security, in breach of Article II(2);

- failed to treat its investment no less favorably than investments from other countries, in breach of Article III; and

- expropriated its investment, in breach of Article V.

Request for Arbitration ¶¶ 77–79.

The Request for Arbitration did not specify the amount of Gold Reserve's alleged damages, but characterized them as "sizeable" and "substantial." *Id.* ¶ 80. In July 2011 in its reply in the arbitration, Gold Reserve quantified its damages claim at $2,083,819,000. *See* Declaration of Mélida Hodgson ("Hodgson Decl.," filed herewith as Exhibit A) ¶ 14.

On December 22, 2010, following the appointment of the arbitrators and their acceptances of appointment, Venezuela submitted a timely objection to the Tribunal's jurisdiction on the ground that Gold Reserve could not avail itself of Venezuela's offer to arbitrate disputes under its BIT with Canada because Gold Reserve was neither a Canadian enterprise, nor had it made an investment in Venezuela, both of which are requirements for the Tribunal to be able to exercise jurisdiction over a claim against Venezuela. Award ¶¶ 222–233.

Simultaneously with its jurisdictional objections, Venezuela requested that the proceedings be suspended while its objections were pending. On February 25, 2011, the Tribunal declined to suspend the proceedings, and ruled that Venezuela's jurisdictional objections would be joined with the merits of the arbitration. *Id.* ¶ 103.

### 2.      The Oral Hearings

The parties and the Tribunal agreed during an April 23, 2010 teleconference that the hearing would begin on December 5, 2011 and that ten days would be reserved for the hearing.

*Id.* ¶ 41, 65.  On November 3, 2010, the Tribunal informed the parties that the selected dates

would no longer work for the Tribunal and, a week later, informed them that the hearing would

take place on February 6–17, 2012.  *Id.*  On November 21, 2011, the Tribunal again postponed

the hearing until February 9, 2012 due to its unavailability, and proposed sitting on Saturday,

February 11, 2012 to make up one of the three lost days.  *Id.* ¶ 69.  The proposal was adopted by

the Tribunal on November 30, 2011.  *Id.* ¶ 71.

On January 9, 2012, consistent with the bedrock principle in international arbitration of

equal treatment, the parties requested that during the hearings "time should be shared equally."

*Id.* ¶ 73.  This was enshrined in the Procedural Rules for the Hearing on Jurisdiction and the

Merits adopted on 18 January 2012, Article 2.1 of which provided: "The hearing shall proceed

on the basis of an equal share of the available hearing time."  Hodgson Decl. at Annex 1 (Jan. 18,

2012 Procedural Rules).

On January 26, 2012, counsel for Venezuela informed the Tribunal that Venezuela's

Attorney General, Dr. Carlos Escarrá Malavé, who was "the official and only representative of

Venezuela in cases before ICSID," had unexpectedly died the previous day.  Award ¶ 75; *see*

*also* Hodgson Decl. at Annex 2 (Jan. 26, 2012 Goodman letter to Tribunal).  Venezuela's

counsel explained that he was working with counsel for Gold Reserve in regard to the impact this

might have on the hearing, but that he was limited in his ability to make any agreement on behalf

of Venezuela until it could be confirmed with his client's new representative.  *Id.*  The Tribunal

responded that it "understands the problem you mention due to this sad and unexpected event."

*Id.* at Annex 3 (Jan. 27, 2012 Tribunal letter to Goodman).

On February 1, 2012, counsel for Venezuela informed the Tribunal that a new Attorney

General had been appointed, who would have "direct responsibility for the arbitration."  *Id.* at

Annex 4 (Feb. 1, 2012 Goodman email to Tribunal).  Since the new Attorney General required a brief interval to "review urgent pending matters" and to "be briefed on this case," Venezuela requested that commencement of the hearing be delayed by four days, until Monday, February 13.  It explained that the hearing could still be completed by February 17.  This was because, as is often the case in international arbitration, it was not necessary to have live testimony in light of the extensive written statements of the witnesses and experts which had been presented to the Tribunal.  *Id.*

Gold Reserve responded the same day by objecting to Venezuela's request if it would reduce Gold Reserve's time to conduct direct examination of its witnesses or cross-examination of Venezuela's witnesses.  *Id.* at Annex 5 (Feb. 1, 2012 Smutny letter to Tribunal).  In response, Venezuela maintained its position as to the delayed start of the hearing and observed that Gold Reserve's desire to have live testimony from its own witnesses was contrary to both an agreement that had been reached by the parties during the first procedural hearing and the procedural rules.  *Id.* at Annex 6 (Feb. 2, 2012 Goodman email to Tribunal).  The email concluded, "In any event, we are confident that, whatever might be the Tribunal's eventual rulings on that issue, it will be able to allocate time equitably and efficiently as between the parties, giving both parties an adequate opportunity to present their cases."  *Id.*

On February 2, 2012, the Tribunal agreed to delay commencement of the hearing, which would have the effect of shortening it.  However, to Venezuela's surprise, despite the fact that Rule 2.1 of the agreed-upon procedural rules required that the time allocated for the hearing be divided equally, the Tribunal cast aside this rule of fundamental fairness, ordering:

> The principle of equal sharing of the available hearing time set forth in Rule 2.1 of the Procedural Rules for the Hearing does not apply in this new situation, which is attributable to Respondent [Venezuela].  Claimant [Gold Reserve], therefore, is entitled to more than one-half of the five hearing days.

Award ¶ 77.

On February 7, 2012, Venezuela recorded its objection to this ruling, writing to the

Tribunal:

> Respectfully, Venezuela cannot waive the principle of equality of time, a
> fundamental element of its right to due process, and therefore does not accept that
> Rule 2.1 of the Procedural Rules for the Hearing (the principle of equal sharing of
> time) agreed to by the parties and the Tribunal, should now be changed to its
> detriment, apparently for requesting a change in the start of the hearing as a result
> of unique and extenuating circumstances.  We respectfully suggest that Claimant
> is not, as the Tribunal says "entitled" to more time than one-half of the five
> hearing days, simply because the hearing start date has been changed.  Rather,
> both parties need to be given an adequate and equal opportunity to present their
> cases, in the context of the existence already of massive and multiple pleadings
> and witness and expert statements.

Hodgson Decl. at Annex 8 (Feb. 7, 2012 Goodman email to Tribunal).  Venezuela therefore

requested "that the principle of equal time for both sides be respected."  *Id*; Award ¶ 80;

Nonetheless, on February 8, 2012, the Tribunal confirmed what it had said on February 2,

2012; Gold Reserve would be given a disproportionate share of the time allocated for the

hearings.  Award ¶ 82.  Those hearings were held on February 13–17, 2012.  *Id.* ¶ 112.

### 3.      The Parties' Agreement On The Proper Method Of Calculating Damages

On July 25, 2012, more than five months after the completion of the hearing on

jurisdiction and merits and following numerous post-hearing submissions by the parties, the

Tribunal issued an order "invit[ing] the Parties to request their experts to confer and produce

jointly a report" estimating the fair market value of Claimant's gold mining project assuming

Claimant lacked the right to use a certain parcel of land, referred to as the North Parcel.  Award,

¶¶ 113–127 (*citing* Procedural Order No. 2 of July 25, 2012).

Venezuela objected to the Tribunal's order because this issue had already been

considered by the parties and their experts during the three-year course of the arbitration.  Award

¶ 129; Hodgson Decl. at Annex 10 (Sep. 12, 2012 Venezuela letter to Tribunal).  Venezuela had addressed extensively Gold Reserve's failure to obtain the North Parcel in its first pleading in the arbitration and had reiterated this issue in subsequent written submissions and at the hearing on jurisdiction and merits.  Hodgson Decl. ¶ 15 and Annex 10 (Sep. 12, 2012 Venezuela letter to Tribunal).  Moreover, the Tribunal itself had already asked Gold Reserve to consider the effect of the absence of the North Parcel on Claimant's valuation claim on three prior occasions.  Hodgson Decl. ¶ 10 and Annex 10 (Sep. 12, 2012 Venezuela letter to Tribunal).  Venezuela asserted that Gold Reserve failure to do so was an indication of its inability to carry its burden of proof concerning its claim for damages and that this failure to prove its case should result in a denial of damages, not the opening of an unanticipated, unusual, prolonged and expensive new stage of the arbitration.  *Id*.  Subject to this objection, Venezuela nonetheless decided that it had to comply with the order.  *Id.* ¶ 16; Award ¶ 129.

