## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| **GOLD RESERVE INC.,** ) | |
| ) | |
| **Petitioner,** ) | |
| ) | |
| **v.** ) | **Civil Action No. 1:14-cv-02014-JEB** |
| ) | |
| **BOLIVARIAN REPUBLIC OF** ) | |
| **VENEZUELA,** ) | |
| ) | |
| **Respondent.** ) | |
| ) | |
| ) | |
| ) | |
| ) | |

### SECOND DECLARATION OF ABBY COHEN SMUTNY

Pursuant to 28 U.S.C. § 1746, I, Abby Cohen Smutny, declare as follows:

1.      I refer the Court to my first declaration submitted in this case on July 2, 2015 in support of Gold Reserve's Opposition to the Motion to Dismiss of the same date ("Smutny Decl.").[1]  I offer the following additional comments and observations in response to issues raised by Venezuela in its Reply in Support of Its Motion to Dismiss dated July 15, 2015 ("Reply") and in the accompanying declarations and expert reports.

  I.      Damages Awarded to Gold Reserve Inc.

2.      Venezuela relies on two expert reports submitted for the first time with its Reply to support its argument that the Tribunal acted outside of the terms of the Parties' submission to arbitration by awarding damages to the Claimant, Gold Reserve Inc., rather than to Gold Reserve Inc.'s indirect wholly-owned Venezuelan subsidiary Compañía Aurífera Brisas del Cuyuní, C.A.

---

[1] Terms used in my first declaration will have the same meaning here.

(the "Brisas Company").[2]  Venezuela also argues that the Tribunal's award of damages to Gold

Reserve Inc. deprived the State of the opportunity to tax the Brisas Company and its Venezuelan

parent on the basis of the income the Brisas Company would have obtained from the Award.[3]

While Venezuela's legal arguments are addressed in Gold Reserve's Sur-Reply and in the

accompanying expert reports,[4] I address below a number of factual points from the Arbitration

record that are relevant to these issues.

      A.     <u>Gold Reserve Inc. Presented Claims for Its Own Losses</u>

     3.     As the plain language of Article XII of the Canada-Venezuela BIT permits, Gold

Reserve presented a claim for compensation on the basis that Venezuela's unlawful conduct

caused Gold Reserve enormous loss and damage.  There was never any dispute in the Arbitration

that the Canada-Venezuela BIT permitted Gold Reserve to present such a claim and the Tribunal

to issue an award to Gold Reserve.

     4.     Venezuela observes that, in its Request for Arbitration, Gold Reserve referred to

the fact that, as a result of Venezuela's breach of the Canada-Venezuela BIT, both Gold Reserve

and its Venezuelan subsidiaries incurred loss and damage and that Gold Reserve submitted

consents and waivers that could have permitted claims to be presented in the Arbitration both for

Gold Reserve's losses as well as for losses suffered by the Venezuelan subsidiaries.[5]  The

Request for Arbitration also stated that Gold Reserve "requests an award … of compensation to

---

[2] Reply, at 3-13 (citing Expert Report of Kenneth J. Vandevelde dated July 3, 2015; Expert Report of Matthew Kronby dated July 15, 2015).

[3] Reply, at 6 (citing Expert Report of Luis Garcia Montoya dated July 13, 2015 ("Garcia Montoya Rpt.") ¶¶ 16-25, 31, 36).

[4] Expert Report of Andrea K. Bjorklund dated August 31, 2015; Expert Report of Todd Weiler dated August 31, 2015.

[5] Reply, at 8-9.

Gold Reserve and respectively to [its subsidiaries], as appropriate, for all losses and damages suffered, in an amount to be elaborated and quantified in the course of this proceeding."[6]

5.     Under the Canada-Venezuela BIT, it would have been possible, therefore, to bring claims on behalf of Gold Reserve and/or its Venezuelan subsidiaries, including the Brisas Company.  Indeed, Article XII of the Canada-Venezuela BIT permits a claimant to bring a claim for losses it incurred, as a claimant may prefer to do when its investments have been entirely frustrated and effectively wrongfully terminated, as occurred in this case.  The BIT also permits a claimant to bring a claim for losses suffered by an enterprise that it owns or controls, as a claimant may prefer to do when the enterprise's business operations continue in the host State and it seeks to restore the enterprise to the position it would have been in but for the host State's wrongful conduct.  Nor does the Canada-Venezuela BIT limit claims to what Venezuela refers to as "direct" losses.   As Venezuela's wrongful conduct effectively terminated the Brisas Company's operations in their entirety, Gold Reserve elected to present claims for its own losses.

6.     Once the Arbitration commenced, Gold Reserve elaborated and quantified its claim in its first substantive submission in the arbitration (its Memorial).  Gold Reserve therefore presented its claim as follows:

> As an enterprise duly constituted under the laws of the Yukon Territory, Canada that has made investments in Venezuela, Gold Reserve qualifies as an investor under Article I of the BIT. Article XII of the BIT thus provides that Gold Reserve may submit its claims that measures taken and not taken by Venezuela breached the provisions of the BIT and that Gold Reserve has incurred loss and damage by reason of or arising out of those breaches.
>
> Gold Reserve's losses entail, most prominently, the loss of the returns it stood to gain from the Brisas Project and the right to develop the promising Choco 5 property, the rights to which it

---

[6] Request for Arbitration dated October 21, 2009 ("Request for Arbitration") (Excerpted) (Exhibit 22), ¶ 96.

> enjoyed through its indirectly wholly-owned subsidiaries,
> Compañía Aurífera Brisas del Cuyuní, C.A. and GR Minerales El
> Choco, C.A., respectively.
>
> […]
>
> The fact that the BIT also permits investors to bring claims
> regarding loss or damage suffered by an enterprise that the investor
> directly or indirectly owns or controls does not detract from the
> investor's right to bring claims regarding its own losses.[7]

Thus, Gold Reserve clearly presented a claim seeking compensation for its own losses and requested only that the Tribunal award compensation to the Claimant, Gold Reserve Inc., notably not including the Brisas Company.[8]  The evidence of loss presented by Gold Reserve's damages expert Mr. Kaczmarek of Navigant Consulting, Inc. ("Navigant") reflected the losses incurred by Gold Reserve Inc.,[9] and Gold Reserve reiterated in the request for relief in its Reply brief in the Arbitration that it presented a claim only for the losses incurred by the Claimant, Gold Reserve Inc.[10]

7.     Consistent with seeking compensation for its own losses caused by Venezuela's unlawful conduct, in its post-hearing brief Gold Reserve stated expressly that "Gold Reserve's

---

[7] Claimant's Memorial dated September 24, 2010 ("Memorial") (Excerpted) (Exhibit 23), ¶¶ 364-367.

