**UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

|  |  |
|---|---|
| **GOLD RESERVE INC.,** | |
| **Petitioner,** | |
| v. | **Civil Action No. 14-2014 (JEB)** |
| **BOLIVARIAN REPUBLIC OF VENEZUELA,** | |
| **Respondent.** | |

**<u>MEMORANDUM OPINION</u>**

Associate Justice Stephen Breyer has recently noted the striking increase in the share of the Supreme Court's docket involving cases that "call on the Court to consider foreign persons and activities."  Stephen Breyer, <u>The Court and the World</u> 3 (2015).  Following this trend, the present case — a dispute between a Canadian mining company and a foreign state — asks this Court to untangle a web of international agreements, foreign procedures, and multinational corporate-ownership structures.  While the facts undergirding this suit take place far from Washington, D.C., the parties are properly here.

The present quarrel involves the abrupt curtailment of mining concessions granted by Venezuela to a subsidiary of a company called Gold Reserve Inc.  Yet their dispute has already been adjudicated by an international arbitration tribunal, as mandated under the terms of a bilateral investment treaty between Canada and Venezuela.  After nearly five years of briefings, exhibits, expert reports, and hearings, that tribunal, sitting in Paris, awarded over $700 million in damages to Gold Reserve.  As Petitioner, the company now seeks to enforce the Award here under authority granted by the Convention on the Recognition and Enforcement of Foreign

1

Arbitral Awards (commonly referred to as the New York Convention), which has been incorporated in U.S. law through the Federal Arbitration Act. Given the FAA's favorable stance toward the enforcement of arbitration awards — both domestic and foreign — Venezuela does not, and cannot, seek *de novo* review of the merits of the arbitral tribunal's decision. Instead, alleging violations of due process and public policy, it asks the Court to deny enforcement of the Award. After a grand tour around the world of foreign and international law, the Court ultimately holds that Gold Reserve may indeed have its Award enforced right here in Washington.

**I.     Background**

A.  Parties

Petitioner is a mining company incorporated under the laws of the Province of Alberta, Canada, although it was incorporated under the laws of the Yukon Territory at the time arbitration was initiated in October 2009. See Pet., ¶ 2 & n.2. As it turns out, Petitioner's nationality and ownership structure are front and center to the resolution of this case — and hotly contested by the parties. This is because determining which corporate entity possessed an ownership interest in the concessions at issue is not straightforward.

Those concessions granted 20 years' exclusive extraction rights to near-surface gold resources and hard rock gold, copper, and molybdenum resources located within the 500-hectare property in Venezuela known as Brisas. See id., Declaration of Matthew H. Kirtland (ECF No. 2), Exhs. 1(A)-1(D) (Arbitration Award), ¶ 10. These concessions were known as the Brisas and Unicornio Concessions. See id., ¶¶ 10-12. In 1988, the Brisas Concession was originally granted to a Venezuelan company, Compañia Aurífera Brisas del Cuyuní, C.A. ("Brisas Company"), which was acquired in November 1992 by Gold Reserve de Venezuela, a subsidiary

of the United States company Gold Reserve Corporation ("Gold Reserve Corp.").  See id., ¶ 11.

The Brisas Company applied for rights to the Unicornio Concession in 1993, which it received in

1998.  See id., ¶ 12.  To complicate matters further, on October 5, 1998, Gold Reserve

Incorporated ("Gold Reserve Inc.") — the Petitioner here — was incorporated in Canada as a

wholly owned subsidiary of Gold Reserve Corp. — the American company.  See id.  In early

1999, however, Gold Reserve Inc. acquired the shares of Gold Reserve Corp., thereby becoming

the latter's parent company.  See id., ¶¶ 11, 235.  From that point forward, the Canadian Gold

Reserve Inc. was the parent company of the American Gold Reserve Corp., which in turn held

the Venezuela subsidiary Gold Reserve de Venezuela, owner of the Brisas Company that held

the Brisas and Unicornio Concessions.  See id., ¶ 11.  Or, for those more spatial learners:



Much simpler is the status of Respondent, which is the Bolivarian Republic of Venezuela, which granted — and then revoked — the Brisas and Unicornio Concessions. See id., ¶ 2.

In light of the nationalities of the parties, the Tribunal adjudicating the dispute did so according to the bilateral investment treaty between Canada and Venezuela, which came into force on January 28, 1998. See Kirtland Decl., Exh. 2 (Agreement between the Government of Canada and the Government of Venezuela for the Promotion and Protection of Investments, Can.-Venez., Jan. 28, 1988, E101531–1998 Can. T.S. No. 20) (the "BIT"). According to Respondent, Gold Reserve's corporate ownership structure is relevant because the Canada-Venezuela BIT would have no applicability if Petitioner were not considered a Canadian company as defined by the BIT. For ease of reference, the Court will refer to all of the Gold Reserve entities as "Gold Reserve" unless distinguishing among them, as in Sections III.A.3 and III.C.1, *infra*.

B.  Dispute Over Concessions

In most federal suits, the merits dispute between the parties is of central relevance to any resolution. Here, however, Gold Reserve's Petition for enforcement of the Award, and Venezuela's opposition thereto, do not turn on the issues that led to the arbitration itself, and so the Court will only briefly recite the facts pertaining to that disagreement. The Award concerns Gold Reserve's claims arising out of Venezuela's revocation of permits and licenses related to the concessions, as well as its seizure of Petitioner's assets. See Arb. Award, ¶¶ 24-28. While Respondent alleged breaches of mining and environmental obligations that justified the rescission, see MTD at 6, Petitioner rejoined that this cancellation constituted a "failure to accord fair and equitable treatment" in violation of the BIT. See Pet., ¶ 17. Specifically, Gold Reserve

alleged that, after it had invested close to $300 million between 1992 and 2008 to develop gold and copper mining projects on the concessions, its investments were "unlawfully and effectively taken from it as a result of and by the decisions and actions taken, directed, and supported by the administration of the then-President of Venezuela, Hugo Chávez." Id., ¶¶ 18, 20.

C. The Arbitration

To vindicate its rights, Petitioner sought adjudication of the dispute through arbitration under the BIT, submitting its request pursuant to the International Centre for Settlement of Investment Disputes (ICSID) Arbitration (Additional Facility) Rules on October 21, 2009. See id., ¶¶ 21, 22; Arb. Award, ¶ 29; Kirtland Decl., Exh. 4 (Consent and Authorization to Commence Arbitration of Bilateral Investment Treaty Dispute) ("Consent to Arbitrate"); see also Additional Facility Rules, available at https://icsid.worldbank.org/apps/ICSIDWEB/icsiddocs/ Documents/AFR_English-final.pdf. In its initial request, Gold Reserve sought compensation both for itself and on behalf of its Venezuelan subsidiary for losses, including pre- and post-award interest. See Pet., ¶ 22.

As is often the case, the parties did not agree on the number of arbitrators or their method of appointment within 60 days of registration of the request. See Arb. Award, ¶ 32. As a result, in January 2010, the Secretary-General of ICSID informed the parties that, in accordance with ICSID Arbitration Additional Facility Rule Article 9(1), a three-member Arbitral Tribunal would be composed of one arbitrator appointed by each party, and a third, the president of the tribunal, would be appointed by mutual agreement of the parties. See id., ¶ 33. Gold Reserve appointed Professor David A.R. Williams QC, and Venezuela appointed Professor Pierre-Marie Dupuy. See id., ¶¶ 33-35. The parties jointly settled on Professor Piero Bernardini as President of the

Tribunal.  <u>See id.</u>, ¶¶ 33, 38-39.  They also jointly selected Paris to be the seat of the arbitration.
<u>See</u> MTD at 33; Pet., ¶ 27.

      After several rounds of pre-hearing briefings and the exchange of expert-witness reports,
the Tribunal held a hearing on both jurisdictional and merits matters in Washington, D.C., on
February 13-17, 2012.  <u>See</u> Pet., ¶ 30.  Fact and expert witnesses also testified during this
hearing.  <u>See id.</u>  After additional submissions, the Tribunal held a further hearing for two more
days in Paris on October 15-16, 2013, and reviewed further submissions from the parties through
December 2013.  <u>See id.</u>, ¶¶ 31-32.  Over two years after the initial hearing on the matter and
nearly five years after Gold Reserve's initial request was filed, the Tribunal announced its
unanimous Award on September 22, 2014, consisting of a not-inconsiderable 225 pages of
factual findings and legal determinations.  <u>See id.</u>, ¶¶ 35-36; <u>see generally</u> Arb. Award.  The
Tribunal found Venezuela in breach of Article II(2) of the BIT by "failing to accord fair and
equitable treatment to Gold Reserve's investment."  Arb. Award, ¶ 863.  It further concluded that
the "number, variety, and seriousness of the breaches make the FET violation by Respondent
particularly egregious. The compensation due to Claimant for such breaches should reflect the
seriousness of the violation."  <u>Id.</u>, ¶ 615.  The Tribunal accordingly ordered Venezuela to pay
Gold Reserve compensation in the sum of $713,032,000, plus pre- and post-award interest, and
$5 million in legal fees incurred by Gold Reserve in vindicating its interests before the Tribunal.
<u>See</u> Pet., ¶¶ 38-40; Arb. Award, ¶¶ 863, 850-56.