Over the following year, the parties and their experts sought to implement the Tribunal's request by considering the effect of the absence of the North Parcel on Claimant's valuation claim via a proceeding referred to as the "Joint Expert Procedure."  Hodgson Decl. ¶ 17.  The Joint Expert Procedure substantively encompassed over a year and involved the submission of two rounds of reports by each party's experts wherein they noted their points of agreement and disagreement on the matter; comments on the expert reports by each party; a hearing that took place on 15 and 16 October 2013 in Paris involving the participation of eighteen experts; and post-hearing submissions by the parties in December 2013.  Award ¶¶ 153, 200, 212.

During the Joint Expert Procedure, the parties and their experts confirmed their agreement on the use of a discounted cash flow ("DCF") approach to calculating the fair market value of Claimant's mining project for valuation purposes. Hodgson Decl. ¶ 18; Award ¶ 690.

Both parties' experts based their DCF calculation on a detailed contemporaneous cashflow model developed by a consultant of Claimant in 2008 (the "DCF Model").  Award ¶ 690.

Following the Joint Expert Procedure, there were no further requests by the Tribunal, which declared the arbitration proceedings closed on July 23, 2014.  Award ¶ 221.

### 4.    The Tribunal's Award

The Tribunal rendered the Award on September 22, 2014.  It dismissed Gold Reserve's claim that its investment had been expropriated in violation of Article V of the BIT.  In making this determination, the Tribunal held that Gold Reserve had failed to comply with "an important provision in both Concessions" by failing to "exploit [the Concessions] within the required timeframe."  Award ¶ 667.  Gold Reserve's "failure" in this regard gave Venezuela the "contractual right to terminate" the Concessions.  *Id.*  Accordingly, "termination on this ground," the Tribunal held, "could not be said to be merely 'pretextual,'" and Venezuela's reasons "for terminating the Concessions were sufficiently well founded that the termination cannot be considered as a form of expropriation under international law."  *Id.*

The Tribunal also dismissed the claim that Venezuela had not provided Gold Reserve's investment with full protection and security, as required by Article II(2) of the BIT.  *Id.* ¶ 622. The claim failed because there was "no suggestion" that Venezuela had "failed to protect Claimant's investment from physical harm," as would be required to establish a breach of this obligation.  *Id.* ¶ 623.

Nonetheless, despite having found that Gold Reserve had breached an important requirement of the Brisas and Unicornio Concessions that entitled Venezuela to terminate them, the Tribunal inexplicably found that Venezuela had violated the BIT because it did not accord

"fair and equitable treatment" ("FET") to Gold Reserve's investment, *id.* ¶ 564.[3]  Inconsistent

with other findings, the Tribunal found incorrectly that because the concessions were terminated

close in time, because the Brisas Concession was terminated in the same administrative

procedure as another concession, as well as the fact that because Gold Reserve's partial

environmental permit was revoked, Venezuela had failed to provide fair and equitable treatment.

*Id.* ¶¶ 601, 614–15.

    At a minimum, it is clear that the Tribunal's decision to find that Venezuela had not

accorded Gold Reserve's investment fair and equitable treatment was based in significant part on

its views concerning the political priorities of the Venezuelan Government, which the Tribunal

found were at least partially responsible for the termination of the Concessions.  *See*, *e.g.*, *id.* ¶

590 ("Clearly, the change in policy by Venezuela regarding mineral exploitation, as evidenced

by the numerous announcements and statements made during this period by the highest level of

the Administration, including President [Hugo] Chávez, motivated Respondent's conduct.").  *See*

*also id*. ¶¶ 580, 582, 600, 662.  In so finding, the Tribunal also gave considerable weight to

unreliable press reports.  *See, e.g.*, *id.* ¶ 580 & nn. 490–494, 497.

    In regard to the determination of damages, as described above, both parties agreed that

the proper standard for damages is fair market value (FMV), and further agreed on the

mathematical model that should be used for calculating FMV with precision, namely the "DCF

Model" described above.  The only relevant differences between the parties, as previously

mentioned, concerned the inputs that should be used in the DCF Model.  Despite this agreement,

the Tribunal disregarded the DCF Model in favor of making gross estimations that resulted in a

---

[3] In light of its ruling on FET, the Tribunal declined to address Gold Reserve's claim for breach of the BIT's most favored nation clause.  *Id.* ¶ 632

significant overestimation of the investment's FMV.  *Id.* ¶¶ 772, 842.  And it made these estimations without giving Venezuela the opportunity to present argument on them.

For instance, both Venezuela and Gold Reserve agreed on how the DCF Model should account for the country risk premium that reflects the risk of investing in Venezuela.  *Id.* ¶¶ 841–42.  They parted ways on the value that should be assigned for the risk premium: Gold Reserve maintained it should be just 1.5%, while Venezuela argued that it should be no lower than 6.7%.  The Tribunal selected a 4% country risk premium, which is approximately the midpoint between the parties' respective positions.  *Id.* ¶¶ 840–42.  However, rather than input the 4% value into the agreed-upon model, the Tribunal simply estimated that this reduced the FMV by $130 million, based on the misassumption that the size of the risk premium has a linear impact on FMV, even while conceding that the resulting estimate "might be 'rough.'"  *Id.* ¶ 842.  Venezuela was not accorded an opportunity to present argument on the accuracy of the Tribunal's "rough" estimate, or on whether it would be appropriate for the Tribunal to abandon the parties' agreed upon model for determining FMV.  Hodgson Decl. ¶ 21.  Had the 4% country risk premium been input into the agreed-upon model, it would have reduced the valuation by $104.7 million.  *Id.* ¶ 21.

Similarly, both parties agreed that any period of delay before the mine entered into production is an important factor for determining FMV and further agreed on how this should be addressed in the DCF Model.  Award ¶ 770.  Their difference concerned the length of the delay.  Gold Reserve argued there should be no delay; Venezuela argued for a two-year delay to take account, *inter alia*, of the need for additional environmental permitting.  *Id.* ¶¶ 767–768.  The Tribunal determined that a one-year delay was reasonable.  *Id.*  ¶ 772.  But rather than input that length of time into the agreed-upon model, the Tribunal estimated its financial impact, assuming

that it would result in a reduction by one-half of the impact of a two-year delay, *i.e*, one-half of

$217 million.  *Id.*  It did this despite explicitly acknowledging that this technique yielded "only

an approximation of the financial impact" that was no better than "roughly correct."  *Id.* ¶ 772.

Again, Venezuela was not given the opportunity to present argument on the Tribunal's departure

from the agreed-upon model.  Hodgson Decl. ¶ 25.  Had a one-year delay been inputted into that

model, it would have reduced the valuation by $104.5 million.  Hodgson Decl. ¶ 21.

5.      <strong>The Parties' Attempts To Correct The Award</strong>

On October 31, 2014, Venezuela requested corrections to the Award pursuant to Article

56 of the Arbitration (Additional Facility) Rules, entitling either party to request that the

Secretary-General of ICSID obtain from a tribunal a correction of any clerical, arithmetical or

similar error in an award rendered by that tribunal.  Hodgson Decl. ¶ 25.  Venezuela noted that

there were several significant errors of this nature in the Tribunal's Award, including the

Tribunal's failure to use the DCF Model that had been agreed upon by both Parties in the process

of calculating the effects of its decisions on various assumption units (as discussed in more detail

in Section B.4 on the Award above.)  *Id.* ¶ 21.

Venezuela subsequently supplemented its request to correct the Award on November 5,

2014 with a formal memorandum detailing the clerical, arithmetical or similar errors.  *Id.*  ¶ 21.

Venezuela showed how the correction of the errors it had identified would reduce the

compensation granted to Gold Reserve by $361 million, over half of the $713 million award

granted Claimant.  *Id.*  Venezuela also requested that the Tribunal ask the experts for both Parties

to jointly run the DCF Model they had agreed upon to obtain the most accurate results using the

assumption units the Tribunal had decided upon.  *Id.* ¶ 22.

Gold Reserve also sought to correct the Award.  On November 4, 2014, Gold Reserve

requested that the Tribunal correct its calculation of the effect of the Tribunal's decision on the

cost of the stockpiles on the value of the damages to be awarded Gold Reserve. *Id.* ¶ 23. Gold Reserve asserted that this correction would increase the value of the compensation granted to it by between $34.5 million and $53 million. *Id.*

At the Tribunal's invitation, each Party responded to the other's request for corrections on November 13, 2014. Hodgson Decl. ¶ 24. In its submission of that date, Venezuela requested the opportunity to respond to Gold Reserve's Reply to Venezuela's request for corrections that had been filed on the same day. *Id.* Venezuela also requested a hearing to address the Parties' request for corrections. *Id.* A few days later, on November 17, 2014, the Tribunal informed the Parties that "it does not foresee any further steps in the procedure regarding the Parties' request for corrections of the Award." *Id.* ¶ 25.