[8] Memorial (Exhibit 23), ¶ 467 (detailing request that the tribunal award compensation to Claimant, Gold Reserve, Inc.).

[9] *See generally* Expert Report of Brent C. Kaczmarek, CFA dated September 24, 2010 ("Navigant I") (Excerpted) (Exhibit 24), ¶ 7 ("Claimant's losses are equivalent to the value of the Brisas Project and the Choco 5 Property as of 14 April 2008 plus interest from that date to compensate Claimant for the time value and opportunity cost of money"); *id.*, ¶ 56 ("In the present case, Claimant (directly or indirectly) owned 100 percent of the legal rights that are defined above as the Brisas Project and the Choco 5 Property. Consequently, Claimant is entitled to 100 percent of the ownership benefits flowing from the Brisas Project and the Choco 5 Property"); *id.*, ¶ 60 ("In the present case, Claimant holds 100 percent of the Brisas Project and the Choco 5 Property and is therefore entitled to 100 percent of the free cash flows these assets were expected to produce").; *id.*, ¶ 210 ("The total damages suffered by Claimant due to Respondent's Measures is the fair market value of the Brisas Project as of 14 April 2008 plus the wasted costs in the Choco 5 Property as of 14 April 2008.").

[10] Claimant's Reply dated July 29, 2011 ("Claimant's Reply") (Excerpted) (Exhibit 25), ¶ 687 (repeating request that the Tribunal award compensation to Claimant, Gold Reserve, Inc.).

claims are not in regard to losses suffered by an enterprise that it owns or controls as contemplated by Article XII(9) of the Canada-Venezuela BIT."[11]

### B.   Venezuela Did Not Challenge the Tribunal's Authority to Award Damages to Gold Reserve Inc.

8.      Venezuela does not, in its present filings, pretend to have taken the position in the Arbitration that the Tribunal did not have the authority to award damages to Gold Reserve in the circumstances of this case.  Indeed, as I set out below, Venezuela did not meaningfully raise the issue at all.

9.      Although Venezuela raised various jurisdictional objections in response to Gold Reserve's claims in the Arbitration, the argument it now presents to this Court was not among them.   In the more than 1,000 pages of briefing by Venezuela in the Arbitration, the only reference to the issue appeared in footnote n. 1510 of its Rejoinder.[12]   Almost as an after-thought, Venezuela's counsel also referenced the issue briefly in its closing argument at the February 2012 Hearing,[13] but then declined to elaborate when the Tribunal specifically asked for clarification as to the import of counsel's passing comment.[14]

---

[11]  Claimant's Post-Hearing Brief dated March 16, 2012 ("Claimant's Post-Hearing Brief") (Excerpted) (Exhibit 26), ¶ 83, n.199.

[12]  *See* Rejoinder on Jurisdiction and Merits of the Bolivarian Republic of Venezuela dated December 8, 2011 (Excerpted) (Exhibit 27), ¶ 667, n.1510.  On a separate issue (discussed below), Ms. Hodgson complains that Gold Reserve "did not address [an] issue substantively" where the only reference allegedly was a "vague footnote."   Second Hodgson Decl. ¶ 13.  Although Ms. Hodgson is mistaken on that particular point (as discussed below), she clearly considers that a footnote is insufficient to address an issue substantively.

[13]  *See* Arbitration Hearing Transcript for February 17, 2012 (Excerpted) (Exhibit 28), at 1200:13-1201:8 ("And just another matter of interest should the Tribunal ever regretfully get to the point where they would be making an award of damages, as we have pointed out in, I think, our Rejoinder--and I don't have the citation here--is that mining rights certainly were held by--mining rights were held by the Venezuelan company.   And the Article IX of the last--very last paragraph of the Treaty says that where an investor brings a claim under this article regarding loss or damage suffered by an enterprise the investor directly or indirectly owns or controls, any award shall be made to the affected enterprise.  I just draw that to your attention, should the--should that occasion ever arise.  But, again, even that clause does not relate to the actual definition that we've drawn your attention to of 'investor.'").

[14]  *See* Arbitration Hearing Transcript for February 17, 2012 (Excerpted) (Exhibit 28), at 1201:14-1202:1 ("ARBITRATOR WILLIAMS:  May I just ask a question.  What is the practical import of what you have just

10.     As the applicable arbitration rules require that the award must contain "the decision of the Tribunal on every question submitted to it, together with the reasons upon which the decision is based,"[15] at the close of the oral hearings, the Tribunal asked the Parties to provide a complete list of the questions they expected the Tribunal to decide in the Award.[16]  In response, Venezuela did not ask the Tribunal to decide whether the Award should be made to Gold Reserve or to the Brisas Company, as Venezuela now argues was required, or any similar question.[17]   Gold Reserve, by contrast, expressly asked the Tribunal to decide "[w]hether the measure of ***Claimant's loss*** is as set forth in the expert reports of Brent Kaczmarek (Navigant)."[18]

11.     Thus, notwithstanding that Gold Reserve plainly and expressly presented a claim for the losses that it incurred as a result of Venezuela's unlawful conduct, and sought compensation on that basis, Venezuela did not raise a jurisdictional objection in regard to that claim or otherwise argue that an award of compensation to Gold Reserve in the circumstances of this case would be outside of the terms of the Parties' submission to arbitration as reflected in the BIT.

---

said about the award being to the affected enterprise?  Do you believe that, A, is a matter of procedural significance and, B, a matter which affects Respondent?  How do you see it?  DR. GOODMAN:  We do see that it's just a matter in the Treaty, which we wanted to draw your attention to.").

[15] ICSID Additional Facility Arbitration Rules (Exhibit 19), Article 52(1)(i).

[16] *See* Arbitration Hearing Transcript for October 16, 2013 (Excerpted) (Exhibit 29), at 235:15-236:1 (President of the Tribunal advising that "[w]e need to know from the parties at this late stage of the proceeding what are the questions in the sense of the Additional Facility Rules.  Sometimes one relies on the relief requested, but this relief requested more than often is just a summary of a number of questions that are being put to the Tribunal.  I wouldn't like the Tribunal to go searching in the documents, in the parties' submissions, for what questions have been really put to us, in order to be able to respond.  Please make a certain point of the post-hearing brief a statement of: these are my questions to the Tribunal.").