      This was not the end of the story, however.  Because the parties agreed to arbitrate their
dispute in Paris, the arbitration was governed by French arbitration law, and so Venezuela
appealed the Award to the Paris Court of Appeal.  <u>See</u> MTD at 17.  Venezuela separately filed a
notice of petition to set aside the Award with that court, and Gold Reserve countered with a

petition to confirm it.  See id.  These two procedures are different in scope and length.  Although the Court of Appeal confirmed the Award — since the only basis on which not to do so is if it is manifestly contrary to international public policy — it is presently considering Venezuela's petition to set aside the Award, a proceeding that entails a more searching review of the Tribunal's decisionmaking.  See id. at 17-18.  Respondent recently notified the Court that oral arguments before that court have been rescheduled from November 3, 2015, to February 4, 2016. See Notice of Change of Schedule in Paris Court of Appeal (ECF No. 39).  Independent of these Parisian proceedings, across the Atlantic, Gold Reserve filed the instant Petition to Confirm the Award, which Venezuela has opposed.

## II.    Legal Standard

The Court begins with the procedural backdrop.  At first glance, it might seem strange that a dispute of this nature — confirmation of an ICSID arbitration award issued in France and governed by a bilateral investment treaty between Canada and Venezuela — has ended up in this Court.  Yet U.S. domestic law enables just such a procedure for confirmation and enforcement. Gold Reserve's Petition to Confirm the Arbitral Award is governed by the New York Convention, which provides for "recognition and enforcement of arbitral awards made in the territory of a State other than the State where the recognition and enforcement of such awards are sought."  Convention on the Recognition and Enforcement of Foreign Arbitral Awards, opened for signature June 10, 1958, art. I.1, 21 U.S.T. 2517 ("New York Convention").  Since the Award was made in France and enforcement is sought in the United States, both of which are signatories to the New York Convention, the confirmation is governed by the Convention.  See Pet., ¶ 47; U.S. Dept. of State, Treaties in Force: A List of Treaties and Other International Agreements of the United States in Force on January 1, 2007, § 2 at 12, available at

http://www.state.gov/documents/organization/89668.pdf.  The New York Convention, moreover,

has been codified via the Federal Arbitration Act, 9 U.S.C. §§ 201-208, which permits any party

to an arbitration under the Convention to seek confirmation of the arbitral award in U.S. federal

district court within three years of the award.  See 9 U.S.C. § 207.

      As with claims concerning domestic arbitral awards, courts that are asked to confirm

international arbitral decisions do so recognizing the substantial deference they owe to arbitral

tribunals under the FAA: "Consistent with the 'emphatic federal policy in favor of arbitral

dispute resolution' recognized by the Supreme Court[,] . . . the FAA affords the district court

little discretion in refusing or deferring enforcement of foreign arbitral awards."  Belize Social

Development Ltd. v. Government of Belize, 668 F.3d 724, 727 (D.C. Cir. 2012) (quoting

Mitsubishi Motors Corp. v. Soler Chrysler–Plymouth, Inc., 473 U.S. 614, 631 (1985)).

      A further constraint is that courts "may refuse to enforce the award [brought under the

New York Convention] only on the grounds explicitly set forth in Article V of the Convention."

TermoRio S.A. E.S.P. v. Electranta S.P., 487 F.3d 928, 935 (D.C. Cir. 2007) (citation omitted);

see also Int'l Trading & Indus. Inv. Co. v. DynCorp Aerospace Tech., 763 F. Supp. 2d 12, 19

(D.D.C. 2011) (collecting cases).  Because "the New York Convention provides only several

narrow circumstances when a court may deny confirmation of an arbitral award, confirmation

proceedings are generally summary in nature."  DynCorp Aerospace Tech., 763 F. Supp. 2d at 20

(citing Zeiler v. Deitsch, 500 F.3d 157, 169 (2d Cir. 2007)).  The party resisting confirmation —

in this case, Venezuela — bears the heavy burden of establishing that one of the grounds for

denying confirmation in Article V applies.  See Imperial Ethiopian Gov't v. Baruch-Foster

Corp., 535 F.2d 334, 336 (5th Cir. 1976); see also Ottley v. Schwartzberg, 819 F.2d 373, 376 (2d

Cir. 1987) ("[T]he showing required to avoid summary confirmation is high.").

### III.   Analysis

With that framework in mind, Venezuela raises three types of challenges to block confirmation of the Award, each of which it alleges falls within the New York Convention's Article V exceptions permitting non-enforcement.  First, it contends that the Award exceeds the scope of Venezuela's consent to arbitration; second, it asserts that the Tribunal's conduct during the hearing violated the country's due-process rights; and third, it argues that the Award is contrary to U.S. public policy because it assesses punitive damages against a foreign state. Alternatively, should the Court choose to order enforcement of the Award, Venezuela seeks to have confirmation stayed pending resolution of the appeal currently before the Paris Court of Appeal.  The Court will first separately address Venezuela's three substantive challenges and conclude by examining the question of staying enforcement.

### A.   Award Exceeds Scope

In its first challenge, Venezuela contends that the Award exceeded the scope of its consent to arbitrate.  In so doing, Respondent invokes Article V(1)(c) of the New York Convention, which provides in relevant part:

> Recognition and enforcement of the award may be refused . . . if . . . [t]he award deals with a difference not contemplated by or not falling within the terms of the submission to arbitration, or it contains decisions on matters beyond the scope of the submission to arbitration. . . .

At the outset, the Court takes care to note that Venezuela's challenge actually involves a two-part inquiry.  This is because the Court must not only decide, substantively, whether the Tribunal acted within its permissible scope to arbitrate.  Before doing so, it must first determine, procedurally, the amount of deference it should grant the Tribunal's own determination of such

Case 1:14-cv-02014-JEB   Document 42   Filed 11/20/15   Page 10 of 39

scope, insofar as that question was itself delegated to the Tribunal.  The Court begins with the
latter.

### 1.  *Deference Owed to Tribunal*

In cases where both parties have clearly and unmistakably delegated the question of
arbitrability to the arbitrator, a court "should give considerable leeway to the arbitrator, setting
aside his or her decision only in certain narrow circumstances."  First Options of Chicago, Inc. v.
Kaplan, 514 U.S. 938, 943 (1995).  Indeed, at least one circuit has held that where the parties
"clearly and unmistakably agreed to arbitrate issues of arbitrability," the party resisting
confirmation of the award "is not entitled to an independent judicial redetermination of that same
question."  Schneider v. Kingdom of Thailand, 688 F.3d 68, 74 (2d Cir. 2012).  To the extent
that the parties here have "clearly and unmistakably" agreed to arbitrate arbitrability, then, this
Court must give substantial deference to that decision.  This is because "the [New York]
Convention . . . does not sanction [a Court's] second-guessing the arbitrator's construction of the
parties' agreement."  Parsons & Whittemore Overseas Co., Inc. v. Societe Generale De
L'Industrie Du Papier (RAKTA), 508 F.2d 969, 977 (2d Cir. 1974).

The question, consequently, is whether the parties so "clearly and unmistakably" agreed
to delegate arbitrability.  At first glance, the answer could hardly appear to be in dispute.  The
parties consented that arbitration proceedings between them would be governed by the ICSID
Additional Facility Arbitration Rules.  See Arb. Award, ¶¶ 29-31; Consent to Arbitrate at 1-2.
Under the BIT, where "either the disputing Contracting Party or the Contracting Party of the
investor, but not both, is a party to the ICSID Convention," the investor may submit the dispute
to arbitration under the Additional Facility Rules of ICSID.  See BIT, art. XII(4)(b).  It is
undisputed that Canada is a party to the ICSID Convention and Venezuela is not.  See ICSID,

List of Contracting States and Other Signatories of the Convention (as of April 18, 2015), <u>available at</u> https://icsid.worldbank.org/apps/ICSIDWEB/icsiddocs/ Documents/List%20of%20Contracting%20States%20and%20Other%20Signatories%20of%20th e%20Convention%20-%20Latest.pdf.  The Additional Facility Rules, in turn, explicitly provide that "[t]he Tribunal shall have the power to rule on its competence."  Additional Facility Rules, art. 45(1).  As Gold Reserve argues, "[B]y incorporating the ICSID Additional Facility Arbitration Rules into their arbitration agreement through the BIT, the parties agreed that the Tribunal would decide any issues of arbitrability."  Opp. at 6-7.