The following day, Venezuela objected to the Tribunal's decision to deny it the opportunity to respond to Gold Reserve's comments on Venezuela's request for corrections in written or oral pleadings as a breach of its right to adequately present its case and defend itself. Hodgson Decl . ¶ 25.

Nevertheless, without further consideration of Venezuela's requests, on December 15, 2014, the Tribunal decided not to correct the Award. The decision uncritically adopted much of Gold Reserve's arguments against Venezuela's requested corrections. *Id.* ¶ 26. The decision also held, *inter alia*, that its decision not to use the parties' agreed upon DCF method to calculate the fair market value of Claimant's mining project in favor of its own linear computation was "not an error by the Tribunal, but a deliberate and considered decision based on the expert evidence before it and its own independent judgment." *Id.* ¶ 27. This, despite the Tribunal's earlier recognition at the hearing on the Joint Expert Procedure that the precise method it later adopted in the Award would be imprudent. *Id.* ¶ 27; *see also id.* at Annex 11. Transcript of the

Joint Expert Hearing, at 225–227 ("PRESIDENT: I take it as a warning for lawyers to be careful

how to manage the amounts.  A. (By MR. KACZMAREK [Claimant's expert]): Absolutely".)

### 6.    The Annulment Proceedings In France

On October 20, 2014, Venezuela submitted a notice of petition to set aside the Award to

the Paris Court of Appeal, which has jurisdiction over petitions to set aside arbitration awards

seated in Paris.  Declaration of Thomas Bevilacqua ("Bevilacqua Decl.," attached hereto as

Exhibit B) ¶ 8.  Venezuela's petition challenges the Award based on four grounds: (1) the

Tribunal incorrectly found that it had jurisdiction over this dispute where there was no

investment by a Canadian investor in the territory of Venezuela as required by the BIT; (2) the

Tribunal denied Venezuela due process under French law through inequitable treatment of the

parties, use of a damages calculation that was not open to review and debate by the parties, and

the refusal to allow written reply submissions or oral argument as part of the Award correction

proceedings; (3) the Tribunal disregarded its mandate under French law by ruling in equity rather

than in law; and (4) the Tribunal confused corporate entities by directing an award at a corporate

parent for harm allegedly suffered by a subsidiary in violation of the requirements of the BIT and

fundamental principles of international law.  *Id.* ¶¶ 22–49.

On October 31, 2014, Gold Reserve filed a petition with the Paris Court of Appeal to

confirm the Award.  *Id.*  ¶ 14.  Venezuela opposed confirmation and, in the alternative, moved

for a stay of the Award pending the completion of the set aside proceeding, while Gold Reserve

moved for an order requiring Venezuela to put the judgment in escrow.  *Id.* ¶ 15.  In its order, the

Court of Appeal granted confirmation of the Award and denied other requested pre-judgment

relief.  *Id.* ¶ 16.  Under French law, a court before which a petition for confirmation and

enforcement has been filed must recognize the award if the existence of the award is established

by the party seeking to benefit from it, and provided that recognition and enforcement are not

"manifestly contrary to international public policy." *Id.* ¶ 11 (citing CPC 1514 and 1515). These extremely limited grounds for opposing the issuance of a recognition and enforcement order are readily distinguishable from the much broader set of grounds available to a party seeking to have an award set aside. Recognition and enforcement (*exequatur*) proceedings and setting aside proceedings (*recours en annulation*) are entirely distinct proceedings governed by different legal standards.

The set-aside action is proceeding quickly. Venezuela filed its brief in support of its petition on March 20, 2015; Gold Reserve's response is due on June 18, 2015. *Id.* ¶ 17, 19. Venezuela's reply is due on September 10, 2015, and Gold Reserve's rejoinder is due on October 8, 2015. *Id.* ¶ 19. Oral argument is scheduled for November 3, 2015. *Id.* A judgment is expected by the end of 2015. *Id.* ¶ 20. The Court will announce at the oral argument the date on which it intends to issue its decision. *Id.*

Notwithstanding the ongoing annulment proceeding before the Paris Court of Appeal, on November 26, 2014, Gold Reserve filed the present petition for recognition with this Court. Dkt. 1.

## ARGUMENT

### 1.   RECOGNITION OF THE AWARD SHOULD BE DENIED UNDER ARTICLE V OF THE NEW YORK CONVENTION

This recognition proceeding is governed by the United Nations Convention on the Recognition and Enforcement of Foreign Arbitral Awards of 1958 ("the New York Convention"). The New York Convention is applicable to the courts of the United States pursuant to the Federal Arbitration Act ("FAA"). 9 U.S.C. § 201 *et seq.*

Article V of the New York Convention specifies the grounds under which a court may refuse recognition or enforcement of an arbitral award. *Int'l Trading & Indus. Inv. Co. v.*

*DynCorp Aero. Tech.*, 763 F. Supp. 2d 12, 19 (D.D.C. 2011).  Here, at least three of the grounds for refusal under Article V apply:

(1) the Award addresses matters over which Venezuela has not consented to arbitrate because (a) Gold Reserve is neither a Canadian enterprise nor a party that "ma[de] an investment in" Venezuela, both of which are requirements under the BIT for there to be an arbitration agreement; and (b) the Tribunal awarded damages to Gold Reserve even though the loss allegedly suffered was incurred by its subsidiary (the Brisas Company), which held the Concessions, and the BIT allows only that company, not its corporate parent (Gold Reserve), to be compensated (Art. V(1)(c));

(2) Venezuela was denied due process because (a) the Tribunal entered an order that, by its express terms, gave more time to Gold Reserve to present its case than it did Venezuela; (b) Venezuela was not afforded a meaningful opportunity to present arguments on the Tribunal's methodology for calculating damages, which materially departed from the methodology that the parties had agreed upon; and (c) Venezuela could not respond to Gold Reserve's comments on its submission on corrections (Art. V(1)(b));

(3) recognition of the Award would be contrary to important interests of public policy because (a) it awards compensation to an entity that the express terms of the BIT do not allow to be compensated; and (b) it awards punitive damages even though the applicable law (international law) forbids it from doing so, and this Court is precluded by the Foreign Sovereign Immunities Act from enforcing punitive damages against a foreign state except in extraordinary circumstances not present here (Art. (2)(b)).

### A.     The Award Exceeds The Scope of Venezuela's Consent To Arbitration

Article V(1)(c) of the New York Convention permits a Court to refuse to recognize an arbitral award when:

The award deals with a difference not contemplated by or not falling within the terms of the submission to arbitration, or it contains decisions on matters beyond the scope of submission to arbitration . . . .

New York Convention, Art. V(1)(c).

The Award should not be recognized because it deals with a difference not contemplated by or falling within the terms of the submission to arbitration.  This is because the Tribunal had no jurisdiction over a dispute between Venezuela and a party, such as Gold Reserve, that does not qualify as an investor under the BIT.  Recognition should also be denied for the further reason that the Award contains a decision on a matter beyond the scope of submission to arbitration.  In that regard, the Tribunal awarded compensation to Gold Reserve in contravention of the express terms of the BIT, which allows compensation to be awarded only to the affected entity (the Brisas Company).

### 1.     The Tribunal Lacked Jurisdiction Over Gold Reserve's Dispute With Venezuela

It is axiomatic that an arbitral tribunal may exercise jurisdiction only if the parties to the dispute have consented to arbitration.  *PCH Mut. Ins. Co. v.  Cas & Sur. Inc.,* 750 F.Supp.2d 125, 142 (D.D.C. 2010) ("it is fundamental that arbitration is a matter of consent").  Unlike many arbitrations, where the parties' consent to arbitrate is included in the same instrument (usually a contractual arbitration clause), investment arbitration generally operates differently.  In that context, the State makes a standing offer to arbitrate, often in the dispute resolution provisions of an investment treaty.  The offer to arbitrate is frequently subject to conditions.  An arbitration agreement is concluded only if the investor accepts the State's offer to arbitrate by consenting to arbitration, and fulfills the conditions set out in the treaty.  Here, Venezuela's offer to arbitrate under the BIT extended only to disputes with a party that qualifies as an "investor," as that term

is defined in the treaty.  Because Gold Reserve does not so qualify, the Tribunal had no jurisdiction.