[17] *See* Bolivarian Republic of Venezuela's Joint Expert Procedure Post-Hearing Brief dated December 23, 2013 (Excerpted) (Exhibit 30), § V ("Questions for the Tribunal to Answer").

[18] *See* Claimant's Post Hearing Brief Following Procedural Order No. 2 dated December 23, 2013 (Excerpted) (Exhibit 31), ¶ 138(o) (emphasis added).

C.    The Award Was Based On A Measure of Loss Net of Venezuelan Tax

12.    Venezuela argues that the award of compensation to Gold Reserve Inc. "circumvented" Venezuelan tax because the Brisas Company would have been taxed on the award proceeds and because dividends to the Venezuelan parent of the Brisas Company also would have been taxed.[19]   Venezuela's tax argument also was never raised in the Arbitration, and thus never debated by the Parties or considered by the Tribunal.

13.    This argument also is misleading on the facts.  Specifically, Venezuela fails to acknowledge that the damage measures presented by both Parties were calculated expressly **net of the taxes** that the Brisas Company, but for Venezuela's unlawful conduct, would have owed on future earnings before any dividends would have been paid.

14.    As Gold Reserve's damages expert Mr. Kaczmarek of Navigant explained, the DCF measure of value was calculated net of tax:

> In a DCF valuation the cash flows produced by the business is calculated after deducting all necessary expenses and taxes that must be paid in executing the business.  Valuation practitioners typically refer to this cash flow measure as 'free cash flow' as it represents the cash flow available to be paid to lenders or shareholders after all expenditures have been met.[20]

15.    Venezuela's damages expert, Dr. Burrows of Charles River Associates ("CRA"), acknowledged that Navigant's DCF calculation was made net of tax,[21] and both Parties agreed the corporate income tax rate to take into consideration was 34%:

---

[19] Reply, at 6 (citing Garcia Montoya Rpt. ¶¶ 16-25, 31, 36).

[20] Navigant I (Excerpted) (Exhibit 24), ¶ 60.

[21] *See* Expert Report of Dr. James C. Burrows dated April 14, 2011 ("Burrows I") (Excerpted) (Exhibit 32), ¶¶ 30-31 ("In a discounted cash flow (DCF) valuation … cash flows include the difference between cash inflows (revenues) and cash outflows (costs), including capital costs, operating costs, and taxes … Kaczmarek's discounted cash flow model is based on the cash flow model developed by Pincock, Allen & Holt ('PAH') as part of its March 31, 2008 report.  Kaczmarek used PAH's inputs for projected revenues, cost of sales, taxes, capital expenditures, reclamation expenditures, and working capital changes.  He revises the PAH commodity price assumptions and the value added tax ('VAT') calculation and adjusts costs for inflation.").

Mr. Kaczmarek and I agree on several components of the cost of capital calculation, including … Venezuela's corporate tax rate used to adjust the pre-tax cost of debt to an after-tax equivalent (34% tax rate).[22]

16.     Both Parties' experts thus accounted in their DCF measures of damage for the Value Added Tax ("VAT") credits and income tax that would have applied to the Brisas Company's earnings.[23]

17.     As the Tribunal's Award was based upon the DCF measures of value,[24] its award of damage was assessed net of Venezuelan taxes, and the Award thus represents the losses incurred after factoring in the effects of Venezuelan tax.   Any additional tax imposed by Venezuela on the Award, therefore, would constitute a double taxation windfall and a benefit to Venezuela, and thus a reward for its own wrongdoing.

18.     Investment treaty tribunals actively seek to avoid precisely such circumstances. For example:

- o   In *Corn Products v. Mexico*, where the claimant asked the NAFTA Tribunal "to correct the award so as to ensure that the claimant does not suffer an effective double-taxation (i.e. receiving compensation that was net of taxes, and then having the arbitral award taxed again in Mexico)", the Tribunal issued "a correction of the award which clarifies that the award shall be paid to Corn Products International Inc., a U.S. firm, rather than its wholly owned Mexican subsidiary CPIngredientes."[25]

- o   In *Siemens v. Argentina*, to avoid the concern that Argentina would tax the award, the Tribunal directed that "any funds to be paid pursuant to this decision shall be paid in

---

[22] Joint Expert Procedure Report of Dr. James C. Burrows dated May 24, 2013 (Excerpted) (Exhibit 33), ¶ 53.

[23] *See*, *e.g.*, Navigant I (Excerpted) (Exhibit 24), Appendix 4.A, Lines Q, T and U; Burrows I (Excerpted) (Exhibit 32), Exhibit 14.1 (Adjusted Kaczmarek DCF No-Layback Scenario), Lines "Updated VAT," "Income Tax," and "Free Cash Flow."

[24] *See* Award ¶ 831 ("[T]he Tribunal prefers to use the DCF model only.").

[25] *See* Corn Products Asks Tribunal to Correct Award So As to Take Account of Likely Taxation of Award in Mexico, *Investment Arbitration Reporter*, Oct. 14, 2009, available at: http://www.iareporter.com/articles/corn-products-asks-tribunal-to-correct-award-so-as-to-take-account-of-likely-taxation-of-award-in-mexico/;   ICSID Tribunal Corrects Award So That It Will Be Shielded from Taxation, *Investment Arbitration Reporter*, April 9, 2010, available at: http://www.iareporter.com/articles/icsid-tribunal-corrects-award-so-that-it-will-be-shielded-from-taxation/.