Venezuela objects to this straightforward resolution of the question, responding that its "standing offer to arbitrate" under the BIT only applies if the relevant investor "fulfills the conditions set out in the treaty."  MTD at 20.  As described in more detail below, Respondent contends that Gold Reserve Inc. was not properly an investor under the definition of the BIT, and so Venezuela never consented to arbitration with that entity.  <u>Id.</u> at 21. Venezuela's argument seems to create a sort of analytic Möbius strip: it only consented to the arbitral tribunal when the counterparty is an investor under the BIT, but under the BIT the parties must rely on that same arbitral tribunal to determine whether Gold Reserve Inc. was a proper investor in the first place. At bottom, the ICSID Additional Facility Rules governing such arbitrations under the BIT clearly state that the Tribunal has the power to rule on its own competence, which the Tribunal here did.  <u>See generally</u> art. 45.  The Court thus considers Venezuela's arguments in light of the substantial deference owed to the Tribunal's own findings concerning its scope to act.

* * *

Having resolved the level of deference owed to the Tribunal, the Court turns to the meat of the matter.  Venezuela provides two substantive reasons why the Tribunal acted "beyond the

scope" of Respondent's submission to arbitration.  First, Venezuela claims that the Tribunal

lacked jurisdiction over the parties because Gold Reserve Inc. — the Canadian entity — "does

not qualify as an investor under the BIT."  Id. at 20.  Second, it further contends that Gold

Reserve Inc. was not the proper entity to be awarded damages, as the BIT allows compensation

to be awarded only to the "affected enterprise" — which it argues should be Gold Reserve's

Venezuelan subsidiary only.  See id. at 24.  The Court considers the two issues in turn.

### 2.  *Definition of Investor Under BIT*

Venezuela first asserts that because Gold Reserve Inc. does not qualify as an investor

under the BIT, "the Tribunal had no jurisdiction over a dispute between Venezuela" and that

company.  See MTD at 20.  To remind the reader, Gold Reserve Inc., as of 1999, was the parent

of all Gold Reserve subsidiaries.  Venezuela's objection here is not novel: it first contested the

jurisdiction of the Tribunal in a letter dated December 22, 2010, in which it requested that the

Tribunal suspend the proceedings on the merits until deciding the jurisdiction question.  See Arb.

Award, ¶ 97.  After hearing from both parties, the Tribunal determined that suspension of the

proceedings on the merits was not warranted.  See id., ¶ 103.  Instead, it joined Respondent's

jurisdictional objections to its merits objections, choosing to adjudicate both simultaneously, see

id., a choice permitted under the ICSID Additional Facility Rules.  See Additional Facility Rules,

art. 45(5).  The Tribunal ultimately held, as part of its Award, that it did possess jurisdiction over

the dispute.  See Arb. Award, ¶ 272.

### a.  Tribunal's Jurisdictional Findings

The Tribunal began its analysis by consulting the BIT, which involved a three-part

inquiry.  Under the BIT, a Canadian "investor" is "[1] any enterprise incorporated or duly

constituted in accordance with applicable laws of Canada, who [2] makes the investment in the

territory of Venezuela and who [3] does not possess the citizenship of Venezuela." BIT, art.

I(g)(ii) (emphases added). As to the first and third requirements, the Tribunal determined that

Gold Reserve Inc. was incorporated in Canada and did not possess Venezuelan nationality. <u>See</u>

Arb. Award, ¶ 250. Although it noted Venezuela's contention that Gold Reserve was

headquartered in the United States — and therefore that the Canadian entity was merely a "shell

company" — it pointed to ICSID precedent identifying incorporation as the proper test for

nationality, not "control" or a "genuine connection." <u>Id.</u>, ¶¶ 251-52. Furthermore, as the

Tribunal noted, the state parties to the BIT "could have chosen to include a 'genuine link' test or

a 'management' test, but did not. The Tribunal cannot read these criteria into the BIT." <u>Id.</u>,

¶ 255. And it observed that even under such a test, Gold Reserve would likely succeed, given

that a growing majority of its shares were held by Canadian investors and that the Canadian

Government had directly intervened on its behalf in dealing with Venezuelan authorities. <u>See</u> <u>id.</u>

Absent evidence of abuse (such as incorporation taking place <u>after</u> the dispute arose, which was

not the case here), the Tribunal concluded no further inquiry was necessary. <u>See</u> <u>id.</u>, ¶ 252.

More complicated was its determination of the second requirement — <i>viz.</i>, that Gold

Reserve Inc. had <u>made an investment</u> in the territory of Venezuela. In order to answer this, the

Court must determine whether Gold Reserve <u>Inc.</u> — rather than its subsidiary — can be

considered to have made such an investment. In other words, while <u>a</u> Gold Reserve entity had

made such an investment, the question was whether this could be attributed to Gold Reserve Inc.,

the party to the arbitration. The Tribunal began by recognizing that the BIT's definition of

investment "expressly includes 'rights, conferred by law or under contract, to undertake any

economic and commercial activity, including any rights to search for, cultivate, extract or exploit

natural resources.'" <u>Id.</u>, ¶ 257 (quoting BIT, art. I(f)(vi)). It held that "the ordinary meaning of

the words, 'making an investment in the territory of Venezuela[,]' does not require that there must be a movement of capital or other values across Venezuelan borders." Id., ¶ 261.  This is because, were such a condition to be inferred, an existing investment in Venezuela would not be protected by the BIT if it were acquired by a third party — even if the acquiring party then invested funds in Venezuela to finance the activity of the acquired business.  See id., ¶ 262.

The Tribunal cited several precedents in which ICSID tribunals found that the acquisition of an entity "which owned the companies who held the concessions was considered by all to be sufficient to constitute the 'making' of an investment." Id., ¶¶ 264, 263-69; see also Millicom Int. Operations v. Senegal, ICSID Case No. ARB/08/20, Decision on Jurisdiction (July 16, 2012); Mobil Corp. v. Bolivarian Republic of Venezuela, ICSID Case No. ARB/07/27, Decision on Jurisdiction (June 10, 2010); EnCana Corp. v. Republic of Ecuador, LCIA Case No. UN3481, UNCITRAL, Award (Feb. 3, 2006); Aguas del Tunari S.A. v. Republic of Bolivia, ICSID Case No. ARB/02/3, Decision on Respondent's Objections on Jurisdiction (Oct. 21, 2005).  In light of this, the Tribunal concluded:

> There is no support in previous cases for contentions pertaining to a lack of investment as a result of (1) the parent company entering the structure after the concession had been granted; (2) the parent company being inserted as a result of an internal corporate restructure; or (3) the new parent company being incorporated in a jurisdiction with a BIT which has previously not been relevant.

Id., ¶ 270.

The Tribunal further cited to the fact that one of Gold Reserve's stated reasons for incorporating as a Canadian entity was to raise funds in Canada for its mining activities in Venezuela; indeed, most of the U.S. $300 million invested in the mining projects came through such Canadian investors.  See id., ¶ 271.  In light of the plain meaning, precedents, and factual background, the Tribunal concluded that Gold Reserve "satisfie[d] the definition of investor both

14

as a Canadian incorporated company and as a company that made an investment in Venezuela,"

and therefore that the Tribunal had jurisdiction to adjudicate the claim.  See id., ¶ 272.

> b.  Venezuela's Contentions

Venezuela contests the Tribunal's findings here.  In its Motion to Dismiss before this

Court, it argues that "[p]ermitting Gold Reserve to take advantage of protections intended for

Canadian investors would be an abuse of rights," MTD at 22, for it alleges that Gold Reserve "is

not a *bona fide* Canadian enterprise."  Id. at 21.  For the most part, Venezuela's contentions echo

those it raised before the Tribunal, and which the Tribunal rejected.  As a reminder, the New

York Convention "does not sanction second-guessing the arbitrator's construction of the parties'

agreement."  Parsons & Whittemore Overseas Co., 508 F.2d at 977.  The precedents Venezuela

cites for the Tribunal's lack of jurisdiction, furthermore, do not hold up under scrutiny and were

properly distinguished in that proceeding.  Phoenix Action Ltd. v. Czech Republic, ICSID Case

No. ARB/06/5, Award (Apr. 15, 2009), for instance, concerned an ongoing legal dispute

involving the Czech government and two Czech companies whose owner had fled the Czech

Republic, obtained Israeli citizenship, reacquired the companies, and then brought an arbitration

claim against the Czech Republic under the Czech-Israeli BIT.  See id., ¶ 137.  That tribunal

understandably found that the investment project "was made simply to assert a claim under the

BIT."  Id., ¶ 138.  In contrast, as the Tribunal noted, Gold Reserve's "incorporation in Canada

occurred before the dispute arose, for legitimate purposes."  Arb. Award, ¶ 252.  The

international-arbitration precedents cited by the Tribunal indicate that a bona fide-enterprise test

was not implicated in the BIT's definition of "incorporated," and evidence suggests Gold

Reserve could satisfy such a condition even if it were required.  In light of this — and the

deferential standard of review U.S. courts grant arbitral tribunals — the Court concludes that the

Tribunal properly determined that Gold Reserve Inc. was an investor and that it could thus hear the claim.