In particular, Article XII of the BIT limits the scope of Venezuela's offer to arbitrate to disputes with an "investor."  That term is defined in the relevant part of Article I(g) of the BIT as "any enterprise incorporated or duly constituted in accordance with applicable laws of Canada, who makes the investment in the territory of Venezuela and who does not possess the citizenship of Venezuela."  BIT Art. I(g).

Gold Reserve does not satisfy the BIT's definition of "investor." To begin with, it is not a *bona fide* Canadian enterprise.  Although it may be formally incorporated in Canada, the company's registered office is in the state of Washington.  Award ¶ 1.  Following the corporate reorganization that put it atop the Gold Reserve corporate structure, the company continued to operate as had the original American parent company, that is, with the same management and board of directors, who continued to make decisions in relation to the Concessions from the company's headquarters in Spokane, Washington.  Its 1999 annual report to shareholders acknowledged that after the reorganization the existing shareholders' ownership interest in the Gold Reserve companies "in aggregate was essentially the same as before the reorganization." The company's filing of a March 31, 2010 Form 10-K, which it submitted to the Securities and Exchange Commission just months after it commenced the arbitration, indicates that it had lost its status as a Canadian "foreign private issuer," by virtue of more than 50 percent of its outstanding voting securities were held by residents of the United States, meaning the Company had to file statements with the SEC like any other US company.  Gold Reserve lacks any real connection to Canada.  It has no offices, employees, or assets there.

Further, to qualify as an "investor" under the BIT, Gold Reserve must have made an "investment" in Venezuela.  BIT Art. I(g).  "Investment" is defined in Article I(f) of the BIT as "any kind of asset owned or controlled by an investor of one Contracting Party either directly or indirectly, including through an investor of a third state, in the territory of the other Contracting Party in accordance with the latter's laws."  Gold Reserve, however, never made such an investment.  When Gold Reserve was incorporated in October 1998—more than halfway through the 20-year term of the Brisas Concession and long after the Brisas Company had breached the requirement that it begin exploiting within three years—it was incorporated as a subsidiary of Gold Reserve US.  It was only the following year, soon after the BIT between Venezuela and Canada came into force, and only through an internal corporate restructuring, that Gold Reserve gained any indirect interest in a Venezuelan company, when the parent-subsidiary relationship between Gold Reserve US and Gold Reserve was reversed.  Even then, there is no evidence that Gold Reserve ever transferred any funds to either of its Venezuelan subsidies (Gold Reserve Venezuela and the Brisas Company).  Indeed, there is no evidence that Gold Reserve ever expended any funds in Venezuela at all.  Put simply, there is no evidence that Gold Reserve did anything that would be considered "mak[ing] an investment" under the plain meaning of those words.

Permitting Gold Reserve to take advantage of protections intended for Canadian investors would be an abuse of rights.  The Tribunal acknowledged—but failed to properly apply—the principle that where the test for nationality is "incorporation," the Tribunal should extend its inquiry beyond just the articles of incorporation to see whether corporate formalities have been abused.  Award ¶ 252.  Abuse occurs when a party uses the legal corporate structure for the purpose of taking advantage of the rights contained in the BIT.  *Phoenix Action Ltd. v. Czech*

*Republic*, ICSID Case No. ARB/06/5, Award, 15 April 2009.[4]  That is what happened here; Gold

Reserve reorganized its corporate structure to put itself in a position of indirect ownership over

Gold Reserve Venezuela so as to bring the Brisas Concession under the BIT.  Notably, it did so

shortly after Venezuela's bilateral investment treaty with Canada came into force and at a time

when the Brisas Company was already in breach of its obligation to exploit the Brisas

Concession.

In short, Gold Reserve failed to satisfy the conditions necessary to qualify as an

"investor" entitled to arbitrate disputes with Venezuela under the BIT.  The Tribunal thus had no

jurisdiction, and for that reason, the resulting Award should not be recognized.

## 2.      Gold Reserve Is Not The Enterprise That Suffered The Alleged Harm

Refusal to recognize the Award is also warranted under Article V(1)(c) of the New York

Convention because the Award contravened the express terms of the BIT by awarding damages

to Gold Reserve for harm allegedly suffered by its indirectly held subsidiary, the Brisas

Company.

The BIT is clear that this may not be done.  Article XII(9) of the BIT provides, in

unmistakable terms, that "where an investor brings a claim under this Article regarding loss or

damage suffered by an enterprise the investor directly or indirectly owns or controls *any award

shall be made to the affected enterprise*."  However, despite the BIT's requirement that

---

[4] United States courts have applied similar tests to prevent a party from manipulating a court's jurisdiction or venue. *See Hertz Corp. v. Friend*, 559 U.S. 77, 97 (2010) ("Indeed, if the record reveals attempts at manipulation — for example, that the alleged 'nerve center' is nothing more than a mail drop box, a bare office with a computer, or the location of an annual executive retreat — the courts should instead take as the 'nerve center' the place of actual direction, control, and coordination, in the absence of such manipulation."); *In re Microsoft Corp.*, 630 F.3d 1361 (Fed. Cir. 2011) (reversing trial court's grant of a venue transfer where plaintiff's offices in Texas did not staff any employees and plaintiff incorporated in Texas just prior to filing suit); *cf. Miller & Lux, Inc. v. East Side Canal & Irrigation Co.*, 211 U.S. 293, 305–06 (1908) (holding that a corporation could not create federal diversity jurisdiction by assigning its claim to an otherwise fictitious subsidiary just for that purpose).

compensation be paid only to an affected subsidiary—not the investor itself—this is precisely what the Tribunal did in the Award.

First, it is incontestable that the Brisas Company, which is "indirectly own[ed]" by Gold Reserve through its ownership interests in Gold Reserve US and Gold Reserve Venezuela, is a separate corporate entity from Gold Reserve. *See* Award ¶ 11. "As a general rule, two separate corporations are regarded as distinct legal entities even if the stock of one is owned wholly or partly by the other." *Sec. Indus. & Fin. Mkts. Ass'n v. United States CFTC*, Civil Action No. 13-1916, 2014 U.S. Dist. LEXIS 130871, at \*60 (D.D.C. Sept. 16, 2014) (quoting 1 William Meade Fletcher et al., Fletcher Cyclopedia of the Law of Corporations §43 (perm. ed., rev. vol 2013)); *see also Dole Food Co. v. Patrickson*, 538 U.S. 468, 474 (2003) (stating that a basic tenet of corporate law is that the corporation and its shareholders are distinct entities).

Second, it is beyond question that the Brisas Company, not Gold Reserve, was the "affected enterprise." The mining concessions that underlie this dispute were awarded to the Brisas Company, not Gold Reserve, which continued to hold them until their termination. It was thus the Brisas Company that was "affected" when the concessions were terminated.

Finally, the Tribunal unquestionably made the Award to Gold Reserve, rather than to the Brisas Company. *See* Award ¶ 863(ii) ("Venezuela shall pay Gold Reserve compensation . . .").

In short, the Tribunal awarded damages to Gold Reserve, not the Brisas Company. This contravened the express terms of Article XII(9) of the BIT. In so doing, the Tribunal decided a matter beyond the scope of the submission to arbitration: the award of damages to an entity not entitled to receive them under the BIT. For that reason, too, the Award should not be recognized.

**B.     The Tribunal Violated Venezuela's Due Process Rights In Its Conduct Of The Hearing**

Recognition of the Award should also be denied because the arbitral process did not comport with fundamental principles of due process.  Under Article V(1)(b) of the New York Convention, recognition of a foreign arbitral award may be denied if the defendant can demonstrate that it was "not given proper notice of . . . the proceedings or was otherwise unable to present his case."  "The defense provided for in Article V(1)(b) 'essentially sanctions the application of the forum state's standards of due process,' and that due process rights are 'entitled to full force under the Convention as defenses to enforcement.'"  *Iran Aircraft Industries v. Avco Corp.*, 980 F. 2d 141, 145 (2d Cir. 1992) (quoting *Parsons & Whittemore Overseas Co., Inc. v. Societe Generale de L'Industrie du Papier (RAKTA)*, 508 F. 2d 969, 975–76 (2d Cir. 1974).)

In order to comply with the requirements of Article V(1)(b), the arbitration must provide a fundamentally fair hearing.  *Slaney v. Int't Amatuer Ath. Fed'n*, 244 F.3d 580, 592 (7th Cir. 2001).  The tribunal must "give each of the parties to the dispute an adequate opportunity to present its evidence and its arguments." *Generica Ltd. v. Pharmaceutical Basics*, 125 F. 3d 1123, 1130 (7th Cir. 1997) (citing *Hoteles Orlando Beach v. Union de Tronquistas*, 763 F.2d 34, 39 (5th Cir. 1974.)  An award should not be recognized pursuant to Article V(1)(b) if a party was denied an opportunity to be heard at a meaningful time and in a meaningful manner.  *Iran Aircraft Industries*, 980 F.2d at 146 (citing *Mathews v. Eldridge*, 424 U.S. 319, 333 (1976)).