dollars and into an account outside Argentina indicated by the Claimant and net of any taxes and costs."[26]

o   In *Mobil v. Venezuela*, the Tribunal stated that "[r]egarding taxation by Venezuela, the Tribunal recalls that the compensation awarded to the Claimants has been calculated taking into account all taxes to be paid to the Venezuelan authorities.  As a consequence, that compensation should be paid net of any Venezuelan tax."[27]

o   In *Chevron v. Ecuador*, the Tribunal referenced "the commitments made by the Respondent not to impose any further taxes or penalties upon any award of the Tribunal that took into account applicable Ecuadorian taxes," and concluded that "[t]he Tribunal considers this representation, among others made over the course of the proceedings, to adequately protect the Claimants against duplicative taxation or penalties for late tax payment."[28]

o   In *Achmea v. Slovakia*, a Dutch claimant that invested in Slovakia through its subsidiaries argued that "it may be subject to taxes on damages that would not have been applicable to dividends and request[ed] an order that Respondent bear any taxes owed as a result of awarded damages."  The Tribunal ultimately awarded the claimant "damages in the sum of €2.1 million, to be paid by Respondent net of any taxes that might be due to be paid by Claimant to Respondent on that sum."[29]

o   In *PSEG v. Turkey*, the claimant, US investor PSEG Global, claimed a 39% Turkish tax gross-up for any compensation to be awarded to its Turkish project company.  Noting that the Turkish project company was wholly owned by PSEG Global, the Tribunal concluded the following:  "The Tribunal accordingly finds no reason to award compensation to the Project Company and will do so only to PSEG Global.  The question of the tax gross up is thus no longer relevant in this context."[30]

19.    Thus, Venezuela's argument that the Tribunal's Award to Gold Reserve deprived

it of the right to tax the Award is refuted by the applicable law and practice in relation to

---

[26] *Siemens AG v. The Argentine Republic*, ICSID Case No. ARB/02/8, Award of Feb. 6, 2007, ¶ 403(11), available at: http://www.italaw.com/documents/Siemens-Argentina-Award.pdf.

[27] *Venezuela Holdings, B.V., Mobil Cerro Negro Holding, Ltd. and others v. Bolivarian Republic of Venezuela*, ICSID Case No. ARB/07/27, Award of Oct. 9, 2014, ¶ 389, available at: http://www.italaw.com/sites/default/files/case-documents/italaw4011.pdf.

[28] *Chevron Corporation (USA) and Texaco Petroleum Company (USA) v. The Republic of Ecuador*, UNCITRAL, PCA Case No. 34877, Final Award of Aug. 31, 2011, ¶ 352, available at: http://www.italaw.com/documents/ChevronEcuadorFinalAward.pdf.

[29] *Achmea B.V. v. The Slovak Republic*, UNCITRAL, PCA Case No. 2008-13 (formerly *Eureko B.V. v. The Slovak Republic*), Award of Dec. 7, 2012, ¶¶ 308, 333, available at: http://www.italaw.com/sites/default/files/case-documents/italaw3206.pdf.

[30] *PSEG Global, Inc. and Konya Ingin Elektrik Üretim ve Ticaret Limited Sirketi v. Republic of Turkey*, ICSID Case No. ARB/02/5, Award of Jan. 19, 2007, ¶¶ 338-340, available at: http://www.italaw.com/documents/PSEGGlobal-Turkey-Award.pdf.

investment treaty claims. That is because to further tax an award that reflects compensation for losses incurred net of tax is to deprive the claimant of compensation in the full amount needed to wipe out the loss caused by the wrongful act[31] and would unjustly confer a benefit on a wrongdoer for its own misconduct.

20.     In any event, Venezuela's contention that it was deprived of taxes to which it is entitled is unproven. Any income tax that would have been imposed on the Brisas Company would have had to take into account the massive losses incurred as a result of Venezuela's unlawful conduct,[32] leaving it most unlikely that there would have been any net income left to tax even accounting for the Award. In addition, as Mr. Garcia Montoya acknowledges, damages intended to compensate a lost investment would not be taxable,[33] and as the Award makes clear, the compensation awarded reflects the Tribunal's assessment of the fair market value of the investment at issue.[34] With regard to claimed taxes that would have been owing by the

---

[31] *See* Award ¶ 681 ("[T]his Tribunal is empowered to award monetary compensation in accordance with the principles of international law. The relevant principles of international law applicable in this situation are derived from the judgment of the Permanent Court of International Justice in the *Chorzów Factory* case that *reparation should wipe-out the consequences of the breach and reestablish the situation as it is likely to have been absent the breach*.") (emphasis added).

[32] *See* Garcia Montoya Rpt. ¶ 14 ("As [the Brisas Company and Gold Reserve de Venezuela, C.A.] are considered taxpayers domiciled in this country, they are subject to the net profit system, which consists of '*the increases in assets calculated by subtracting from gross income the costs and deductions permitted under this law, without prejudice regarding the net profits which have their source within the country, with the adjustment for inflation established by this Law.*'") (emphasis in original).

[33] *See* Garcia Montoya Rpt. ¶ 19 ("The above shows a different tax treatment for the recovery that aims to restore the original property condition that a person held in possession prior to the occurrence of damage—that is, the consequential damage—and the agreed-upon recovery for lost profits. Case law and legal doctrine agree in stating that consequential damage does not constitute income. Such income is not included in the calculation of global available annual net income and is therefore not subject to the tax provided under the [Income Tax Law]; consequently, the taxpayer is not required to pay income tax in the country for this purpose"); *id.*, ¶ 26 ("Based on the analysis of the Award, the Recoverable Amount includes both consequential damage, consisting of loss of investment made, which aims to restore the property situation of the receiver, which is not taxable because it does not constitute income and future earnings, calculated based on the present net value of the potential cash flow that would have been received had the damage not occurred.").

[34] Award ¶¶ 681-682.

intermediate Venezuelan parent company (Gold Reserve de Venezuela, C.A.),[35] Mr. Garcia Montoya acknowledges that dividends are not taxable when derived from income on which the payor was taxed.[36]   Moreover, Mr. Garcia Montoya's analysis fails to address the application of tax treaties to which Venezuela is a party and that would be relevant in view of the ownership structure of Gold Reserve's investments in Venezuela in relation to any dividend payments.

## II.   Other Issues Raised by Ms. Hodgson

### A.   The Schedule for the Hearing on Jurisdiction and Merits

21.   Ms. Hodgson again contends that Venezuela was denied due process and the right to defend its case in relation to the February 2012 oral hearing.[37]   In short, Ms. Hodgson contends that Venezuela's due process rights were violated in circumstances where the hearing was shortened at Venezuela's request, Gold Reserve was permitted time to cross-examine witnesses while Venezuela elected not to cross-examine any witnesses, and both Parties were given equal amounts of time (hours) to present opening and closing arguments, with Venezuela notably not even using all the time available to it.   There is simply no reasonable basis in fact to conclude that Venezuela was denied due process in this case.