### 3.  *Affected Enterprise*

Venezuela next argues that the Tribunal awarded damages to the wrong party.  It alleges that non-enforcement is warranted because the Award contravenes "the express terms of the BIT by awarding damages to Gold Reserve for harm allegedly suffered by its indirectly held subsidiary, the Brisas Company."  MTD at 23.  Respondent points to Article XII(9) of the BIT, which provides that "[w]here an investor brings a claim under this Article regarding loss or damage suffered by an enterprise the investor directly or indirectly owns or controls any award shall be made to the affected enterprise."  BIT, art. XII(9).  It accordingly contends that because Gold Reserve's Venezuelan subsidiary is a separate corporate entity from Gold Reserve Inc., and because the mining concessions that underlie the dispute belonged to the former, the subsidiary was the affected enterprise to whom compensation should have been awarded.  See MTD at 23-24.

As a preliminary matter, the parties contest whether Venezuela properly raised this issue in its briefs ahead of the arbitral hearing and/or during the hearing itself.  Gold Reserve contends that the country "waived any claim that the Tribunal should have awarded damages to Gold Reserve's subsidiary rather than Gold Reserve itself" because it "failed to raise its Article XII(9) argument with the Tribunal, and thereafter abandon[ed] the issue altogether . . . ."  Sur-Reply at 8.  The Court first looks at whether Venezuela was on notice that Gold Reserve Inc. was bringing the claim on its own behalf and then at whether Respondent thus waived its challenge concerning the affected enterprise.  Finding waiver exists here, the Court will not consider the merits of the issue.

a.   Notice

Petitioner argues that because it repeatedly raised a claim for losses on behalf of Gold

Reserve Inc., Venezuela was aware throughout the hearing that this was the entity seeking

damages.  While acknowledging that in its initial Request for Arbitration that Gold Reserve

"submitted consents and waivers that permitted claims to be presented both for Gold Reserve's

losses as well as those of its subsidiaries," it states that in its first substantive submission, and in

every subsequent submission before the Tribunal, "it presented its claim only on behalf of its

own damages, and not those of its subsidiaries . . . ."  Sur-Reply at 5.  To evince this, it points to

language in its Claimant's Memorial — its first advocacy brief before the Tribunal — submitted

in 2010, in which it expressly made the case that Gold Reserve Inc. could bring claims regarding

its own losses under the BIT:

> Article XII of the BIT . . . provides that Gold Reserve may submit
> its claims that . . . Gold Reserve has incurred loss and damage by
> reason of or arising out of those breaches. . . . The fact that the BIT
> also permits investors to bring claims regarding loss or damage
> suffered by an enterprise that the investor directly or indirectly owns
> or controls does not detract from the investor's right to bring claims
> regarding its own losses.

Sur-Reply, Exh. 23 to Second Declaration of Abby Cohen Smutny (Claimant's Memorial (Sept.

24, 2010)), ¶¶ 364-367.  Gold Reserve continued to make claims for its own losses in evidence

presented by its damages expert, see id., Exh. 24 to Smutny Second Decl. (Expert Report of

Brent C. Kaczmarek, CFA (Sept. 24, 2010)), ¶¶ 7, 56; in its Reply brief, see id., Exh. 25 to

Smutny Second Decl. (Claimant's Reply (July 29, 2011)), ¶ 687 (seeking compensation wholly

and solely on behalf of Claimant Gold Reserve Inc.); and in its post-hearing brief.  See id., Exh.

26 to Smutny Second Decl. (Claimant's Post-Hearing Brief (March 16, 2012)), ¶ 83 ("Gold

Reserve seeks monetary damages in the amount of the loss it suffered as a result of Respondent's

breaches of the BIT.").  Given that Gold Reserve repeatedly made the claim on its own behalf,

the Court agrees that "Venezuela thus was fully aware that Gold Reserve sought relief in the

arbitration for its own losses."  Sur-Reply at 6.

           b.  Waiver

     If Venezuela had concerns that Gold Reserve Inc. was not the proper entity to be awarded

damages, Petitioner contends, it "should have raised them during the arbitration proceedings, and

offered any supporting factual and legal argument . . . to the arbitration Tribunal.  It did not.  It

has therefore waived this argument."  Id.

     Venezuela counters that it did raise the argument — twice.  See Sur-Surreply at 2-3.

First, in a footnote of its Rejoinder on Jurisdiction and Merits to the Tribunal in December 2011,

it stated, "It should be noted, in fact, that pursuant to Article XII(9) of the Venezuela-Canada

BIT, any award would have to be made to Compañía Aurifera Brisas del Cuyuní, C.A. and GR

Minerales El Choco, C.A."  Sur-Reply, Exh. 27 to Second Smutny Decl. (Rejoinder on

Jurisdiction and Merits of the Bolivarian Republic of Venezuela (Dec. 8, 2011)), ¶ 667 n.1510.

Second, a representative of Venezuela raised the text of the BIT during the hearing itself, in the

midst of arguing that Gold Reserve did not properly qualify as an investor under the BIT,

prompting a short exchange with one of the Tribunal members.  See Sur-surreply at 3.  The

entire colloquy went as follows:

> Dr. GOODMAN: . . . And the Article IX of the last--very last
> paragraph of the Treaty says that where an investor brings a claim
> under this article regarding loss or damage suffered by an enterprise
> the investor directly or indirectly owns or controls, any award shall
> be made to the affected enterprise. I just draw that to your attention,
> should the--should that occasion ever arise. . . .
>
> ARBITRATOR WILLIAMS: May I just ask a question. What is the
> practical import of what you have just said about the award being to
> the affected enterprise? Do you believe that that, A, is a matter of

procedural significance and, B, a matter which affects Respondent?
How do you see it?

DR. GOODMAN: We do see that it's just a matter in the Treaty,
which we wanted to draw your attention to.

Sur-Reply Exh. 28 to Smutny Second Decl. (Hearing on Jurisdiction and Merits, Gold Reserve

Inc. v. The Bolivarian Republic of Venezuela, ICSID Case No. ARB(AF)/09/1 (Feb. 17, 2012)),

1200-01.

Although Gold Reserve cites to numerous cases that clearly indicate that a party waives a

claim that it entirely fails to raise in its briefings, these cases are not on all fours with the facts

here because, as both parties agree, Venezuela did — albeit obliquely — raise the issue.  The

Court is not persuaded, however, that the brief footnote in Venezuela's Rejoinder is sufficient.

The waiver threshold requires more.  After all, "perfunctory and undeveloped arguments, and

arguments that are unsupported by pertinent authority, are [also] deemed waived."  Johnson v.

Panetta, 953 F. Supp. 2d 244, 250 (D.D.C. 2013); see also Nikijuluw v. Gonzales, 427 F.3d 115,

120 n.3 (1st Cir. 2005) ("It is well established that issues adverted to in a perfunctory manner,

unaccompanied by some effort at developed argumentation, are deemed waived.") (citation and

internal quotation marks omitted); Dillery v. City of Sandusky, 398 F.3d 562, 569 (6th Cir. 2005)

(same); accord Bridas S.A.P.I.C. v. Gov't of Turkmenistan, 345 F.3d 347, 356 n.7 (5th Cir.

2003) ("Arguments that are insufficiently addressed in the body of the brief, however, are

waived.").  This is especially true where the only reference to the argument is raised in a

footnote.  See United States v. Judd, 42 F. App'x 140, 144 (10th Cir. 2002) ("Arguments made

in a perfunctory manner, such as in a footnote, are waived."); Tolbert v. Queens Coll., 242 F.3d

58, 75 (2d Cir. 2001) ("A contention is not sufficiently presented for appeal if it is conclusorily

asserted only in a footnote.").

This is because "[i]t is the [party's] task 'to spell out [their] arguments squarely and

distinctly.'" <u>Raines v. U.S. Dep't of Justice</u>, 424 F. Supp. 2d 60, 66 (D.D.C. 2006) (quoting

<u>Rivera–Gomez v. de Castro</u>, 843 F.2d 631, 635 (1st Cir.1988)).   Here, Venezuela fell well short

of the task required, even if the Court considers both the footnote and the hearing.   In regard to

the latter, it is important to mention that Dr. Goodman — speaking on behalf of Venezuela —

referred to the <u>wrong</u> article of the BIT, referencing Article IX.   <u>See</u> Hearing on Jurisdiction and

Merits, 1200-01 ("And the Article IX of the last--very last paragraph of the Treaty says that

where an investor brings a claim under this article regarding loss or damage suffered by an

enterprise the investor directly or indirectly owns or controls, any award shall be made to the

affected enterprise.").   Article IX, of course, it quiet on this issue, speaking instead to issues of

subrogation, and so it is not surprising that the tribunal member's response was to ask, "What is

the practical import of what you have just said . . . ?"   <u>Id.</u> at 1201.   Even under the most lenient

standard, Dr. Goodman's response, "We do see that it's just a matter in the Treaty, which we

wanted to draw your attention to," <u>id.</u> at 1201-02, clearly does not constitute "developed

argumentation."   <u>See</u> <u>Nikijuluw</u>, 427 F.3d at 120 n.3.   Indeed, his response did nothing to clarify

the "practical import" of Article XII.