Here, the Tribunal deprived Venezuela of due process in three ways.  First, its pre-hearing orders, particularly the February 2, 2012 scheduling order, which it later confirmed on February 8, 2012, over Venezuela's objection, expressly provided for disparate treatment of the parties in a way that no tribunal acting to ensure equal treatment would deem proper.  Second,

- 25 -

the Tribunal employed a damages calculation methodology that differed from what had been agreed upon by the parties and submitted to the Tribunal for use in calculating damages. Third, the Tribunal prevented Venezuela from fully addressing arguments concerning the errors in the Award after issuing it.

### 1. The Tribunal's Inequitable Treatment Of The Parties

The Tribunal treated the parties differently. This is clear from its directive of February 2, 2012, which it later confirmed on February 8, 2012, where the Tribunal responded to Venezuela's request to delay the start of the oral hearings as an accommodation for the unexpected death of its Attorney General, whose replacement needed to be adequately briefed. The Tribunal consented to the delay, but as recorded in the Award itself, directed that Venezuela would not have as much time as Gold Reserve to present its case during the oral hearings. In the words of the Tribunal: "Claimant . . . is entitled to more than one-half of the five hearing days." Bevilacqua Decl. ¶ 32.

The Tribunal made this patently inequitable ruling notwithstanding the fact that the procedural rules governing the hearings, which had been endorsed by both parties, expressly stated in Rule 2.1 that "[t]he hearing shall proceed on the basis of an equal share of the available hearing time."

This type of inequitable conduct by a tribunal cannot be countenanced under the New York Convention. For instance, when a tribunal refused to allow a witness to testify with evidence not found from other sources, the Second Circuit held that the tribunal acted in a manner that is fundamentally unfair and sufficient to vacate the award. *See Tempo Shain Corp. v. Bertek*, 120 F. 3d 16, 21 (2d Cir. 1997) (finding an arbitration panel's refusal to continue a hearing to allow the only witness with evidence of fraud to testify amounted to fundamental unfairness and misconduct sufficient to vacate the award under the F.A.A.); *see also Iran*

*Aircraft Indus.*, 980 F.2d at 146 (vacating an award pursuant to Article V(1)(b) when, during the hearing, the arbitrator changed the method by which evidence could be presented thus preventing a party from presenting its case).

That the Tribunal's unequal and inequitable treatment of the parties violated Venezuela's due process rights is confirmed by the fact that it contravened the clear requirements of French arbitration law governing the conduct of the proceedings.  In that regard, Article 1510 of the Décret n° 2011-48 of January 13, 2011 for reform of arbitration provides: "Irrespective of the procedure adopted, the arbitral tribunal shall ensure that the parties are treated equally and shall uphold the principle of due process."  Bevilacqua Decl. at Annex 2, Art. 1510.  As explained in further detail below, the Tribunal's breach of this requirement is the subject of one of Venezuela's grounds for annulling the Award, which is currently under consideration by the Court of Appeal in Paris.  For present purposes, Venezuela observes that the Court should not recognize under the New York Convention an award that is the result of procedures that violate the law of the seat of the arbitration because, as the U.S. Supreme Court has made clear, the "goal of the [New York] Convention, and the principal purpose underlying American adoption and implementation of it, was … to unify the standards by which agreements to arbitrate are observed and arbitral awards are enforced in signatory countries." *Scherk v. Alberto-Culver Co.*, 417 U.S 506, 520 n.15 (1974).

> **2.     The Tribunal Denied Venezuela A Meaningful Opportunity To Respond To The Damages Adjustments Introduced By The Tribunal In Its Award**

The Tribunal also deprived Venezuela of due process during the hearing and the post-hearing submissions by denying Venezuela a meaningful opportunity to address issues that arose for the first time in or after the Award.

As detailed above, the Tribunal ordered the parties to engage in a lengthy Joint Expert Procedure in order to narrow the damages issues in dispute and to arrive at areas of agreement. This procedure utilized the parties' prior agreement in the main arbitration proceeding on the proper methodology for calculating with precision the fair market value of the mine project, which would be the measure for damages should Venezuela be found liable.  In that regard, they agreed that the correct means for doing so was to apply a sophisticated mathematical algorithm embedded in a model which had been developed by one of Gold Reserve's consultants in 2008. That model (the "DCF Model") was capable of determining the investment's fair market value on a discounted cash flow basis by taking account of the inter-relationship of a host of variables. Although Venezuela and Gold Reserve disagreed about the number values to be assigned to these inputs for the DCF Model, they agreed that applying the agreed-upon model was the correct means by which the fair market value of the investment should be calculated.

Despite the agreement that the investment should be valued based on application of the DCF Model, the Tribunal disregarded it when determining damages, and did not provide Venezuela with an opportunity to present argument on this important matter.  This denial of due process arose in the Award's use of what was referred to as a "roughly correct" estimate of the effect that the Tribunal's determinations of fact had on the fair market value determination, ¶¶ 772, 842.  This was done instead of using the agreed-upon DCF Model.  As described above, the Tribunal's disregard of the DCF Model had a dramatic effect on the valuation, including most notably in regard to the impact on the valuation of delay in commencement of production and the country risk premium.

When the Tribunal raised the possibility of taking this approach at the hearing, experts for both parties agreed that the impact of using different values for key variables was not linear,

which is why use of the DCF Model is important.  Hodgson ¶ 27.  Nonetheless, the Tribunal determined fair market value based on this flawed approach.  In so doing, it deprived Venezuela of the opportunity to present its case on the proper measure of damages, and on why the methodology employed by the Tribunal was flawed.  *See*, *Shu-Tao Lin v. McDonnell Douglas Corp.*, 742 F.2d 45, 49 (2d Cir. 1984) (holding that it was improper for a trial judge to make his own calculation of plaintiff's damages that was based on inappropriate assumptions).  This resulted in a damages award that exceeds the correct value, as determined by the agreed-upon DCF Model, by over $351.6 million.

The Tribunal compounded this problem in its procedure for the submission on corrections.  In that procedure, Venezuela notified the Tribunal of the significant erroneous effect of the Tribunal's abandonment of the DCF Model.  Hodgson Decl. Annex 16.  But then, when Gold Reserve's response to Venezuela's submission raised several arguments for the first time, the Tribunal denied Venezuela the right to respond to those arguments in writing or at a hearing.  *Id.* ¶¶ 25–26.  The Tribunal then drew liberally from Gold Reserve's responses in rejecting Venezuela's corrections.  *See* Hodgson Decl. at Annex 18.  Again, Venezuela was deprived of the ability to present its case in a meaningful way.

In sum, the Tribunal's actions breached Venezuela's right to a procedurally fair arbitration by denying it the opportunity to present its case on issues of paramount importance.  The Award, which resulted from these serious deprivations of due process, should not be recognized.

### C.    The Award Is Contrary To Public Policy Of The United States Because It Assesses Punitive Damages Against A Foreign State

Recognition of the Award would also be contrary to the public policy interests of the United States.  New York Convention, Article V(2)(b).  In that regard, the United States has a

compelling interest in ensuring that the rules of international law are respected, and an equally compelling interest in not endorsing, or furthering, the transgression of those rules.  That interest is especially strong where, as here, the interests of co-equal foreign sovereigns are implicated.

Recognizing the Award would be contrary to this public policy interest in at least two respects.  To begin with, the investment treaty that Venezuela concluded with Canada provides clear rules on which corporate entities are entitled to receive compensation.  It states, in unmistakable terms, that "where an investor brings a claim … regarding loss or damage suffered by an enterprise the investor directly or indirectly owns or controls, *any award shall be made to the affected enterprise*."  BIT, Article XII(9) (emphasis added).

That is not what happened here.  Instead, the Tribunal awarded damages to Gold Reserve itself, even though the "affected enterprise" was unquestionably its indirectly owned subsidiary, the Brisas Company, the entity which held the Concessions at issue in the arbitration.  The United States has a compelling interest in not sanctioning, or permitting the recognition or enforcement of an Award, that was plainly made in contravention of the treaty the Tribunal was obligated to apply.

The United States' interest in ensuring compliance with the rules of international law would be contravened in another way, were the Award to be recognized.  The Award subjects Venezuela to punitive damages even though the applicable rules of international law, which are found in the BIT and customary international law, forbids such an award.  Article XII(7) of the BIT provides, in relevant part, that "A tribunal established under this Article shall decide the issues in dispute in accordance with this Agreement and applicable rules of international law."