22.   Ms. Hodgson repeats details about the circumstances of Venezuela's request to shorten the hearing.   It is not disputed that Venezuela informed the Tribunal on January 26, 2012 that its Attorney General had died.[38]   It also is not disputed that Venezuela waited until February

---

[35] Garcia Montoya Rpt. ¶¶ 9, 13, 31-37.

[36] *See* Garcia Montoya Rpt. ¶ 35 ("The system for taxing dividends … consists of a proportional tax on dividends originating in net income, which is not exempt or exonerated, that has not been taxed by the income tax, of the payor exceeding his net taxed fiscal income…").

[37] *See* Second Hodgson Decl. ¶¶ 3-11.

[38] *See* Second Hodgson Decl. ¶ 4.

1, 2012 to ask the Tribunal to postpone and shorten the hearing on jurisdiction and merits, which was scheduled to begin the following week.[39]

23.     Ms. Hodgson claims that it is "surprising" that I stated that it was not clear that a postponement of the February 2012 Hearing was justified because Venezuela's case was not to be presented by the Attorney General, but by Ms. Hodgson and her colleagues from Foley Hoag LLP who had been working on the case from the beginning.[40]  Ms. Hodgson also claims that I did not question Venezuela's claimed justification for a postponement during the Arbitration.[41] In fact, I did question Venezuela's claimed justification, which was that "logistical efforts with respect to witness appearances at the hearing, visa applications, arrangements to pay travel expenses, and the like, ha[d] been put on hold temporarily as the requisite approvals [were] being sought."[42]  Because such arrangements should have been finalized well before the few days prior to the hearing, I observed that:

> Respondent has had full and fair notice of the schedule in this arbitration with ample time to have made all necessary logistical arrangements well in advance of recent events.   Under the circumstances, it cannot be considered unfair or inequitable to insist that the hearing proceed as planned or, if schedule modifications are made, that they not reduce Claimant's hearing time.[43]

24.     What Ms. Hodgson does not mention is that Venezuela also informed the Tribunal in its February 1, 2012 communication that it considered that a shorter "five-day

---

[39] *See* Smutny Decl. 12; Email from Venezuela to the Tribunal dated February 1, 2012 (Exhibit 2).  *See also* Second Hodgson Decl. ¶ 4.

[40] *See* Second Hodgson Decl. ¶ 5.  *See also* Smutny Decl. ¶ 13.

[41] *See* Second Hodgson Decl. ¶ 5.

[42] Email from Venezuela to the Tribunal dated February 1, 2012 (Exhibit 2).

[43] Letter from Gold Reserve to the Tribunal dated February 1, 2012 (Exhibit 3), at 2.

hearing [would be] feasible" because Venezuela did "not intend to call any of Claimant's witnesses or experts" for examination.[44]

25.     As I noted in my prior declaration, the Tribunal granted Venezuela's request the day after it was made to postpone and shorten the February 2012 Hearing.[45]  The Tribunal also encouraged the Parties to agree on a schedule for the conduct of the hearing, although it noted that Claimant would be permitted more than one-half of the hearing as a whole in view of the "new situation, which is attributable to Respondent."[46]  This makes clear that the Tribunal had taken note of Venezuela's request for the hearing to start later as well as Venezuela's suggestion that it also could be shortened because Venezuela did not intend to use any hearing time to cross-examine witnesses; the Tribunal obviously also took note of Gold Reserve's position that it did not object to postponing and shortening the hearing if Venezuela did not wish to examine witnesses, as long as Gold Reserve retained the hearing time originally contemplated to accommodate witness examination, which Gold Reserve intended to use.  The Tribunal thus accommodated Venezuela's request and provided both Parties the opportunity to present their cases – both Parties were given equal time (hours) to present oral argument, as both wished to do so, and both Parties had the opportunity to cross-examine witnesses, which Gold Reserve used and Venezuela declined.

26.     Ms. Hodgson should not be "surprised" to be reminded that "equality of time" is not a fundamental element of due process,[47] as the fundamental principle is not "chess clock equality," but rather that both parties should be given an equal, full and fair opportunity to

---

[44] Smutny Decl. ¶ 12; Email from Venezuela to the Tribunal dated February 1, 2012 (Exhibit 2).

[45] Smutny Decl. ¶ 14.

[46] Smutny Decl. ¶ 14; Letter from ICSID to the Parties dated February 2, 2012 (Exhibit 4), at 2.

[47] Second Hodgson Decl. ¶ 9.  *See also* Smutny Decl. ¶ 15.

present their case.  Put differently, equal treatment is not synonymous with equal time, and it is incorrect to suggest otherwise.[48]

27.     Ms. Hodgson contends that the alleged unfairness to Venezuela was significant because, she claims, Gold Reserve "intended to use more time on the examination of its <u>own</u> witnesses and experts, than on examination of Venezuela's witnesses and experts."[49]  This observation is entirely irrelevant, however, as Gold Reserve ultimately was not permitted to conduct any direct examination.  Gold Reserve also used less time than initially estimated for cross-examination.[50]  On its part, Venezuela declined to conduct even any redirect examination, although it was provided a full opportunity to do so in each case,[51] and it maintained its decision not to call any witnesses for cross-examination.[52]

---

[48] *See*, *e.g.*, Gary B. Born, INTERNATIONAL COMMERCIAL ARBITRATION (2d ed. 2014) (Exhibit 34), at 2274-2275 (discussing "the fact that an 'equal' division of the time does not necessarily mean a 50/50 division of time: as discussed above, there are circumstances where a 50/50 division of time is not required, and may instead amount to unfair or unequal treatment. … For example, if one party's case requires much more detailed affirmative factual proof than the other party, it may be unfair to limit that party to only the amount of time required for proof of its adversary's case.  This can be particularly problematic with respect to cross-examination in cases where the parties have significantly different numbers of witnesses, leaving one party with substantial time constraints in examining all its counter-party's (more numerous) witnesses"); *id.*, at 3520 ("Parties sometimes oppose recognition of an award on the grounds that the tribunal's procedural timetable either impeded their ability to present their case (*i.e.*, prevented the attendance of a witness, granted counsel less preparation or presentation time than requested) or provided adverse parties with some allegedly unfair advantage (*i.e.*, more time to respond).  National courts have generally been highly skeptical of such claims in recognition proceedings, affording tribunals substantial discretion in establishing and adjusting the procedures and procedural timetable of the arbitration.").