Waiver is motivated by issues of fairness: in any adjudicatory context, "a litigant has an

obligation to spell out its arguments squarely and distinctly, or else forever hold its peace."

<u>Rivera-Gomez</u>, 843 F.2d at 635 (citation and internal quotation marks omitted).   Here, <u>Paterson-

Leitch Co., Inc. v. Massachusetts Mun. Wholesale Elec. Co.</u>, 840 F.2d 985 (1st Cir. 1988), is

instructive.   That court affirmed a district court's refusal to consider an argument that was only

raised before the magistrate judge "in a single sentence in its opposition memorandum, bereft of

meaningful citation of authority."   <u>Id.</u> at 990.   As the <u>Paterson-Leitch</u> court stated, "A party has a

duty to put its best foot forward . . . to spell out its arguments squarely and distinctly.  One should not be allowed to defeat the system by seeding the record with mysterious references to unpled claims, hoping to set the stage for an ambush should the ensuing ruling fail to suit."  Id. At all stages of the arbitration proceedings, Petitioner repeatedly asserted its claims on behalf of Gold Reserve Inc.  Given the thousands of pages of briefings and exhibits, if establishing the proper entity for a damages award was so central to Venezuela's legal position, one would expect this argument to be made with some clarity.

To the degree that Venezuela did not properly flag the issue before and during the hearing, furthermore, it blames Gold Reserve's obfuscation for the omission.  It contends Gold Reserve did not make clear that it was bringing claims only on its own behalf until post-hearing briefing.  See Sur-surreply at 4.  The Court, however, has just refuted that point by showing Gold Reserve made the argument in earlier pleadings as well.  In light of the substantial deference owed to the Arbitral Tribunal in making its determination, and the nearly five years the parties spent participating in the arbitration process, it would be inappropriate for the Court to second-guess the Tribunal regarding an argument that was never properly developed before it.  The Court thus finds that Venezuela waived its claim as to the proper entity to which an award should be issued under the BIT.

B.  Due-Process Violations

Venezuela next resists confirmation of the Award on the basis that the Tribunal violated due-process standards in the conduct of the hearing.  See MTD at 25.  The country again points to the New York Convention, which permits courts to deny enforcement of an arbitral award if "[t]he party against whom the award is invoked . . . was . . . unable to present his case . . . ."  New York Convention, art. V(1)(b).  At the outset, both sides agree that this standard means that

each party must be offered an "opportunity to be heard at a meaningful time and in a meaningful manner."  MTD at 25; see Opp. at 17.  Both cite to Iran Aircraft Indus. v. Avco Corp., 980 F.2d 141, 146 (2d Cir. 1992)), which incorporated from Mathews v. Eldridge, 424 U.S. 319, 333 (1976), the standard that "due process is the opportunity to be heard 'at a meaningful time and in a meaningful manner.'"  This is because the due-process standard applied in determining whether to enforce an award in a forum state — here, the United States — is that forum state's law.  See Generica Ltd. v. Pharm. Basics, Inc., 125 F.3d 1123, 1129-30 (7th Cir. 1997) ("[A]n arbitral award should be denied . . . if the party challenging the award proves that he was not given a meaningful opportunity to be heard as our due process jurisprudence defines it.") (emphasis added) (citing Iran Aircraft Indus., 980 F.2d at 145).  The Court will therefore assess Venezuela's claims under standards of American law, which require an arbitrator to provide a fundamentally fair hearing, defined as "one that meets the minimal requirements of fairness — adequate notice, a hearing on the evidence, and an impartial decision by the arbitrator." Generica, 125 F.3d at 1130 (citation and internal quotation marks omitted).

Venezuela's due-process objections are threefold.  First, it argues that the Tribunal provided disparate treatment by denying equal time for the parties to present their cases at the hearing.  Second, it asserts that the Tribunal employed a damages-calculation methodology different from that which had been agreed upon by the parties.  Third, it maintains that the Tribunal prevented Respondent from fully addressing arguments concerning the errors in the Award after issuing it.  The Court addresses each in turn.

### 1.  *Inequitable Treatment of Parties' Share of Time*

Venezuela first alleges that the Tribunal inequitably granted Gold Reserve "more than one-half of the five hearing days" in violation of the parties' rules regulating the proceedings.

<u>See</u> MTD at 26 (quoting Arb. Award, ¶ 77). Rule 2.1 states that "[t]he hearing shall proceed on the basis of an equal sharing of the available hearing time." <u>Id.</u>, Exh. 1 to Smutny Decl. (Procedural Rules for the Hearing on Jurisdiction and the Merits ("Arbitration Rules")) at 1.

 Although the parties had agreed to hold the hearing beginning February 9, 2012, after the death of the Attorney-General for Venezuela, Respondent requested that the Tribunal push back the date to February 13, 2012. <u>See</u> Arb. Award, ¶¶ 71, 75. This would reduce the hearing from a total of eight days to five. <u>See</u> Smutny Decl., ¶¶ 10, 12. Gold Reserve responded that it would object to this proposal if it reduced the time available to Gold Reserve to conduct direct examination of its own witnesses and cross-examination of Respondent's witnesses. <u>See</u> Arb. Award, ¶ 76. Counsel for Respondent, however, stated that it did "not intend to call any of Claimant's witnesses or experts. That, by itself, should significantly reduce the time necessary for the hearing." Opp., Exh. 2 to Smutny Decl. (Email from Ronald Goodman, Counsel for Respondent, to Members of the Tribunal (Feb. 1, 2012)). On account of Venezuela's intention not to cross-examine Gold Reserve's witnesses or experts, the Tribunal agreed to shorten the hearing to five days, but determined that Gold Reserve was "entitled to more than one-half of the five hearing days," since Gold Reserve intended both to present its own witnesses and experts and also to cross-examine Venezuela's. <u>See</u> Arb. Award, ¶ 77. The Tribunal determined that the "principle of equal sharing of the available hearing time set forth in Rule 2.1 of the Procedural Rules for the Hearing does not apply in this new situation, which is attributable to Respondent." <u>Id.</u> Even though the total time for witnesses was not equal, the Tribunal nonetheless went on to grant the parties equal time to present opening submissions (four and a half hours each), <u>see id.</u>, with each party taking a full day to present its opening, and both parties being granted two hours to make closing arguments and answer potential questions (if any). <u>See</u> Opp., Exh. 5 to Smutny

Decl. (Email from Tribunal to Parties (Feb. 8, 2012)), ¶ 3.  Venezuela objected to this plan,

requesting that "the principle of equal time for both sides be respected . . . ," Arb. Award, ¶ 80,

but the Tribunal nonetheless proceeded with its announced revised schedule.  Id., ¶ 82.

 Although Venezuela is technically right that the parties were not afforded equal time,

establishing a denial of a "meaningful opportunity to be heard" requires more.  Under Article

V(1)(b) of the New York Convention, confirmation may be denied only if it can be shown that

the party was "unable to present [its] case."  However, "the strong federal policy in support of

encouraging arbitration and enforcing arbitration awards dictates that we narrowly construe the

defense that a party was 'unable to present its case.'"  Rive v. Briggs of Cancun, Inc., 82 F.

App'x 359, 364 (5th Cir. 2003) (quoting Parsons & Whittemore Overseas Co., 508 F.2d at 975).

It is not enough that Venezuela provides evidence of unequal time; it must show exactly what it

needed more time for, and how the denial of extra time prevented it from presenting its case.

See, e.g., Rive, 82 F. App'x at 364 ("Defendants did not present the district court with any

additional information or evidence that [the party] would have presented at the arbitration had it

had the opportunity to do so. Accordingly, the district court properly rejected the argument that

the [party] did not have the opportunity to participate meaningfully . . . .").