The applicable international legal rules make plain that punitive damages may not be awarded against a state no matter how egregious its wrongful conduct may have been.  *See, e.g.*,

*Draft Articles on Responsibility of States for Internationally Wrongful Acts, with Commentaries*, 2001, p. 111 ("the award of punitive damages is not recognized in international law even in relation to serious breaches of obligations arising under peremptory norms").  Rather, a tribunal may only award compensatory damages, which in this context, the parties agreed was the fair market value of the investment.

Despite the fact that international law barred the Tribunal from awarding punitive damages, this is what the Tribunal did.  The punitive nature of the Tribunal's damages award is readily apparent from the Award itself.  The parties agreed on a precise mathematical model -- the DCF Model -- for determining the fair market value of the investment, which they also agreed was the correct standard for compensation.  Nevertheless, the Tribunal decided not to apply the agreed-upon model, which would have yielded the mathematically correct valuation.  Instead, the Tribunal claimed the right to use "discretion," or to apply what it called a "margin of appreciation," in determining the amount of damages owed by Venezuela.  The Tribunal then exercised that purported authority to inject into the damages determination what it referred to as "equitable considerations." Award ¶ 686.

The "equitable considerations" to which the Tribunal made reference are clear.  Throughout the Award are references to what the Tribunal called the "seriousness" of Venezuela's breach of fair and equitable treatment, which the Tribunal said would be taken into account in the determination of damages.  For example, it stated that "[t]he number, variety and seriousness of the breaches make the FET violation by Respondent particularly egregious," and that "[t]he compensation due to Claimant for such breaches should reflect the seriousness of the violation."  Award, ¶ 615.  *See also id.* ¶ 668 ("The seriousness of the breach [of FET] shall be duly taken into account when determining the amount of the compensation due to Claimant…").

The considerations cited by the Tribunal are quintessential factors used for awarding punitive damages. *Weinstein v. Islamic Republic of Iran*, 184 F. Supp. 2d 13, 24 (D.D.C. 2002) (identifying punitive damages factors as including "the character of the defendant's act" and "the nature and extent of the harm to the plaintiff that the defendant caused or intended to cause").[5]

Imposing punitive damages on Venezuela, however, is not permitted by the rules of international law. Recognizing an Award that makes such an unlawful assessment of damages would, therefore, be contrary to the public policy interests of the United States. *Laminoirs-Trefilerie-Caleries de Lens, S.A. v. Southwire*, 484 F. Supp. 1063, 1069 (N.D. Ga. 1980 (refusing to recognize arbitral award under Article V(2)(b) insofar as it imposed a rate of interest that is "penal rather than compensatory" because it would contravene public policy).

Indeed, the United States' public policy against subjecting sovereign states to punitive damages is so strong that it is expressly prohibited by the Foreign Sovereign Immunities Act. That statute, which is the sole basis on which a United States court may exercise jurisdiction over a foreign sovereign, provides that "a foreign state … shall not be liable for punitive damages." 28 U.S.C. § 1606.[6] Thus, were this Court to recognize or enforce such an award, it would be acting in excess of its jurisdiction.[7]

---

[5] The Tribunal's application of equitable considerations is also evident from the numerous disparaging references it made to the political and economic priorities of the Venezuelan government. *See, e.g.*, Award ¶¶ 580, 582, 590, 600, 662.

[6] The very narrow exception to this rule set out in the FSIA have no application here.

[7] Venezuela reserves its right to assert all defenses available under the FSIA in any subsequent proceeding.

2.    **IF THE COURT DOES NOT REFUSE RECOGNITION OF THE AWARD, ENFORCEMENT SHOULD BE STAYED TO ARTICLE VI OF THE NEW YORK CONVENTION**

Article VI of the New York Convention permits this Court to stay enforcement of an arbitral award where, as here, an application has been made before the courts of the seat of the arbitration to have the award annulled.  New York Convention, Art. VI.

Venezuela is convinced there are compelling reasons to refuse recognition of the Award, as set out above.  However, if the Court is inclined to decide otherwise, Venezuela respectfully submits that the Award's enforcement should be stayed because the validity of the Award is pending before the Court of Appeal in Paris -- the supervisory court in the seat of the arbitration -- where Venezuela has initiated annulment proceedings to address the serious breaches of French arbitration law that infected the arbitration and the resulting Award.

A.    **The Annulment Action Pending Before the Paris Court of Appeal**

Gold Reserve and Venezuela jointly selected Paris to be the seat of the arbitration.  In so doing, they willingly subjected the conduct of the arbitral proceedings and the Award to French arbitration law and the judicial supervision of the Court of Appeals in Paris.  French law, as enshrined in Article 1520 of the Code of Civil Procedure ("CPC"), gives the Paris Court wide latitude to annul an award, including in circumstances where the Court finds that the Tribunal wrongly upheld jurisdiction; ruled without complying with the mandate conferred upon it; violated due process; or where recognition or enforcement of the award is contrary to international public policy.  Bevilacqua Decl. ¶¶ 13, 21.

Venezuela has petitioned the Paris Court to set aside the Award on each of the aforementioned grounds. In particular, and as described more fully in the Declaration of Thomas Bevilacqua, Venezuela's counsel in the annulment proceeding, which is attached hereto as

Exhibit B, Venezuela has advanced four arguments for annulment of the Award.  Bevilacqua Decl. ¶¶ 23–49.

*First*, Venezuela argues that the Award should be set aside under Article 1520(1) of the CPC because the Tribunal wrongfully upheld its jurisdiction over Gold Reserve's claims; Gold Reserve cannot be considered a Canadian "investor" and cannot be considered to have made an "investment" in Venezuela within the meaning of those terms under the Venezuela-Canada BIT. This argument arises from Article XII of the BIT, which sets out Venezuela's offer to arbitrate specific categories of disputes with specific types of investors and, in that regard, uses the terms "investment" and "investor," which in turn are defined in Articles I(f) and (g) of the BIT.  *Id.*, ¶¶ 26–27.  The Canadian company Gold Reserve is not an "investor" and did not make any "investment" in the mining concessions at issue.  Gold Reserve did not even exist at the time that Gold Reserve US acquired the mining concessions.  The sleight-of-hand corporate restructuring that Gold Reserve US subsequently effected, in an effort to manufacture potential jurisdiction under the Venezuela-Canada BIT that had come into effect long after Gold Reserve US' subsidiaries had undertaken work on the mining project in Venezuela, took place outside of Venezuela, did not involve a transfer of capital to Venezuela, and therefore did not satisfy the condition of a territorial link with Venezuela that is required by the Venezuela-Canada BIT.  *Id.* ¶ 29.

Because this first ground for annulment goes to the very existence of an agreement to arbitrate, the Paris Court will, under established French law precedents, conduct a *de novo* review of all relevant questions of fact and law.  In conducting that review, the Paris Court is not bound by the Tribunal's determinations, and it is free to interpret the existence and scope of the BIT arbitration agreement in a manner different from the Tribunal.  *Id.* ¶ 25.

*Second,* Venezuela argues that the Award must be annulled under Articles 1520(4) and (5) of the CPC because the Tribunal failed in its fundamental duty to treat Venezuela equally with Gold Reserve and to afford Venezuela due process, including an equal opportunity to be heard – essential principles which rise to the level of public policy in France pursuant to Articles 1510, 1520(4), and 1520(5) of the CPC.  *Id.* ¶¶ 30, 33.  The Tribunal breached that duty by punishing Venezuela for an event that should not have been imputed to it – the sudden death of the Attorney General of Venezuela, who had been in charge of the arbitration.  When Venezuela requested a short delay in the proceedings due to the Attorney General's death, so that his successor could be brought up to speed, the Tribunal attributed the situation to Venezuela and determined that it would not be given equal time to present its case at the hearing.  *Id.* ¶32.