[49] Second Hodgson Decl. ¶ 10 (emphasis in original).

[50] *See* Letter from Gold Reserve to the Tribunal dated February 1, 2012 (Exhibit 3), at 3 (estimating that 7.5 hours would be used for cross-examination); Arbitration Hearing Transcript for February 15, 2012 (Excerpted) (Exhibit 35), at 822:1, 12-13 and 873:1-5 and Arbitration Hearing Transcript for February 16, 2012 (Excerpted) (Exhibit 36), at 885:1, 15-16, 942:1-6, 952:1-2, 988:1-3, 992:1, 17-18, 1034:14-17, 1035:1-5, 1094:1, 11-21, 1097:1, 10-13 and 1102:1, 7 (reflecting cross-examinations by Gold Reserve's counsel that totaled approximately 6.25 hours).

[51] Smutny Decl. ¶ 21 (citing Arbitration Hearing Transcript for February 16, 2013 (Excerpted) (Exhibit 9), at 942:6-13, 988:4-12, 1102:8-11).

[52] Smutny Decl. ¶ 21.

28.   Ms. Hodgson raises various other complaints regarding time she claims was wasted by Venezuela preparing for the hearing, but I do not see that these have any possible bearing on the issues presented to the Court.

B.   The Joint Expert Procedure

1.   The Basis for and Timing of the Joint Expert Procedure

29.   Ms. Hodgson now acknowledges that the Tribunal had the authority to call upon the Parties to produce additional expert evidence in the Joint Expert Procedure,[53] which is consistent with my prior statement that such procedures are not unusual, as reflected in the IBA Rules on the Taking of Evidence in Arbitration.[54]   Ms. Hodgson's observation that the IBA Rules were not mandatorily applicable is irrelevant, as there is no dispute that the Tribunal had authority to utilize a familiar and often used procedure to request further expert evidence.

30.   What also is irrelevant (and, moreover, incorrect) is Ms. Hodgson's assertion[55] that the Joint Expert Procedure "was necessitated" by Gold Reserve's failure to address the economic consequences of what was referred to as the "No-Layback Scenario."   In fact, Gold Reserve provided a significant amount of evidence prior to the Joint Expert Procedure regarding the value of the Brisas Project under the No-Layback Scenario.[56]   Following its familiar pattern,

---

[53] Second Hodgson Decl. ¶¶ 12-13.

[54] Smutny Decl. ¶ 29.

[55] Second Hodgson Decl. ¶ 13.

[56] *See* Reply Expert Report of Richard J. Lambert, MBA, P.E., P.Eng. dated July 29, 2011, ¶¶ 153-162 (discussing and quantifying the loss of reserves that would occur in the No-Layback Scenario as analyzed contemporaneously by Pincock, Allen & Holt in a 2004 report that also was in the record as Claimant's Exhibit C-175).   Other contemporaneous reports also in the record, including the 2005 Aker Kvaerner Feasibility Study (Claimant's Exhibit C-176) and the 2006 Micon Report (Claimant's Exhibit C-183), reviewed and confirmed Pincock, Allen & Holt's earlier assessment.   *See also* Second Joint Witness Statement of Jane Spooner, M.Sc., P.Geo., Mani M. Verma, M.Eng., P.Eng., and Christopher R. Lattanzi, P.Eng. dated July 28, 2011, ¶ 26 (explaining the contemporaneous conclusion that the Brisas Project would lose approximately 10% of its gold reserves in the No-Layback Scenario); Brisas Project Presentation dated March 2006 (a contemporaneous presentation made to the Venezuelan Government showing that the No-Layback Scenario would result in a negative impact of approximately 15 % of the total *in situ* value of the project reserves that was submitted as Respondent's Exhibit R-18); Arbitration Hearing Transcript for February 14,

Venezuela chose to wait until its last submission to submit elaborated expert evidence challenging the evidence on this issue submitted by Gold Reserve. As a result, the disputed technical issues were not developed sufficiently to satisfy the Tribunal without permitting further expert submissions.

31.     Ms. Hodgson also offers a variety of entirely irrelevant complaints regarding the delayed nature of the Joint Expert Procedure.[57] The facts are that the Tribunal's Procedural Order No. 2 issued in July 2012 contemplated that the procedure would be completed in December 2012,[58] but that Venezuela failed even to instruct its experts or to participate in the process established by the Tribunal until January 2013. To the extent deemed relevant and notwithstanding Ms. Hodgson's effort to recast reality, Venezuela cannot avoid responsibility for that delay.

32.     In an effort to overcome the impasse and delay to the arbitration caused by Venezuela's failure to participate in the Joint Expert Procedure, Gold Reserve requested in December 2012 to dispense with the Joint Expert Procedure and rely on the evidence in the record. Ms. Hodgson incorrectly claims this request to expedite the case was in fact the cause of delay. Indeed, Gold Reserve did write to the Tribunal on December 10, 2012 stating:

> Respondent's failure to instruct experts and counsel up to now means that there is no longer enough time for the Parties' experts to confer and to produce a joint report(s) as contemplated by Procedural Order No. 2. It also would be unreasonable to continue to delay these proceedings in the circumstance where Respondent

---

2012, at 359:1-9 (Claimant's counsel explaining in response to a question from the Tribunal that the evidence in the record showed that in the No-Layback Scenario the project's gold reserves would be lowered by 1 million ounces); Claimant's Post-Hearing Brief, ¶ 103, n.249 (showing, based on the evidence in the record, that the valuation of the Brisas Project would be reduced by approximately US$ 147 million under the No-Layback Scenario). Excerpts of these documents are provided in Exhibit 37.

[57] Second Hodgson Decl. ¶¶ 14-15.

[58] Smutny Decl. ¶ 31.

maintains an objection to Procedural Order No. 2 and has not even
indicated an agreement in principle to respond to it.[59]

Venezuela responded by stating that logistical impediments continued to prevent it from implementing the Tribunal's procedural order.[60]  Venezuela did not confirm that it was ready to participate in the procedure until January 8, 2013,[61] more than six months after it had been ordered.  After receiving Venezuela's response to Gold Reserve's December 10, 2012 letter on January 18, 2013, the Tribunal decided a few days later that it would commence the contemplated procedure.[62]  There is thus no credible argument that Gold Reserve contributed to, let alone caused, any of that delay.