 Respondent points to courts that have vacated arbitral awards for violations of due

process.  Yet those courts have done so after the moving party showed how the procedural

inequality meant that it was "unable to present its case."  See, e.g., Iran Aircraft Indus., 980 F.2d

at 146 (affirming denial of enforcement of arbitral award after concluding that tribunal had

established lower threshold for party's method of proof before hearing and then applied higher

threshold afterward to reject party's evidence and grant award against it).  Other cases Venezuela

cites are unrelated to the New York Convention and instead applied different F.A.A. rules for

vacating arbitral awards granted <u>in the same districts</u> as the district courts asked to enforce those awards. <u>See</u> MTD at 26; <u>see, e.g.</u> <u>Tempo Shain Corp. v. Bertek, Inc.</u>, 120 F.3d 16, 20 (2d Cir. 1997) (applying 9 U.S.C. § 10 of the F.A.A., which permits "the United States court in and for the district wherein the award was made" to vacate that award where fundamental fairness is violated). Either way, Venezuela has provided neither an explanation about how the unequal timing affected its ability to present its case nor precedents showing that a denial of equal time alone constitutes the lack of a "meaningful opportunity to be heard." On this basis, the Court rejects Venezuela's first due-process claim.

### 2. *Lack of Opportunity to Respond to Damages Adjustment*

Respondent's next contention is that the Tribunal deprived it of due process by denying it a "meaningful opportunity to address issues that arose for the first time in or after the Award." MTD at 27. In particular, it alleges that the Tribunal "disregarded" the parties' joint agreement on the model to calculate damages. <u>See id.</u> at 28. Before addressing the merits of such a position, the Court notes that "[i]n making evidentiary determinations, an arbitrator need not follow all the niceties observed by the federal courts. The arbitrator need only grant the parties a fundamentally fair hearing." <u>Lessin v. Merrill Lynch, Pierce, Fenner & Smith, Inc.</u>, 481 F.3d 813, 816 (D.C. Cir. 2007) (citations and internal quotation marks omitted). Indeed, "a federal court may vacate an award only if the panel's refusal to hear pertinent and material evidence prejudices the rights of the parties to the arbitration proceedings." <u>Id.</u> at 818 (citation and internal quotation marks omitted).

Venezuela contends that the Tribunal disregarded the Discounted Cash Flow (DCF) model that both parties' experts relied upon in making assertions about the proper valuation of a damages award to Gold Reserve. <u>See</u> MTD at 28. At first glance, such an argument appears to

be belied by the Award itself: the Tribunal clearly stated in its Award that "the Tribunal prefers to use the DCF model only."  Arb. Award, ¶ 831.  Scrutinizing the Award more closely, the Court understands Respondent's complaint to be more specific — namely, that the Tribunal applied the DCF model incorrectly.  Instead of internally adjusting the DCF model to account for, among other things, geopolitical risks, see id., ¶ 831, the Tribunal appears to have first applied the unadjusted DCF model, see id., and then manually adjusted the resulting calculation.  See id., ¶ 842.  Venezuela contends that this "had a dramatic effect on the valuation, including most notably in regard to the impact on the valuation of delay in commencement of production and the country risk premium."  MTD at 28.  Not surprisingly, Gold Reserve contests Respondent's depiction of the Tribunal's actions, stating that Venezuela simply "disagrees with the amount of damages awarded by the Tribunal."  Opp. at 23.

Once more, Gold Reserve has the better argument.  In assessing damages, the Tribunal's published Award devotes several dozen pages to weighing the arguments of the parties and their multiple experts — both written reports and testimony given during the damages hearing on October 15-16, 2013 — concerning the calculation of damages, see id., ¶¶ 670-848, including arguments from Venezuela's expert that "the mine was completely uneconomic to operate" and thus the concessions had a "negative valuation."  Id., ¶ 833.  Given the thoroughness with which the Tribunal weighed the evidence, and the fact that it sided with both parties on specific issues related to damages, it can hardly be found to have "refus[ed] to hear pertinent and material evidence."  Lessin, 481 F.3d at 818.  Venezuela may disagree with the approach that the Tribunal took in assessing damages, but it nowhere alleges that arguments it sought to make during the joint-expert procedure were not admitted.  While Venezuela contends that the Tribunal "disregarded the DCF model in favor of making gross estimations . . . without giving Venezuela

the opportunity to present argument on them," see MTD at 13-14, it had a full opportunity to make its case as to the preferred approach to calculating damages — it simply did not prevail before the Tribunal.

Nor will it here.  There is a reason why federal courts grant substantial deference to the evidentiary findings of arbitral tribunals: these bodies have greater resources, expertise, and access to evidence in order to develop factual findings, and federal courts are poorly situated to second-guess their conclusions.  The Arbitral Tribunal conducted a two-day joint-expert-procedure hearing concerning issues related to valuation and damages, and gave counsel for both sides the opportunity to give opening and closing statements.  See Arb. Award, ¶¶ 175, 200.  The Award identifies 44 individuals who were present during this hearing, see id., ¶ 200, and it permitted the parties to submit further post-hearing briefs in the months afterward.  See id., ¶¶ 206-12.  Nothing about this procedure appears to be a gross departure from the due-process standard required, and the Court's role is not to second-guess the evidentiary findings of the Tribunal.  See, e.g., Slaney v. Int'l Amateur Athletic Fed'n, 244 F.3d 580, 593 (7th Cir. 2001) (confirming arbitration award over objections that arbitral tribunal did not properly weigh evidence that was nevertheless heard by the tribunal).  The Court, in sum, finds no due-process violation here.

### 3.  *Meaningful Opportunity to Correct Award*

Venezuela's final argument on this score is that it was deprived of a meaningful opportunity to correct the Award. This, too, is unpersuasive.  The ICSID Additional Facility Rules permit parties to request the correction of "any clerical, arithmetical, or similar errors" in an award rendered by a tribunal.  See Additional Facility Rules, art. 56.  To this end, Venezuela requested corrections, alleging "several significant errors of this nature in the Tribunal's Award

. . . ." MTD at 15. It submitted a memorandum requesting that six specific errors in the Award

be corrected, including the error it raised above regarding the application of the DCF model. See

id., Attach. 1 (Declaration of Mélida N. Hodgson), ¶ 21. It then subsequently corrected this

submission, requesting "that the Tribunal ask the experts for both Parties to jointly run the DCF

Model they had agreed upon to obtain the most accurate results using the assumption units the

Tribunal had decided upon." MTD at 15. Both parties responded to the other's request for

corrections on the same day, and Venezuela then sought the opportunity to respond to Gold

Reserve's Reply to Venezuela's request for corrections. See id. at 16. Venezuela does not spell

out what Gold Reserve's alleged new arguments were or why they necessitated a response. In

any case, the Tribunal rejected its request, and Venezuela filed an objection asserting a "breach

of its due process right to adequately present its case and defend itself." Hodgson Decl., ¶ 25.

This challenge was also denied, and the Tribunal ultimately decided that no correction of the

Award was warranted. See MTD at 16. Respondent insinuates that the Tribunal improperly did

so by "uncritically adopt[ing] much of Gold Reserve's arguments against Venezuela's requested

corrections." Id.

      Venezuela's due-process challenge here falls short because — contrary to what it alleges

— it did have the opportunity to raise claims related to damages, including whether and how to

implement the DCF Model in estimating fair value. Gold Reserve correctly notes that issues

related to calculating the DCF Model were not only raised in post-hearing briefing and in

requests for corrections, but also in the hearing itself, something Venezuela also acknowledges in

its Motion to Dismiss. See Opp. at 25; MTD at 28 ("When the Tribunal raised the possibility of

[deviating from the DCF Model] at the hearing . . . ."). The fact that the Tribunal chose not to

implement Venezuela's preferred methodology, however, does not itself constitute a due-process

violation, for the Tribunal was completely within its delegated powers to render the damages

remedy of its choosing.  The Tribunal provided a lengthy, 26-page decision explaining its

reasoning with regard to the parties' requests for corrections.  <u>See</u> MTD, Attach. 2, Annex 18

(Decision Regarding the Claimant's and the Respondent's Requests for Corrections (Dec. 15,

2014)).  Furthermore, arbitral tribunals "enjoy[] wide latitude in conducting an arbitration

hearing. Arbitration proceedings are not constrained by formal rules of procedure . . . ."  <u>Hoteles</u>

<u>Condado Beach, La Concha & Convention Ctr. v. Union De Tronquistas Local 901</u>, 763 F.2d 34,

38 (1st Cir. 1985).  The Court is satisfied that Venezuela had a fair opportunity to present its case

— which it lost on the merits, not as a result of any denial of due process.

     C.  <u>Public-Policy Arguments</u>

     Venezuela's complaints do not end with its due-process allegations; it also asserts that

confirming the Tribunal's award would be contrary to the public policy of the United States.

The New York Convention Article V(2)(b) permits a court to deny enforcement of an arbitration

award if it "would be contrary to the public policy of that country" in which enforcement is

sought.  Venezuela asserts two grounds upon which it believes this to be so.  The first, recycled

from its jurisdictional challenge above, is that the Award was improperly granted to Gold

Reserve when, under Article XII(9) of the BIT, it should have been granted to the "affected

enterprise" — <i>i.e.</i>, the Brisas Company.  <u>See</u> MTD at 30.  The second argument is that the

Award improperly granted punitive damages in contravention of international legal rules.  <u>See</u> <u>id.</u>

at 30-31.