The Tribunal also violated Venezuela's due process rights when it based its calculation of damages in Gold Reserve's failure not on the method and formula for calculating damage to which the parties had already agreed, but instead a method that was never announced to the parties before the Award and which resulted in a "rough" estimate giving an "approximate adjustment" that did not reflect the method or formula, or any other basis, that either of the parties had had the opportunity to address.  *Id.* ¶ 34.  Equally improperly, the Tribunal based its damages calculations on what it concluded to be "egregious" and "serious" conduct by Venezuela, considerations that Gold Reserve had not asked the Tribunal to take into account and that Venezuela was afforded no opportunity to address.  *Id.* ¶ 35.[8]

*Third,* Venezuela argues that, under Article 1520(3) of the CPC, the Award must be annulled because the tribunal based much of its decision on equitable considerations rather than

---

[8] The tribunal also violated Venezuela's due process rights by refusing to allow oral argument on the requests for corrections of the Award or permit Venezuela to respond to gross errors in Gold Reserve's response to Venezuela's corrections request.  *Id.* ¶ 36.

legal ones, which all of Articles 1511 and 1512 of the CPC, consistent French jurisprudence, and Article XII(7) of the BIT prohibited it from doing. *Id.* ¶¶38–40. The Award is rife with what can only be deemed equitable, and not legal, factors. As just a few examples, the tribunal (a) adopted an ideological assessment of Venezuela's conduct, based upon media reports of alleged statements by Venezuelan officials; (b) characterized Venezuela's breach of the duty of fair and equitable treatment as, *inter alia*, "particularly egregious" and "serious;" announced that the supposed "seriousness" of the breach would be taken into account in setting what are essentially punitive damages; and (d) openly admitted that its damages calculation was based on such non-legal considerations as "back-of-the-envelope calculations," "rough" estimates," and "equitable consideration." *Id.* ¶¶ 41–43.

*Fourth*, Venezuela argues that, pursuant to Article 1520(1), (3) and (5) of the CPC, the Award should be annulled because the Tribunal failed to respect the separate juridical existence of the different entities involved in, variously, the dispute at issue and the arbitration. In this regard, all of the alleged rights at issue were held by Venezuelan companies that had become subsidiaries of Gold Reserve after the corporate reorganization, and not by Gold Reserve, and Gold Reserve failed to prove that it itself—separately from those subsidiaries—had suffered any harm. Despite this, the Tribunal conflated the Venezuelan subsidiaries with Gold Reserve and awarded damages to the latter, in contravention of the fundamental, universally-recognized legal principal of separate corporate existence. *Id.* ¶¶ 45–46.

Moreover, the Tribunal ignored the unique provisions of the Venezuela-Canada BIT specifying that, while under BIT Articles XII(2) and (12)(a) a parent may bring claims on behalf of an entity that it owns or controls, any award must be made to the entity that actually suffered the harm, as mandated by BIT Article XII(9). Instead of awarding damages to the Venezuelan

subsidiaries that held the rights allegedly violated by Venezuela and that allegedly suffered the harm at issue, the Tribunal awarded damages to Gold Reserve.  For this reason alone, the confirmation and enforcement of the Award would violate international public policy.  *Id.* ¶¶ 47–48.

### B.   Enforcement Should be Stayed

Despite the fact that the Paris Court of Appeal is the sole judicial institution that has responsibility for reviewing the Award in accordance with French law, the law of the arbitration, and is the only court in the world that can vacate the Award, Gold Reserve seeks to short-circuit that process by obtaining recognition of the Award from this Court.  Gold Reserve has chosen this tactic so that it may pursue the Award's enforcement *before* the Paris Court decides whether it should be annulled.  This poses a serious risk.  What if Gold Reserve enforces the Award against Venezuelan state assets, and then, after having done so, the Court of Appeal in Paris annuls the Award?

Courts have recognized the need to be vigilant against allowing such an embarrassing result to occur.  This is why the Federal District Court for the Southern District of New York ruled that "it is much better to permit the validity of [an] Italian arbitral award to be first tested under Italian law by Italian courts."  Doing so, the Court held, "is preferable to an American court seeking to apply the law of the foreign country where the award was made, and entering an order enforcing an award later condemned by the courts of that foreign country."  *Spier v. Calzaturificio Tecnica, S.p.A.*, 663 F. Supp. 871, 875 (S.D.N.Y. 1987).

The same concern caused another Federal District Court dealing with a situation where set aside proceedings were ongoing in France, the seat of the arbitration, to hold: "If parallel proceedings are ongoing in the originating country and in the district court and there is a possibility that the award will be set aside, 'a district court may be acting improvidently by

enforcing the award prior to the completion of the foreign proceeding.'" *Alto Mar Girassol v. Lumbermens Mut. Cas. Co*., No. 04 C 7731, 2005 U.S. Dist. LEXIS 7479, at *7 (N.D. Ill. Apr. 12, 2005) (quoting *Europcar*, 156 F.3d 310, 317 (2d Cir. 1998)).  *See also, e.g., Italia, S.P.A. v. Maiellano Tours, Berkenhoff GmbH v. Global Trade Network, Inc.*, No. 1:11-cv-00475, 2012 U.S. Dist. LEXIS 11579 (W.D. OH January 31, 2012at) *4 at *6 (staying enforcement on the ground that, "in order to avoid an inconsistent result, the interests of justice mandate that it stay its decision on the enforcement of the arbitral award in the United States until after such time the German Court system has concluded its review").

A stay is certainly justified here, for the reasons indicated by these District Courts: there is a substantial risk that the Court of Appeal in Paris will annul the Award after it has been enforced in the United States.  Indeed, as shown below, the factors identified by the Second Circuit in *Europcar Italia, S.P.A. v. Maiellano Tours*, 156 F.3d 310, 317–18 (2d Cir. 1998) for determining whether enforcement should be stayed weigh heavily in favor of doing so.  Those factors are:

> (1) the general objectives of arbitration—the expeditious resolution of disputes and the avoidance of protracted and expensive litigations;
>
> (2) the status of the foreign proceedings and the estimated time for those proceedings to be resolved;
>
> (3) whether the award sought to be enforced will receive greater scrutiny in the foreign proceedings under a less deferential standard of review;
>
> (4) the  characteristics of the foreign proceedings including (i) whether they were brought to enforce an award (which would tend to weigh in favor of a stay) or to set the award aside (which would tend to weigh in favor of enforcement); (ii) whether they were initiated before the underlying enforcement proceeding so as to raise concerns of international comity; (iii) whether they were initiated by the party now seeking to enforce the award in federal court; and (iv) whether they were initiated under circumstances indicating an intent to hinder or delay resolution of the dispute;

(5) a balance of the possible hardships to each of the parties, keeping in mind that if enforcement is postponed under Article VI of the Convention, the party seeking enforcement may receive a 'suitable security' and that, under Article V of the Convention, an award should not be enforced if it is set aside or suspended in the originating country; and

(6) any other circumstances that could tend to shift the balance in favor of or against adjournment.

*Europcar Italia, S.P.A.*, 156 F.3d at 317–18 (internal citations omitted).[9]

### 1.   Factor One: Staying Enforcement Would Facilitate The Expeditious Resolution of Disputes And Help Avoid Unnecessary Litigation

The principal objectives of arbitration include the expeditious resolution of disputes and the avoidance of protracted and expensive litigation.  *Europcar Italia, S.P.A.*, 156 F.3d at 317. These goals would be seriously undermined if a stay is not granted and Gold Reserve is permitted -- while the annulment proceeding is pending before the Paris Court -- to pursue enforcement actions in jurisdictions throughout the United States.  Not only would the enforcement actions be unnecessary if the Award is annulled, should Gold Reserve prove successful in attaching Venezuelan state assets, Venezuela would be forced to engage in additional and costly post-annulment litigation in order to attempt to recover its property.

Federal District Courts faced with similar circumstances have not hesitated to stay enforcement, recognizing that doing so furthers arbitration's goals of facilitating the timely resolution of disputes and reducing wasteful litigation.  In *Alto Mar Girassol v. Lumbermens*

---

[9] The District of Columbia Circuit has not formally adopted the *Europcar* factors.  *Cf. Belize Soc. Dev. v. Gov't of Belize*, 668 F.3d 724 (D.C. Cir. 2012) (holding Article VI did not apply because the appeal had not been made to a competent authority in the country in which the decision was made).  This Court, however, has applied the *Europcar* factors. *See Chevron Corp. v. Republic of Ecuador*, 949 F. Supp. 2d 57, 71-73 (D.D.C. 2013); *G.E. Transp. S.p.A. v. Republic of Albania*, 693 F. Supp. 2d 132, 138–39 (D.D.C. 2010); *Continental Transfert Technique Ltd. v. Fed. Gov't of Nigeria*, 697 F. Supp. 2d 46, 59 (D.D.C. 2010); *see also D.R.C., Inc. v. Republic of Honduras*, 774 F. Supp. 2d 66, 74 (D.D.C. 2012)) (stay lifted in *D.R.C., Inc. v. Republic of Honduras*, 999 F. Supp. 2d 1 (D.D.C. 2012)).