33.  After eventually developing extensive written expert reports, which amply addressed the technical issues in dispute, Gold Reserve, again seeking to proceed expeditiously to an award, suggested that no oral hearing was necessary.[63]  In contrast, Venezuela consistently seeking delay, urged that an oral hearing was necessary.  Ms. Hodgson's current complaint that Gold Reserve's plea for procedural efficiency caused Venezuela to "waste … resources" urging the Tribunal to hold a hearing is both irrelevant and baseless.

34.  Ms. Hodgson tries again to blame Gold Reserve for the delayed proceeding when she claims that Gold Reserve failed to provide Venezuela's experts with access to its drill-hole database and geologic block model.[64]  That claim is false.  The Tribunal already had ruled on the

---

[59] Letter from Gold Reserve to the Tribunal dated December 10, 2012 (Exhibit 38), at 1.

[60] Letter from Venezuela to the Tribunal dated December 14, 2012 (Exhibit 12), at 1.

[61] Letter from Venezuela to the Tribunal dated January 8, 2013 (Exhibit 13), at 2.

[62] Letter from ICSID to the Parties dated January 21, 2013 (Exhibit 39).

[63] Letter from Gold Reserve to the Tribunal dated August 26, 2013 (Exhibit 40), at 1-2 ("[T]he issues on which the Tribunal has sought further evidence as well as the positions of the parties with respect thereto are now fully explained and will be readily understood by the Tribunal when it reviews the written submissions that have been presented," and "[f]or that reason alone, Claimant does not consider that a hearing is necessary. … [T]he Tribunal[, however,] may consider it necessary to hold the hearing to examine the experts on their reports and, if so, the Claimant, of course, is prepared to accommodate.").

[64] Second Hodgson Decl. ¶ 14.

terms of access for the experts to Gold Reserve's drill-hole database and geologic block model in its Procedural Order No. 1 dated February 3, 2011,[65] permitting experts "view only" access in view of the confidential and proprietary nature of this information. Despite this prior order that applied equally to experts for both parties, on September 12, 2012, Venezuela asked the Tribunal to revisit its earlier ruling on that issue.[66] The Tribunal rejected Venezuela's request one week later,[67] *i.e.*, before Venezuela was even prepared to participate in the Joint Expert Procedure.

35. Ms. Hodgson's reference to seeking access to documents in February 2013[68] can only refer to a new document request that Venezuela made in late February 2013[69] to which the Tribunal permitted access on March 12, 2013.[70] By that time, as the Tribunal already had established due dates for the Parties' submissions,[71] resolution of that document request did not result in any delay.

   2.   The Tribunal Exercised Its Judgment to Award Compensation Based on the Evidence Presented by the Parties

36. Ms. Hodgson repeats her argument that the Parties "agreed" that, in assessing the amount of compensation due to Gold Reserve for the losses caused by Venezuela's wrongful conduct, the Tribunal had to "apply" the DCF model that was offered as evidence of the fair

---

[65] Procedural Order No. 1 dated February 3, 2011 ("Procedural Order No. 1") (Exhibit 41), ¶¶ 14-16. Request No. 1 concerned the "[d]rillhole database used to generate [the] geological block model," while Request No. 2 concerned the "[g]eological block model used to generate [the] mine plan." *See* Letter from Venezuela's counsel to Gold Reserve's counsel dated November 15, 2010 (Exhibit 42), at 1-2.

[66] Letter from Venezuela to the Tribunal dated September 12, 2012 (Exhibit 43), at 2-3.

[67] Letter from ICSID to the Parties dated September 20, 2012 (Exhibit 44) ("Regarding Respondent's request to have access to Gold Reserve's drill-hole database and geological block model, note has been taken of Claimant's objections in that regard and the reasons for those objections … These previously established arrangements for such access are confirmed.").

[68] Second Hodgson Decl. ¶ 14.

[69] Letter from Venezuela's counsel to Gold Reserve's counsel dated February 20, 2013 (Exhibit 45).

[70] Letter from ICSID to the Parties dated March 12, 2013 (Exhibit 46).

[71] Letter from ICSID to the Parties dated February 1, 2013 (Exhibit 47).

market value of the Brisas Project.[72]  That characterization of the record is wrong.[73]  As noted previously, the fact that both Parties submitted that the DCF model, with various adjustments about which the Parties disputed, was evidence of the fair market value of the Brisas Project does not mean the Tribunal surrendered its discretion to assign such weight to that evidence as it deemed appropriate and to arrive at a level of compensation it considered was warranted in the circumstances.

37.     In fact, as I observed in my first declaration, Gold Reserve proffered other evidence of the fair market value of the Brisas Project in addition to the DCF measure,[74] and Ms. Hodgson's assertion that "the DCF model for determining Fair Market Value was the methodology Gold Reserve pursued through the Joint Expert Procedure,"[75] is inaccurate. Throughout the Joint Expert Procedure, Gold Reserve's expert Mr. Kaczmarek used a weighted average of three different valuation methods to assess the value of the Brisas Project under the No-Layback Scenario, and by no means agreed that the DCF measure was the only relevant one.[76]  Also contrary to the record, as well as irrelevant, is Ms. Hodgson's contention that the Tribunal rejected the other evidence of value as unreliable;[77] in fact, the Tribunal simply indicated that it "preferred" to use the DCF measure.[78]

38.     Ms. Hodgson complains that the Tribunal applied "a third method of determining damages … upon which Venezuela was not given an opportunity to be heard."[79]  What Ms.

---

[72] Second Hodgson Decl. ¶¶ 12, 16.

[73] Smutny Decl. ¶ 33-34.

[74] Smutny Decl. ¶ 34.

[75] Second Hodgson Decl. ¶ 16.

[76] *See*, *e.g.*, Claimant's Comments on the Reports of the Experts Submitted in Response to Procedural Order No. 2 dated August 5, 2013 (Excerpted) (Exhibit 48), ¶¶ 233-234.

[77] Second Hodgson Decl. ¶ 16.

[78] Award ¶ 831.

[79] Second Hodgson Decl. ¶ 12.

Hodgson calls a "third method" was the Tribunal's independent best judgment[80] as to value based precisely on the competing expert assessments presented and indeed within the range of values proffered in those competing assessments.  This is the core function of an arbitration Tribunal – to exercise its independent judgment and come to its own conclusions based on the parties' competing assertions.  That the Tribunal did precisely that in determining the amount of compensation due Gold Reserve is not a ground to refuse enforcement of the Award.