     The New York Convention's public-policy defense to the confirmation of an arbitration

award is "construed narrowly," as courts recognize the presumption that favors upholding

international arbitration awards under the Convention.  <u>See</u> <u>Ministry of Def. & Support for the</u>

Armed Forces of the Islamic Republic of Iran v. Cubic Def. Sys., Inc., 665 F.3d 1091, 1096 (9th Cir. 2011).  Instead, denial is proper only when confirmation "would violate the forum state's most basic notions of morality and justice."  TermoRio, 487 F.3d at 938 (citation and internal quotation marks omitted).

1.   *Proper Entity for Award*

It should go without saying that violations of the most basic notions of morality and justice is a high bar, one that Respondent here falls well short of clearing.  The Court need not rehash the facts discussed above concerning the Tribunal's grant of damages to Gold Reserve Inc., instead of to the Brisas Company, which argument the Court rejected on waiver grounds. See Section III.A.3, *supra*.  In its Motion to Dismiss, Venezuela's only attempt at making an argument with moral suasion is that the United States "has a compelling interest in not sanctioning, or permitting the recognition or enforcement of an Award, that was plainly made in contravention of the treaty the Tribunal was obligated to apply."  MTD at 30.  In considering this issue, the Court bears in mind that U.S. precedents clearly establish that "erroneous legal reasoning or misapplication of law is generally not a violation of public policy within the meaning of the New York Convention."  Karaha Bodas Co., LLC v. Perusahaan Pertambangan Minyak Dan Gas Bumi Negara, 364 F.3d 274, 306 (5th Cir. 2004); see also Chevron Corp. v. Republic of Ecuador, 949 F. Supp. 2d 57, 71 (D.D.C. 2013) (holding that alleged misapplication of law did not violate public policy within meaning of New York Convention without addressing merits of underlying legal question), aff'd sub nom. Chevron Corp. v. Ecuador, 795 F.3d 200 (D.C. Cir. 2015).

Strikingly, Venezuela did not provide an explanation as to why an award to Gold Reserve Inc., instead of to the Brisas Company, actually matters until its Reply brief.  (This, in turn,

necessitated rounds of briefings on whether to grant Gold Reserve a Sur-reply and then, in turn, Venezuela a Sur-surreply, an unusual remedy, to say the least.)  In its Reply, Venezuela states that "creditors with stakes in arbitral awards include the [Venezuelan] tax authorities," and it asserts that had the Award been made to the Brisas Company, it would have been subject to a 34% tax in Venezuela.  See Reply at 6.  Gold Reserve counters in its Sur-reply, however, that the compensation awarded to it was measured net of tax, since the DCF valuation was "calculated after deducting all necessary expenses and taxes that must be paid in executing the business." Sur-reply at 15 (citing Kaczmarek Expert Report).  The expert report for Venezuela acknowledges as much.  See Sur-reply, Exh. 32 to Second Smutny Decl. (Expert Report of Dr. James C. Burrows), ¶ 30 ("In a discounted cash flow (DCF) valuation of a project . . . cash flows include the difference between cash inflows (revenues) and cash outflows (costs), including capital costs, operating costs, and taxes.").  As the Court cannot determine that any tax obligations were "circumvented" by the Tribunal's Award, it is satisfied that confirming the Award will not violate "basic notions of morality and justice."  TermoRio, 487 F.3d at 938.

### 2.  *Improper Award of Punitive Damages*

Venezuela's second public-policy argument is that it would be improper to confirm the Award because it "subjects Venezuela to punitive damages even though the applicable rules of international law . . . forbids [*sic*] such an award" against a state.  See MTD at 30.  Respondent links the BIT, which requires tribunals to follow "applicable rules of international law," see BIT art. XII(7), with various international-law documents that prohibit an award of punitive damages. See MTD at 30-31 (quoting Draft Articles on Responsibility for States for Internationally Wrongful Acts, with Commentaries 111 (2001), available at http://legal.un.org/ilc/texts/instruments/english/commentaries/9_6_2001.pdf).  And although the

Foreign Sovereign Immunities Act permits damages awards against foreign states in the enforcement of an agreement made by that state, see 28 U.S.C. § 1605(a)(6), the FSIA nevertheless prohibits <u>punitive</u> damages awards against such a state.  See <u>id.</u> § 1606 ("[A] foreign state except for an agency or instrumentality thereof shall not be liable for punitive damages . . . .").

Although the Award never expressly mentions punitive damages, Venezuela believes that the Tribunal awarded them implicitly because it mentioned the term "equitable considerations" and noted the "seriousness" of Venezuela's breach of fair and equitable treatment, and the "egregious[ness]" of the number and variety of such breaches.  See MTD at 31 (citing Arb. Award, ¶¶ 615, 668).  Since the Tribunal stated that the seriousness and egregiousness of such breaches would "be duly taken into account when determining the amount of the compensation due to Claimant . . . ," Arb. Award, ¶ 668, Respondent concludes that this is tantamount to granting punitive damages to Gold Reserve.  See MTD at 31.

Unsurprisingly, Gold Reserve disputes this account of the nature of the damages awarded by the Tribunal. It observes that "[n]o mention is made in the Award of 'punitive damages' nor is there any reference to a desire by the Tribunal to 'punish' Venezuela."  Opp. at 27.  Petitioner contends that it was only in the context of providing reparations that would "'eliminate the consequences of the illegal act and re-establish the situation which would . . . have existed if that act had not been committed'" — a permissible basis for awarding damages against a state under international law — that the Tribunal noted both the seriousness and egregiousness of Venezuela's actions.  See Opp. at 27-28 (quoting Arb. Award, ¶ 678).  Nor has Venezuela produced any evidence that the amount ultimately awarded included such a punitive-damages component.  Indeed, it is telling that even the portion of the Award quoted by Venezuela speaks

to the compensatory rather than punitive nature of the Tribunal's award — *viz.*, "when determining the amount of the <u>compensation</u> due to Claimant." Arb. Award, ¶ 668 (emphasis added). While Venezuela is correct that the Tribunal referenced "equitable considerations" in its Award, <u>see</u> id., ¶ 686, it did so expressly to <u>disavow</u> any perception that it might be acting in equity. Instead, it noted that where, as in this dispute,

> the assessment of damages is often a difficult exercise and it is seldom that damages . . . will be able to be established with scientific certainty[,] . . . it is accepted that tribunals retain a certain amount of discretion or "margin of appreciation" . . . . The use of this discretion should not be confused with acting on an *ex aequo et bono* [equitable] basis, even if equitable considerations are taken into account in the exercise of such discretion.

<u>Id.</u> (footnotes omitted). As the Tribunal made clear, then, it did not act on equitable considerations, but it did retain discretion in calculating damages, an inherently difficult exercise given the nature of the dispute. Contrary to Respondent's assertion, the Court finds that the Tribunal identified the seriousness and egregiousness of Venezuela's breaches in order to assess the totality of the losses incurred by Petitioner, <u>not</u> for the purposes of awarding damages on the basis of equitable considerations.

    D.  <u>Stay of Award</u>

    Having rejected Venezuela's due-process and public-policy challenges to the confirmation of the Award, the Court last turns to the country's effort to forestall defeat: its claim that the Court should stay enforcement pending Respondent's appeal before the Court of Appeal in Paris challenging the validity of the Award. <u>See</u> MTD at 33. Because the parties jointly selected that French city as the seat of the arbitration, the arbitral proceedings are governed by French arbitration law and subject to judicial supervision by the Court of Appeal there. <u>See</u> MTD, Attach. 3 (Declaration of Thomas Bevilacqua), ¶ 6. Under the New York

Convention, it is true that district courts have discretion to stay proceedings where "a parallel proceeding is ongoing in the originating country and there is a possibility that the award will be set aside."  Europcar Italia, S.p.A. v. Maiellano Tours, Inc., 156 F.3d 310, 317 (2d Cir. 1998). Noting that "the adjournment of enforcement proceedings impedes the goals of arbitration — the expeditious resolution of disputes and the avoidance of protracted and expensive litigation," however, the Europcar court found that "[a] stay of confirmation should not be lightly granted," and it identified a number of factors courts should consider in evaluating a request for a stay of proceedings.  See id. at 317.

Although the D.C. Circuit has not expressly adopted the Europcar factors, courts in this district have repeatedly drawn on them in determining when a stay of the enforcement of an arbitration award is appropriate.  See, e.g., Chevron Corp., 949 F. Supp. 2d at 71-72; Cont'l Transfert Technique Ltd. v. Fed. Gov't of Nigeria, 697 F. Supp. 2d 46, 59-60 (D.D.C. 2010); G.E. Transp. S.P.A. v. Republic of Albania, 693 F. Supp. 2d 132, 137-38 (D.D.C. 2010).  Given this widespread adoption, and the fact that both parties tailor their arguments to these factors, the Court will follow suit.