*Mut. Cas. Co.*, the District Court granted a stay because of an ongoing annulment proceeding in

France, holding:

> While a stay will cause an immediate delay in resolution of the
> dispute, this delay is likely shorter than the possible delay that
> would occur if this Court confirms the award and the French court
> ultimately sets the award aside resulting in further litigation likely
> involving more complex issues.  Waiting for the French court to
> rule will also likely aid in the avoidance of more expensive
> additional litigation that could arise.

*Alto Mar Girassol*, 2005 U.S. Dist. LEXIS, at *11–12.

Likewise, in *Jorf Lasfar Energy Co., S.C.A. v. AMCI Exp. Corp.*, a case that also

involved annulment proceedings in France, the District Court stayed enforcement.  It explained:

> We find that although causing an immediate delay, this course of
> action will actually serve the objectives of resolving disputes
> expeditiously and avoiding protracted and expensive litigation.
> The delay that will be caused immediately is likely shorter than the
> possible delay that would occur if this court were to confirm the
> award and the French court then set it aside.  More expensive
> litigation involving more complex issues would result from such a
> situation.

*Jorf Lasfar Energy Co., S.C.A. v. AMCI Exp. Corp.*, (Civil Action No. 05-0423, 2005 U.S. Dist.

LEXIS 34969, (W.D. PA Dec. 22, 2005), at *7-8.  *See also, e.g., Higgins v. SPX Corp.*, (Case

No. 1:05-cv-846, 2006 U.S. Dist. LEXIS 20771 (W.D. MI April 18, 2006) at *14 ("comity and

efficient use of judicial resources does strongly favor staying this action to await the decision of

the Brazilian courts as to the nullification action").

The same concerns that motivated the Courts in these cases to grant stays apply with at

least equal force here, where there is a particularly high risk that allowing enforcement to

proceed will result in a multiplicity of costly but redundant litigations, and where Venezuela

would be greatly prejudiced by having to try to recover assets after they have been attached, in

jurisdictions throughout the United States, or indeed, elsewhere, should those assets be transferred out of the country.

###    2.    Factor Two: The Proceeding in Paris Will Be Completed Soon

The second *Europcar* factor—the status of the foreign proceeding and the estimated time needed for it to be completed—weighs heavily in favor of the stay.  The annulment proceeding in Paris is well-underway.  Venezuela's brief in support of its petition to set aside the Award was submitted to the Court on March 20, 2015.  Gold Reserve's response is due on June 18, 2015. Venezuela's reply is due on September 10, 2015, and Gold Reserve's rejoinder is due on October 8, 2015.  The oral hearings are already scheduled, and will take place on November 3, 2015.  The Court of Appeal in Paris typically issues decisions just three weeks after oral arguments are heard.  The Court's judgment is thus likely to be received before the end of 2015, less than seven months from now.  Bevilacqua Decl. ¶¶ 19–20.

###    3.    Factor Three: French Arbitration Law Allows The Paris Court to Subject the Award to Greater Scrutiny Than This Court

The third *Europcar* factor considers the degree to which the court in the foreign jurisdiction will subject the award to a greater degree of scrutiny than will the District Court. That is the case here.  It can be expected that the Paris Court of Appeal would deem itself to be under a particular duty to ensure that the Award be the subject of a full and proper review, as, in acting on the set aside petition, it is fulfilling its special role, as the court of the seat of arbitration, of judicial overseer of the arbitration proceeding. This role of judicial oversight of the proceedings began with the making available of a Paris first instance court judge (the "*juge d'appui*," or judge assigned to act in support of the arbitration), to assist with any difficulties that could have arisen during the arbitration itself, and the responsibility continues with the French courts' role in post-award proceedings.  Nor will it be lost on the Paris Court that the outcome of

the petition to set aside could have worldwide ramifications far beyond France's borders.  If the Award were set aside at the seat of arbitration, then courts in other enforcement venues would be free to deny recognition and enforcement in their own jurisdictions on this basis (New York Convention Art. V(1)(e)).  Moreover, the size of the Award and the presence of a sovereign State as the arbitral respondent are no doubt additional factors that will not have escaped the attention of the Paris Court of Appeal and that will ensure that the matter receives the Court's full attention.

Finally, the Court of Appeal will readily recognize that a number of the grounds for annulment raised by Venezuela have direct analogs in a number of arbitration cases that the Court itself, and the French Supreme Court (the *Cour de Cassation*), have ruled on in recent years, meaning that the Court is especially well positioned to deal with the nuances raised in Venezuela's petition.

### 4.    Factor Four: The Annulment Proceeding In Paris Is Not Intended To Hinder Or Delay The Dispute

The characteristics of the Paris annulment proceeding—the fourth *Europcar* factor—favor staying enforcement as well.  Both Venezuela and Gold Reserve have sought relief before the Court of Appeal in Paris: Gold Reserve to confirm the Award, and Venezuela to annul it. The fact that the proceedings in Paris were filed prior to Gold Reserve's petition before this Court weighs in favor of a stay.  *DRC, Inc. v. Republic of Honduras*, 774 F. Supp. 2d 66, 74-75 (D.D.C. 2011) (that the proceeding in foreign courts was initiated prior to the enforcement proceedings favors staying enforcement) (*stay lifted on other grounds*).

Venezuela's invocation of the Paris Court's jurisdiction to review the Award has not been done to hinder or delay its enforcement.  *See Europcar Italia, S.P.A.*, 156 F.3d at 317–18; *Chevron*, 949 F. Supp. 2d at 72; *Alto Mar Girassol*, 2005 U.S. Dist. LEXIS at *12 (lack of

evidence of intent to hinder or delay resolution of the dispute weighed in favor of stay).  To the contrary, Venezuela has compelling reasons for annulling the Award, as set out above.

### 5.      Factor Five: The Prejudice To Venezuela Of There Being No Stay Greatly Outweighs Any Hardship To Gold Reserve

The balance of possible hardships to the parties weighs heavily in favor of a stay.  Given the size of the Award—over $700 million plus interest—it is beyond dispute that payment of badly needed funds from the public treasury by Venezuela prior to completion of the proceedings in France would be a significant hardship.  That hardship would be greatly increased were the Award to be set aside in France subsequent to the payment, as Venezuela is confident will occur. If that happens, Venezuela would likely be forced to commence costly actions in other fora to attempt to recover its assets.  Gold Reserve is a shell corporation with little -- if any -- actual business operations.  There is therefore a serious risk that it will transfer to other entities Venezuelan state assets that it is able to attach, making their recovery by Venezuela after annulment of the Award extremely difficult, if not impossible.  At a minimum, prolonged and expensive litigation would be inevitable.

By contrast, Gold Reserve would, at worst, be only minimally burdened by a stay since the proceeding before the Paris Court will likely be completed before the end of 2015.  In any event, under the terms of the Award, Gold Reserve is entitled to be compensated for the delay by the imposition of post-Award interest, compounded annually at a rate of LIBOR plus two percent.

In sum, the *Europcar* factors weigh decisively in favor of a stay. Failing to do so risks the awkwardness—and extreme prejudice to Venezuela—of the Award being annulled after this Court allows enforcement of the Award to proceed.

## CONCLUSION

WHEREFORE, Venezuela respectfully requests that the Court dismiss the petition and

deny recognition of the Award or, in the alternative, stay its enforcement.

Respectfully submitted,

BOLIVARIAN REPUBLIC OF
VENEZUELA

By its attorneys,

 /s/ *Lawrence H. Martin*
Lawrence H. Martin (D.C. Bar # 476639)
lmartin@foleyhoag.com
Janis H. Brennan (D.C. Bar # 412100)
jbrennan@foleyhoag.com
FOLEY HOAG LLP
1717 K Street, N.W.
Washington, D.C. 20006
Telephone:  (202) 232-1200
Facsimile:  (202) 785-6687

Dated:  June 12, 2015

## STATEMENT PURSUANT TO LCVR 7(M)

Counsel for Venezuela discussed this motion with counsel for Gold Reserve on June 12,

2015 in a good faith effort to determine whether Gold Reserve opposes the relief sought and

whether the areas of disagreement could be narrowed.  Counsel for Gold Reserve indicated that

Gold Reserve opposes the relief sought in this motion.  Counsel were unable to narrow the areas

of disagreement.

## **CERTIFICATE OF SERVICE**

I hereby certify that this document, filed through the ECF system, will be sent

electronically to the registered participants as identified on the Notice of Electronic Filing (NEF),

and paper copies will be sent to those indicated as unregistered participants on June 12, 2015.

 /s/ *Lawrence H. Martin*
Lawrence H. Martin