39.     Finally, Ms. Hodgson urges the Court to review the hearing transcript on the issue of whether Venezuela's expert confirmed that a "rough" approximation based on a "back-of-the-envelope" calculation could provide a reasonable measure of value.[81]  The record is indeed clear on this point.[82]  The full exchange between the President of the Tribunal and Dr. Burrows establishes that the Tribunal's approach was entirely in line with the expert's testimony on this issue.[83]  In addition, while Dr. Burrows suggested that either he or Mr. Kaczmarek could re-run the DCF model if the Tribunal considered helpful,[84] he did not state that doing so was necessary to arrive at a reasonable measure of value.

40.     Thus, there is no basis to conclude that Venezuela was denied the right to be heard or indeed any due process rights in regard to the Joint Expert Procedure.

C.     The Correction Requests

41.     Ms. Hodgson maintains that Venezuela was denied due process in regard to its request for correction of the Award because the Tribunal did not hold an oral hearing on the

---

[80] *See* Second Hodgson Decl. ¶ 20 (complaining that rather than accepting "the Parties' arguments," the Tribunal used what it considered to be its "best judgment" and its "own independent judgment").

[81] Second Hodgson Decl. ¶ 17.

[82] *See* Smutny Decl. ¶ 36.

[83] *See* Arbitration Hearing Transcript for October 16, 2013 (Excerpted) (Exhibit 29), at 225:6-226:9. *See also* Smutny Decl. ¶ 36

[84] *See* Arbitration Hearing Transcript for October 16, 2013 (Excerpted) (Exhibit 29), at 227:22-228:4.  *See also* Second Hodgson Decl. ¶ 19.

application or permit Venezuela additional opportunities for responsive pleadings. She maintains that because of "the large amount of money at stake," Venezuela should have been given "the opportunity to be fully and completely heard."[85] Due process does not require that a party be heard *ad infinitum*. Venezuela had a full opportunity to present its request for correction of what it contended was a "clerical, arithmetical or similar error." It is also evident that the Tribunal "completely heard" Venezuela's argument and rejected the suggestion that it had made a "clerical, arithmetical or similar error." There is no indication that the Tribunal did not fully appreciate Venezuela's arguments in favor of correction. The fact, to which Ms. Hodgson points, that the Tribunal underscored that its decision was indeed "a deliberate and considered decision based on the expert evidence before it and its own independent judgment,"[86] makes clear that the allegedly offending aspect of the Award was not a "clerical, arithmetical or similar error" and thus that there was no basis for a correction under the ICSID Additional Facility Rules.

42. Ms. Hodgson asserts that I had "studiously avoided" addressing Gold Reserve's request for correction of the Award in my prior declaration.[87] In fact, I pointed out that Gold Reserve requested a correction as well and that the Tribunal rejected both Parties' requests.[88] Although the Tribunal did not accept all of Gold Reserve's arguments during the Arbitration, Gold Reserve accepts, unlike Venezuela, that the Tribunal fully considered the Parties' evidence and argument and issued an award fully in accordance with due process of law.

43. Attached to this Declaration are, to the best of my knowledge, true and correct copies of the following documents:

---

[85] Second Hodgson Decl. ¶ 24.
[86] Second Hodgson Decl. ¶ 20.
[87] Second Hodgson Decl. ¶ 22.
[88] Smutny Decl. ¶ 38.

Exhibit 22        Excerpted Request for Arbitration dated October 21, 2009

Exhibit 23        Excerpted Claimant's Memorial dated September 24, 2010

Exhibit 24        Excerpted Expert Report of Brent C. Kaczmarek, CFA dated September 24, 2010

Exhibit 25        Excerpted Claimant's Reply dated July 29, 2011

Exhibit 26        Excerpted Claimant's Post-Hearing Brief dated March 16, 2012

Exhibit 27        Excerpted Rejoinder on Jurisdiction and Merits of the Bolivarian Republic of Venezuela dated December 8, 2011

Exhibit 28        Excerpted Arbitration Hearing Transcript for February 17, 2012

Exhibit 29        Excerpted Arbitration Hearing Transcript for October 16, 2013

Exhibit 30        Excerpted Bolivarian Republic of Venezuela's Joint Expert Procedure Post-Hearing Brief dated December 23, 2013

Exhibit 31        Excerpted Claimant's Post Hearing Brief Following Procedural Order No. 2 dated December 23, 2013

Exhibit 32        Excerpted Expert Report of Dr. James C. Burrows dated April 14, 2011

Exhibit 33        Excerpted Joint Expert Procedure Report of Dr. James C. Burrows dated May 24, 2013

Exhibit 34        Gary B. Born, INTERNATIONAL COMMERCIAL ARBITRATION (2d ed. 2014), pages 2274-2275 and 3520

Exhibit 35        Excerpted Arbitration Hearing Transcript for February 15, 2012

Exhibit 36        Excerpted Arbitration Hearing Transcript for February 16, 2012

Exhibit 37        Compilation of Excerpts Referenced in Footnote 56

Exhibit 38        Letter from Gold Reserve to the Tribunal dated December 10, 2012

Exhibit 39        Letter from ICSID to the Parties dated January 21, 2013

Exhibit 40        Letter from Gold Reserve to the Tribunal dated August 26, 2013

Exhibit 41        Procedural Order No. 1 dated February 3, 2011

Exhibit 42     Letter from Venezuela's counsel to Gold Reserve's counsel dated November 15, 2010

Exhibit 43     Letter from Venezuela to the Tribunal dated September 12, 2012

Exhibit 44     Letter from ICSID to the Parties dated September 20, 2012

Exhibit 45     Letter from Venezuela's counsel to Gold Reserve's counsel dated February 20, 2013

Exhibit 46     Letter from ICSID to the Parties dated March 12, 2013

Exhibit 47     Letter from ICSID to the Parties dated February 1, 2013

Exhibit 48     Excerpted Claimant's Comments on the Reports of the Experts Submitted in Response to Procedural Order No. 2 dated August 5, 2013

44.     I declare under penalty of perjury that the foregoing is true and correct.

Executed on August 31, 2015
Washington, D.C.

_____
Abby Cohen Smutny