Europcar instructs courts to look at:

> (1) the general objectives of arbitration—the expeditious resolution of disputes and the avoidance of protracted and expensive litigation;
>
> (2) the status of the foreign proceedings and the estimated time for those proceedings to be resolved;
>
> (3) whether the award sought to be enforced will receive greater scrutiny in the foreign proceedings under a less deferential standard of review;
>
> (4) the characteristics of the foreign proceedings including (i) whether they were brought to enforce an award (which would tend to weigh in favor of a stay) or to set the award aside (which would tend to weigh in favor of enforcement); (ii) whether they were

> initiated before the underlying enforcement proceeding so as to raise concerns of international comity; (iii) whether they were initiated by the party now seeking to enforce the award in federal court; and (iv) whether they were initiated under circumstances indicating an intent to hinder or delay resolution of the dispute;
>
> (5) A balance of the possible hardships to the parties . . . ; and
>
> (6) Any other circumstance that could tend to shift the balance in favor of or against adjournment . . . .

Id. at 317–318.  Notably, the Europcar court held that "[b]ecause the primary goal of the Convention is to facilitate the recognition and enforcement of arbitral awards, the first and second factors on the list should weigh more heavily in the district court's determination."  Id. at 318.  In considering each of these factors, the Court follows this emphasis.

The first factor, the general objectives of arbitration, weighs strongly in favor of confirmation.  The BIT, ICSID Additional Facility Rules, and New York Convention all require immediate satisfaction of arbitral awards.  See BIT, art. XII(10); see generally Additional Facility Rules, arts. 52-53; New York Convention, art. III.  Gold Reserve first filed its request for arbitration in October 2009 — over six years ago — and the dispute with Venezuela involves investments made as far back as 1992.  Given these delays, the goal of ensuring "expeditious resolution of disputes" counsels against a stay.  See, e.g., G.E. Transp., 693 F. Supp. 2d at 139 (holding that delay of four years after initial notice of arbitration "plainly weigh[ed] in favor of confirmation rather than an adjournment").

The second factor — the status of the foreign proceedings and the estimated time for their resolution — also weighs in favor of Gold Reserve.  While the Paris Court of Appeal is currently considering Venezuela's petition to set aside the Award, that appeal is not likely to be resolved soon.  Although Venezuela pled in its Motion to Dismiss that the judgment was "likely to be received before the end of 2015," it recently notified the Court that oral arguments have now

been postponed to February 2016.  See Notice of Change of Schedule in Paris Court of Appeal.

What it omits, and what Gold Reserve pointedly raises in its Opposition, is that this is because

Venezuela sought a postponement in the hearing, and there is no guarantee it will not do so

again.  See Opp. at 35; id. Attach. 23 (Declaration of Christian Dargham), ¶¶ 34-38.  As counsel

for Gold Reserve notes, moreover, the judgment rendered by the Paris Court of Appeal can be

further appealed to the French Supreme Court, whose ultimate resolution of the case may not

come for at least another sixteen months after the appeal begins.  See Dargham Decl., ¶ 39.  As

no final resolution appears imminent, the Court finds this factor also weighs in favor of Gold

Reserve.

In turning to the lesser four Europcar factors, the Court begins with the third — whether

the award will receive greater scrutiny in foreign proceedings.  The call here is close.  On review,

the Paris Court of Appeal examines the Tribunal's findings on jurisdiction de novo, see Opp. at

35, a standard that subjects the Award to more exacting scrutiny than this Court's more

deferential examination.  On the other hand, the decision may be set aside only on grounds

narrower than those of Article V of the New York Convention, and Venezuela brings the same

challenges before the Paris Court of Appeal that it does before this Court.  See Opp. at 35-36;

Dargham Decl., ¶¶ 9-11.  Venezuela has provided no compelling reason to believe that the Paris

Court of Appeal, relying on French laws governing the appeal of arbitration awards, will come to

a contrary judgment, and so this factor weighs, at best, only marginally in its favor.

Though styled as a single factor, the fourth actually involves several related but distinct

considerations pertaining to the foreign proceeding.  The first is the posture in which it was

brought.  If brought to enforce the award, the Europcar court found this would tend to weigh in

favor of a stay, see 156 F.3d at 318, presumably because a foreign proceeding brought to enforce

an award could lead to competing enforcement orders and duplicative litigation.  If it was brought to set aside the award, however, the Europcar court found this would weigh in favor of enforcement, see id., presumably because a foreign proceeding brought to set the award aside might frivolously delay proper enforcement of the Award.  A similar rationale motivates another of the fourth-factor considerations: whether the foreign proceeding was initiated by the party now seeking to enforce the award in federal court.  See id.  Here, Venezuela initiated the appeals process in Paris, while Gold Reserve brought this suit, and Venezuela seeks to set aside, not enforce, the Award.  Both considerations thus weigh in favor of the Court's enforcing the award.

The fourth factor also recommends consideration of whether the foreign proceedings in France were initiated before the underlying enforcement proceeding "so as to raise concerns of international comity."  Id.  This component seems to favor Venezuela, as the action there was indeed filed before Gold Reserve sought enforcement in this Court.  Another consideration is whether the foreign proceeding was "initiated under circumstances indicating an intent to hinder or delay resolution of the dispute," id., and here the evidence is more mixed.  Although the Court will not go so far as to question Venezuela's intent in appealing the Award, as a practical matter, the proceedings have had the effect of delaying resolution of the dispute, as the appeals process has further dragged out what has already been an almost-six-year-long adjudication between the parties.  As mentioned above, the Paris court recently postponed the hearing on the appeal at the behest of Venezuela.  In light of these various considerations, some of which point in favor of each party, the Court finds that this factor does not counsel either a stay or an enforcement of the Award.

The fifth factor addresses the balance of possible hardships to the parties.  Not surprisingly, both sides argue that this tips in their favor.  Venezuela's primary hardship

argument is that the over-$700-million Award will draw "badly needed funds from the public treasury" of the state.  <u>See</u> MTD at 43.  Such hardship, however, is at least as significant for Gold Reserve, which the Tribunal found had been "unjustifiably and unlawfully stripped of its investment by the Venezuelan government," from which it has waited over eight year to recoup its losses.  <u>See</u> Opp. at 37.  In its Reply, Venezuela additionally emphasizes that it will have to spend "significant time and resources to defend against a plethora of enforcement actions, only to have the Award subsequently set aside by the Paris Court," including "further litigation actions to attempt to recover any Venezuelan state assets that Gold Reserve may succeed in attaching."  <u>See</u> Reply at 23.  Gold Reserve nevertheless counters that "Venezuela's admitted lack of liquidity and potential inability to meet its Award obligation strongly favors immediate confirmation so that Gold Reserve can begin to enforce the Award as soon as possible."  Opp. at 37.  Although both points carry some weight, on balance this factor seems to weigh at least as strongly for Gold Reserve as it does for Venezuela.

The sixth and final factor is a catch-all "any other circumstances" consideration that might shift the balance.  Both parties point to holdings by other bodies as evidence of the correctness of their positions.  Gold Reserve raises under this grab-bag factor the point that the Paris Court of Appeal has already rejected Venezuela's application to annul the Award, <u>see</u> Opp. at 38, while Venezuela counters in its Reply that the Court of Appeal of Luxembourg granted a stay of a similar enforcement petition over Gold Reserve's opposition.  <u>See</u> Reply at 24.  The Court believes neither outcome is of particular relevance here.  As Respondent notes, the application to annul was governed by different standards under French law, including a narrow set of considerations that do not directly map on to the issues and legal standards at play here.  <u>See</u> Reply at 24. Venezuela, likewise, provides no explanation as to the reasoning behind the

Luxembourg Court's decision to stay the enforcement, other than that it anticipated that the appeal would "take place in a few months' time . . . ." Reply at 19.  As discussed above, this Court does not find that fact persuasive in light of Venezuela's successful effort to postpone the hearing, coupled with the prospect of an additional appeal that could delay the ultimate resolution even further.  The Europcar factors are silent as to the relevance of the outcome of enforcement actions in other jurisdictions, and so absent a more persuasive explanation as to why that court's determination should have influence here, this Court declines to give it much weight.

Europcar factors one and two — the ones relied on most heavily by the that court — both favor Gold Reserve, while the totality of the other four at least marginally favors Gold Reserve as well.  Taken together, then, the Europcar analysis supports an immediate confirmation, and so the Court will follow that path.

**IV.    Conclusion**

For the aforementioned reasons, the Court will grant Gold Reserve's Petition and order confirmation of the Award. A separate Order consistent with this Opinion will be issued this day.

/s/ James E. Boasberg
JAMES E. BOASBERG
United States District Judge

Date:  November 20, 2015